**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

---------------------------------------------------------------x
                            :

In re                              :    Chapter 11
                            :

OAKLAND PHYSICIANS MEDICAL CENTER,:   No.15-51011-wsd
L.L.C.  d/b/a  DOCTORS'  HOSPITAL  OF:
MICHIGAN, a Michigan limited liability company, :
                            :

        Debtor.             x
----------------------------------------------------------------

# SECOND AMENDED COMBINED PLAN OF REORGANIZATION
# AND DISCLOSURE STATEMENT

Proponent:     Save the Hospital Group

Dated:        November 17, 2015

## PLAN OF REORGANIZATION

On July 22, 2015, Oakland Physicians Medical Center, L.L.C. d/b/a Doctors' Hospital of Michigan (the "Debtor" or the "Hospital"), filed a voluntary petition under chapter 11 of the Bankruptcy Code.

Save the Hospital Group ("Proponent") proposes the following Plan of Reorganization ("Plan") under the provisions of Title 11 of the United States Code ("Bankruptcy Code"). Save the Hospital Group includes Drs. Greg and Ted Naman, who are supported by the Detroit Medical Center (the "DMC"), see **Exhibit A,** attached hereto.

This is a competing Plan to the Plan proposed by Sant Partners, LLC ("Sharma Plan"). The principal problem with the Hospital's operation is underutilization. Proponent will increase significantly the utilization of the Hospital by various innovative strategies that are set forth in Proponent's disclosure statement, which immediately follows this Plan. Proponent's Plan will bring in a new medical team with nearly two decades of experience in medical management.

1. **GENERAL OVERVIEW OF THE PLAN**.

In accordance with the Plan, Proponent proposes to satisfy creditor claims and capital needs of the Hospital by providing an estimated amount of $6,000,000 on the Effective Date, and from post-confirmation income earned by the Hospital through increased utilization. The Proponent's Plan is based on its belief that the interests of creditors and the public will best be served if Debtor is allowed to reorganize its debts.

## 2. DEFINITIONS, RULES OF INTERPRETATION.

**2.1  Defined Terms.**  All capitalized terms used in this Plan shall have the meaning given them in this Plan or the Sant/Sharma Plan, unless the context clearly requires otherwise.

**2.2  Rules of Construction.**  The rules of construction used in §102 of the Bankruptcy Code shall apply to the construction of this Plan.  Unless the context clearly requires otherwise, words in any gender shall include all other gender, masculine, feminine and neutral and singular shall include the plural and plural shall include the singular.

## 3. CLASSIFICATION OF CLAIMS AND INTERESTS.

**3.1  Classification Summary.**  The general Classes of Claims and Interests under the Plan are:

> **(1)  Unclassified** - Administrative Claims
>
> **(2)  Class 1** - Priority Claims
>
> **(3)  Class 2** – Other Secured Claims
>
> **(4)  Class 3** – Crittenton Secured Claims
>
> **(5)  Class 4**—CMS Overpayment Claims
>
> **(6)  Class 5**— Michigan Department of Health and Human Services ("DHHS") Overpayment Claims
>
> **(7)  Class 6**—WRC Secured Claims
>
> **(8)  Class 7**—General Unsecured Claims
>
> **(9)  Class 8**-  Interests

**3.2  Description of Classes.**  The Classes are more particularly described as follows:

> **(1)  Unclassified Claims: Administrative Claims.**  These Claims consist of all Claims for the actual and necessary costs and expenses of administration entitled to priority in accordance with §§ 503(b) and 507(a)(1) of the Bankruptcy Code, including all Claims for professional compensation and expenses entitled to priority, during the pendency of the Chapter 11 Case.

3

*(2)  Class 1 Claims: Priority Claims.*  Class 2 Claims consist of all Claims entitled to priority under §507(a)(2) through §507(a)(9) of the Bankruptcy Code, including any claims for unpaid taxes to the extent they are entitled to such priority by law.

*(3) Class 2 Claims: Other Secured Claims.*  Class 2 Claims consist of secured claims other than Class 3 to 6 Claims. Each of Class 2 claims shall constitute a separate Class numbered 2.1, 2.2, 2.3, etc.

*(4) Class 3 Claims. Crittenton Secured Claims.* Class 3 Claims consist of secured claims under the Crittenton Loan Documents.

*(5) Class 4 Claims. CMS Overpayment Claims*.  Class 4 Claims consist of secured claims for CMS overpayments.

*(6) Class 5 Claims. Michigan Department of Health and Human Services ("DHHS") Overpayment Claims*.  Class 5 Claims consist of secured claims of the State of Michigan for Medicaid overpayments and unpaid QAAP taxes.

*(7) Class 6 Claims. WRC Secured Claims*. Class 6 Claims consist of secured claim of the WRC, a water utility.

*(8)  Class 7 Claims: General Unsecured Claims.*  Class 7 Claims consist of the Claims of all general unsecured creditors.

*(9) Class 8 Interests: Equity*. Class 8 Interests consist of the Interests of the equity security holders.

4. IMPAIRMENT.

   *4.1 Unimpaired*.  The Claims in Class 1 and Class 2 are not Impaired.

   *4.2 Impaired.*  The Claims in Classes 3 to 8 are Impaired.

5. PROVISIONS FOR TREATMENT OF CLAIMS.

   *5.1 Unclassified Claims: Administrative Claims.*

   *(1) Unimpaired.*  Class 1 Claims are not Impaired.

   *(2)  Treatment.*  The holders of an Allowed Administrative Claim shall receive either:  (i) with respect to Administrative Claims that are Allowed Claims on the Effective Date, the amount of such Claimant's Allowed Claim in one cash payment on the Effective Date from the Debtor; (ii) with respect to

4

Administrative Claims that become Allowed Claims after the Effective Date, the amount of such Allowed Claim in one cash payment within 30 days after such claim becomes an Allowed Administrative Claim to be paid in one cash payment by the Debtor; or (iii) such other treatment agreed upon by the Debtor and such Claimant.

*(3) Professional Fee Claims*. Each Professional employed by the Debtor during the Chapter 11 Case is required to (A) submit a written estimate of its Professional Fee Claim through the Effective Date to the Debtor within 5 days after the Confirmation Date; and (B) file with the Bankruptcy Court a final application for its Professional Fee Claim within 30 days after the Effective Date and to serve notice thereof on all parties entitled to such notice. The failure to timely submit such estimate or file any such application will result in the Professional Fee Claim being forever barred. A Professional Fee Claim with respect to which an application is properly filed shall become an Allowed Administrative Claim only to the extent allowed by Final Order of the Bankruptcy Court.

*(4) Professional Retainers.* Each Professional employed by the Debtor during the Chapter 11 Case that holds a pre-petition retainer from the Debtor ("Retainer") shall be entitled to use such retainer to pay the outstanding balance of its Professional Fee Claim upon allowance of such claim by the Bankruptcy Court by Final Order.

*5.2 Class 1 Claims: Priority Claims.*

*(1) Unimpaired.* Class 1 Claims are Unimpaired.

*(2) Treatment.* For (A) any Priority Tax Claim that is subsequently filed for which the Debtor is responsible for the period during which the Debtor's Chapter 11 Case is being administered, or (B) any other Taxes of the Debtor payable pursuant to Section 507(a)(8) of the Bankruptcy Code, the Allowed Amount of such Claim will be payable in equal monthly payments over a period of five (5) years from the Effective Date. Monthly payments shall commence on the fifteenth day of the first month following the Effective Date, and shall include interest at the rate of three percent (3%) per annum.

*(3) Treatment of Michigan Unemployment Insurance Agency*. This Claim totals $1,113,854.77, a portion of which is secured, but all shall be given priority status. The Claim accrues interest at 12% per annum under MCL 421.15. The Claim will be paid in full over five (5) years, and the secured amount will be reinstated.

*5.3 Class 2 Claims: Other Secured Claims*

*(1) Unimpaired*. The Class 2 Claims are Unimpaired.

*(2) Treatment*. These Claims shall either be (i) Reinstated, (ii) paid in Cash, (iii) satisfied by surrender of collateral to the Holder of the Claim, or (iv) treated on such other terms and conditions as may be agreed upon between Proponent/Debtor and the Holder of the Claim.

5

*5.4 Class 3 Claims: Crittenton Secured Claims*

*(1) Impaired*.  The Class 3 Claims are Impaired.

*(2) Treatment*.  The Crittenton Secured Claim shall be Reinstated, and paid in full in equal monthly installments over ten (10) years with interest at three percent (3%) per annum; provided that it is a condition precedent to the Effective Date that Proponent/Debtor and Crittenton have agreed, in form and substance acceptable to Proponent, whether that certain Graduate Medical Education Affiliation Agreement between Crittenton and the Debtor dated April 14, 2011 will be assumed and whether any new Medicare graduate medical education affiliation agreements will be proposed.

*5.5 Class 4 Claims: CMS Overpayment Claims*.

*(1) Impaired.*  The Class 4 Claims are Impaired.

*(2) Treatment.*  The CMS Overpayment Claim shall re Reinstated and the participation agreements between the Debtor and CMS shall be deemed assumed; provided that it is a condition precedent to the Effective Date that Proponent/Debtor and CMS have agreed, in form and substance acceptable to Proponent to a repayment plan with respect to the CMS Overpayment Claim.

*5.6. Class 5 Claims: Michigan Department of Health and Human Services ("DHHS") Overpayment Claims*

*(1) Impaired.*  The Class 5 Claim is Impaired.

*(2) Treatment*.  The DHHS Overpayment Claim shall re Reinstanted and the participation agreements between the Debtor and DHHS shall be deemed assumed; provided that it is a condition precedent to the Effective Date that Proponent/Debtor and DHHS have agreed, in form and substance acceptable to Proponent to a repayment plan with respect to the DHHS Overpayment Claim.

*5.7 Class 6 Claim: WRC Secured Claim*.

*(1) Impaired.*  The Class 6 Claim is Impaired.

*(2) Treatment*. The WRC shall receive, in full and final satisfaction release, and discharge of, and in exchange for, the WRC Secured Claim, sixty (60) equal fixed monthly payments of $13,237.76 over a five year period commencing on the first day of the month following the Effective Date. The WRC Secured Claim shall not accrue interest for the period after the Petition Date.

6

***5.8  Class 7 Claims: General Unsecured Claims.***

    ***(1)  Impaired.***  The Class 7 Claims are Impaired.

    ***(2)  Treatment.***  Class 3 Creditors shall be paid 10% of the their Claims over five (5) years, without interest, as follows: 1% of the amount of their Allowed Claimshall be paid fifteen (15) days after the Effective Date, and then 2% in years 2, 3 and 4 on the anniversary of  the Effective Date, and 3% in year 5 on the anniversary of the Effective Date..

    ***5.9  Class 8 Interests: Equity Security Holders***.

    ***(1)  Impaired***.  The Class 8 Interests are Impaired.

    ***(2)Treatment***.  The equity security holders shall not retain their ownership interest upon confirmation of this Plan and such interestsshall be cancelled.  Upon confirmation, Proponent's constitutents will own 100% of Debtor's equity.

## 6.  MEANS OF IMPLEMENTATION OF THE PLAN.

    ***6.1 Payments***.  The Proponent proposes to satisfy creditor claims from an estimated amount of $3.5 million to be provided by Proponent on the Effective Date and from income earned by the Hospital through continued operations.

    ***6.2  De Minimis Payments.***  No distribution of less than fifty dollars ($50.00) shall be required to be made to any holder of an allowed unsecured claim.  Instead, the Debtor shall have the option of retaining such funds to be distributed when the amount due any such creditor is fifty dollars ($50.00) or more, or at the time of final distributions under the Plan.

    ***6.3 Documents.***  Proponent and/or Debtor will execute and deliver all documentation to the Bankruptcy Court and to all parties in interest who are entitled to receive the same as required by the terms of the Plan and the Bankruptcy Code.

    ***6.4 Other Actions.***  Proponent and/or Debtor shall take such other action as necessary to satisfy the terms and requirements of the Plan and the Bankruptcy Code, including payment of U.S. Trustee fees until the Chapter 11 Case is closed.

    .  ***6.5 Objections to Claims***.  The Proponent and/or Debtor shall have the right to file, prosecute and settle any objections to and requests for §502(c) estimation of Claims of Creditors under Unclassified Claims and Classes 1 through 7.  All objections to and requests for estimation of Claims shall be filed no later than 90 days after the Effective Date, unless otherwise ordered by the Bankruptcy Court.  The rights of the Proponent and/or Debtor to object to or request estimation of Claims of Creditors in Unclassified Claims and Classes 1 through 7 shall be fully preserved by this Plan, and the failure to file an objection or request for estimation prior to the Effective Date shall not waive or affect such rights.

***6.6 Late Filed Claims/Disallowed Claims***.  No payment shall be made on any Claim if the Claimant filed its proof of claim after the Bar Date, unless otherwise ordered by the Bankruptcy Court.  No payment shall be made on any Disallowed Claim.

7**. UNEXPIRED LEASES AND EXECUTORY CONTRACTS**.

   ***7.1 Rejection of Executory Contracts***.  All prepetition executory contracts and leases to which Debtor is a party and which have not expired or terminated by their own terms shall be deemed rejected as of the Confirmation Date, except as expressly provided in a pleading to be filed by Proponent on or before the date of the Confirmation Hearing of this Plan.

   ***7.2 Damage Claim***.  Claims for damages, if any, suffered by any person or entity as party to any rejected executory contract or lease shall be included in Class 7, provided that proofs of claims for such damages are filed with the Bankruptcy Court and served on the Proponent within 30 days after the Confirmation Date, which is the deemed date of such rejection.  The Proponent shall file any objection to such proof of claim for damages within 90 days after receipt of such proof of claim, unless otherwise ordered by the Bankruptcy Court.

8**. DISCHARGE/INJUNCTIONS.**

   ***8.1 Discharge***.  Pursuant to this Plan and the Confirmation Order, and except as provided for in this Plan, the rights afforded in this Plan and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Interests of any nature whatsoever against the Debtor and any of the Debtor's property; and, except as otherwise provided in this Plan, upon the Effective Date, the Debtor shall be deemed discharged and released under §1141 of the Bankruptcy Code from any and all Claims and Interests, including but not limited to demands and liabilities that arose before the Effective Date, and all debts of the kind specified in §§ 502(g), 502(h), or 502(i) of the Bankruptcy Code, whether or not (a) a proof of claim or interest based upon such debt is filed or deemed filed under §501 of the Bankruptcy Code; (b) a Claim based upon such debt is allowed under §502 of the Bankruptcy Code; or (c) the holder of a Claim based upon such debt or Interest has accepted the Plan.  Except as provided in the Plan, the Confirmation Order shall be a judicial determination of discharge of all liabilities of the Debtor.  As provided in §524 of the Bankruptcy Code, such discharge shall void any judgment against the Debtor at any time obtained to the extent it relates to a Claim or Interest discharged, and shall operate as an injunction against the prosecution of any action against the Debtor, or its propertyto the extent it relates to a Claim or Interest discharged.

   ***8.2 Permanent Injunction.***

      *(1) PURSUANT TO THIS PLAN AND THE CONFIRMATION ORDER, EXCEPT AS EXPRESSLY PROVIDED IN THE PLAN, AT ALL TIMES ON AND AFTER THE EFFECTIVE DATE, ALL PERSONS WHO HAVE BEEN, ARE, OR MAY BE HOLDERS OF CLAIMS AGAINST THE DEBTOR ARISING PRIOR TO THE EFFECTIVE DATE, AND ALL CREDITORS SHALL BE ENJOINED FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST OR*

*AFFECTING THE DEBTOR, THE ESTATE, OR ITS PROPERTY, WITH RESPECT TO SUCH CLAIMS OR INTERESTS (OTHER THAN ACTIONS BROUGHT TO ENFORCE ANY RIGHTS OR OBLIGATIONS UNDER THE PLAN):*

*(a)    COMMENCING, CONDUCTING OR CONTINUING IN ANY MANNER, DIRECTLY OR INDIRECTLY ANY SUIT, ACTION, OR OTHER PROCEEDING OF ANY KIND AGAINST THE DEBTOR, THE ESTATE, OR THEIR PROPERTY (INCLUDING, WITHOUT LIMITATION, ALL SUITS, ACTIONS, AND PROCEEDINGS THAT ARE PENDING AS OF THE EFFECTIVE DATE, WHICH SHALL BE WITHDRAWN OR DISMISSED WITH PREJUDICE);*

*(b)    ENFORCING, LEVYING, ATTACHING, COLLECTING, OR OTHERWISE RECOVERING BY ANY MANNER OR MEANS WHETHER DIRECTLY OR INDIRECTLY ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE DEBTOR, THE ESTATE, OR THEIR PROPERTY, INCLUDING THEIR ASSETS;*

*(c)    CREATING, PERFECTING, OR OTHERWISE ENFORCING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY LIEN AGAINST THE DEBTOR, THE ESTATE, OR THEIR PROPERTY, INCLUDING THEIR ASSETS;*

*(d)    ASSERTING ANY RIGHT OF SUBROGATION, OR RECOUPMENT OF ANY KIND, DIRECTLY OR INDIRECTLY AGAINST ANY OBLIGATION DUE THE DEBTOR, THE ESTATE, OR THEIR PROPERTY, INCLUDING THEIR ASSETS; AND*

*(e)    PROCEEDING IN ANY MANNER IN ANY PLACE WHATSOEVER THAT DOES NOT CONFORM TO OR COMPLY WITH THE PROVISIONS OF THE PLAN.*

*8.3  Exculpation and Limitation of Liability*. None of the Exculpated Parties (as defined below) shall have or incur any liability to any Person for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, the Combined Disclosure Statement and Plan, the transactions contemplated by or described in the Transaction Documents, the formulation, negotiation, or implementation of this Plan or the Transaction Documents, the pursuit of Confirmation of this Plan, the operation of the Debtor during the Chapter 11 Case, the Confirmation of this Plan, the consummation of this Plan or the Transaction Documents, or the administration of Chapter 11 Case or this Plan or the property to be distributed under this Plan, except for acts or omissions that are the result of fraud or willful misconduct; provided, however, that the foregoing exculpation and limitation of liability shall not apply to and shall not operate to waive, release, or exculpate any Claims or causes of action arising from or related to the rights and obligations under this Plan, the Transaction Documents, and the contracts, instruments, releases, and other agreements or documents delivered hereunder or contemplated hereby and thereby. Without limiting the generality of the foregoing, Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under this Plan.  The term "Exculpated Parties" means each of the following in their capacity as such (a) the Debtor, (b) the Reorganized Debtor, (c) the Creditors' Committee, (d) the members of the Creditors' Committee, (e) the Proponent, (f) the Chapter 11 Trustee; (g) the Patient Advocate, and (h) for each of the foregoing, each such

9

Person's current equity holders, including shareholders, partnership and limited partnership interest holders, and limited liability company membership interest holders, affiliates, partners, subsidiaries, members, officers, directors, managers, principals, employees, agents, managed funds, advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, together with their respective predecessors, successors, and assigns (in each case, solely in their capacity as such).

9. **EFFECT OF CONFIRMATION OF THE PLAN**.

9.*1 Vesting of Property*.   On the Effective Date, the Debtor shall be vested with the property of the Debtor and Estate as provided in the Plan, free and clear of all claims, liens, encumbrances, charges, and other interests of Creditors and shall thereafter hold, use, disburse, and otherwise deal with such property in the manner set forth in the Plan.

9.*2   Treatment of Contingent, Disputed or Unliquidated Claims*.   Until such time as a contingent, disputed, or unliquidated Claim becomes fixed and allowed, such Claim shall be treated as contested and shall not be entitled to vote on the Plan or receive distributions under the Plan, unless and until it is allowed by the Bankruptcy Court for the purposes of voting or distribution, as applicable.

9.*3 Permanent Injunction*.   *THE CONFIRMATION ORDER SHALL PROVIDE, AMONG OTHER THINGS, THAT ALL CREDITORS AND PERSONS ARE PERMANENTLY ENJOINED ON AND AFTER THE EFFECTIVE DATE AS SET FORTH IN SECTION 8.2 OF THE PLAN.*

9.*4   No Preclusive Effect on Rights of Action/Avoidance Actions*.   All Rights of Action and Avoidance Actions of the Debtor and Estate are expressly preserved by this Plan, and nothing contained in this Plan, the Confirmation Order, or the Disclosure Statement shall have the effect of barring, releasing, prejudicing, impacting or waiving any of the Rights of Action or Avoidance Actions under the doctrines of res judicata, collateral estoppel, equitable estoppel, judicial estoppel, or any other legal or equitable doctrines of preclusive effect.

10. **RETENTION OF JURISDICTION**.

*10.1   Broad Retention*.   Notwithstanding entry of the Confirmation Order, the occurrence of the Effective Date or consummation of the Plan, the Bankruptcy Court shall retain jurisdiction post-confirmation to the full extent that it is legally permissible, including all jurisdiction necessary to ensure that the provisions of the Plan are carried out.

*10.2   Other Specific Purposes*.   The Bankruptcy Court will also retain jurisdiction post-confirmation for the following specific purposes:

*(1)*   to determine any controversies and disputes regarding interpretation and implementation of the Plan;

10

*(2)* to determine any controversies, disputes, and issues arising under or in connection with the Plan,;

*(3)* to enter orders in aid of this Plan including, without limitation, appropriate orders to protect the Debtor, and other Persons from actions prohibited under this Plan;

*(4)* to authorize any other action, transaction or proceeding referred to or as set forth in the Plan, upon motion of the Debtor;

*(5)* to conduct any litigation brought by the Debtor;

*(6)* to authorize distributions to creditors, and to adjudicate any disputes regarding such distributions or creditors entitled to distributions, upon motion of the Debtor;

*(7)* to authorize the settlement, compromise or abandonment of any assets, upon motion of the Debtor;

*(8)* to enter such Orders, including injunctions, as are necessary to enforce the title, rights, and powers of the Debtor;

*(9)* to enforce the permanent injunctions set forth in this Plan, to resolve all actions involving the scope and effect of such permanent injunction, and the Confirmation Order, including determinations of whether such injunction was violated and penalties where required;

*(10)* to determine requests for payment of Claims entitled to priority under the Bankruptcy Code, including compensation of and reimbursement of expenses of parties entitled thereto;

*(11)* to determine any and all applications, adversary proceedings, and contested or litigated matters pending on or brought after the Effective Date;

*(12)* to allow, disallow, estimate, liquidate or determine any Claim against the Debtor and to enforce any order requiring the filing of any such Claim by the Bar Date;

*(13)* to determine any and all issues regarding the existence, assumption or rejection of executory contracts or leases, and to hear and determine, and if need be to liquidate, any and all Claims arising therefrom;

*(14)* to decide issues concerning federal, state or local tax liability, reporting and withholding which arise in connection with the Debtor;

*(15)* to correct any defect, cure any omission, or reconcile any inconsistency in this Plan, or the Confirmation Order, as may be necessary to carry out the purposes and intent of the Plan;

11

*(16)* to modify this Plan after confirmation pursuant to the Bankruptcy Code; and

*(17)* to enter a final decree closing the Chapter 11 Case.

## 11. EFFECTIVE DATE AND CONSUMMATION.

**11.1 Prior to the Effective Date**. The following acts and actions shall have occurred prior to, and are conditions of, the Effective Date:

*(1)* The Confirmation Order, in form and substance satisfactory to the Debtor, shall have been entered and shall have become a Final Order.

*(2)* All actions, documents, and agreements necessary to implement the Plan, and the transactions contemplated thereby, shall have been effected or executed, except to the extent waived in writing by the Proponent. This provision includes, without limitation, the condition precedent that as to Class 2 Secured Claims, the Proponent and the Claimants, shall have agreed to a payment plan or other disposition of such Claims.

**11.2 Effective Date**. The Effective Date shall be a Business Day on or after the Confirmation Date specified by Proponent on which (a) no stay of the Confirmation Order is in effect and (b) the conditions to effectiveness of the Plan specified herein have been satisfied or waived. All Persons shall take such actions required by the Plan, execute releases, file and diligently seek dismissal of the lawsuits required to be dismissed under the Plan and perform any other duty required by the Plan.

## 12. MISCELLANEOUS PROVISIONS.

**12.1 Request for Relief Under § 1129(b)**. In the event any Impaired Class of Claims shall fail to accept this Plan in accordance with § 1129(a) of the Bankruptcy Code, the Debtor requests the Bankruptcy Court to confirm this Plan in accordance with the provisions of § 1129(b) of the Bankruptcy Code.

**12.2 Headings**. All headings utilized in this Plan are for convenience and reference only, and shall not constitute part of this Plan for any other purpose.

**12.3 No Post-Petition Interest**. No interest, penalty or late charge will be paid or allowed on any Allowed Claim subsequent to the Petition Date.

**12.4 No Post-Petition Attorneys Fees**. No post-petition attorney's fees or expenses will be paid or allowed with respect to any Allowed Claim of any Creditor.

**12.5 Modification and Amendments**. This Plan shall not be modified except upon the agreement of the Debtor.

**12.6  Term of Injunction or Stays**.  All preliminary injunctions, temporary restraining orders, and stays provided for or granted in the Chapter 11 Case pursuant to §§ 362 and/or 105 of the Bankruptcy Code in effect on the Confirmation Date shall remain in full force and effect until the closing of the Chapter 11 Case. The injunctive provisions of this Plan are permanent and shall not be affected by this provision.

**12.7  Governing Law**.  Except to the extent that the Bankruptcy Code or other federal law is applicable, the rights, duties and obligations arising under this Plan shall be governed by and construed and enforced in accordance with the internal laws of the State of Michigan without reference to the laws of other jurisdictions.

**12.8  Successors and Assigns**.  The rights, benefits and obligations of any Person named or referred to in this Plan will be binding upon and will inure to the benefit of the heirs, executors, administrators, successors or assignees of such Person.

13

**12.9  Default and Cure**.  Upon failure of Debtor to make any payments due on an administrative, secured, or priority tax claim that is not cured within 30 days of the mailing of written notice of default by the Creditor, such Creditor may exercise all rights and remedies available under non-bankruptcy law for the collection of its entire claim and/or seek appropriate relief in the Bankruptcy Court.

**SAVE THE HOSPITAL GROUP**
Proponent

/s/ Shakib Halabu
Shakib Halabu, DDS
Authorized Agent

   /s/ S. S. Toll
**SHELDON S. TOLL PLLC**
Sheldon S. Toll (P21490)
29580 Northwestern Hwy., Suite 100
Southfield, MI 48034
(248) 797-9111
sst@lawtoll.com
ATTORNEY FOR PROPONENT

14

## DISCLOSURE STATEMENT

I.       The Plan of Reorganization.

The proposed Plan of Reorganization appears on pages 1-12 of this document.

### Summary of Classification and Treatment of Claims and Interests

| Class | Description | Treatment under Plan |
|---|---|---|
| Unclassified administration claims | SantPartners, LLC loan, estimated $1.0 million to $2.0 million; professional fees, estimated $600,000 to $1.0 million | Paid in full on Effective Date |
| 1-priority claims | Tax claims estimated $2.0 million; non-tax claims, $55,000 | Tax claims, spread over 5 years; non tax claims paid in full |
| 1-priority claim of Michigan Unemployment Insurance Agency | $1,113,854.77 | Paid over 5 years at 12% per annum interest |
| 2---other secured claims | Estimated $268,000 | Either (i) Reinstated, (ii) paid in cash, (iii) surrender of collateral, or (iv) as agreed by Proponent/Debtor and Claimant |
| 3---Crittenton Secured Claims | Estimated $3,750,000 | Paid in full over 10 years at 3% per annum interest |
| 4---CMS Overpayment Claims | Estimated $6,700,000 | Reinstated; parties to negotiate payment plan |
| 5---Michigan Department of Health and Human Services ("DHHS") Overpayment Claimst | Estimated $1,900,000 | Reinstated; parties to negotiate payment plan |
| 6---WRC Secured Claim | Estimated $794,000 | Paid in full; spread over 5 years |
| 7---General Unsecured Claims | Estimated $13,000,000 | Paid 10% over 5 years. |
| 8---Equity | Canceled | -$0- |

15

II.    **A description of the Debtor.**

**A.**  Debtor is reorganizing and continuing its business.  Debtor, d/b/a Doctors' Hospital of Michigan, is a limited liability company formed by a group of physicians and McLaren Health.   Debtor is Michigan's first acute-care, for-profit hospital with physician ownership. Debtor's main facility is located in the city of Pontiac, Michigan. It is a licensed 304-bed hospital that provides, primarily, behavioral and family medicine, including 24-hour urgent care, to patients residing in the surrounding communities. The Debtor provides other medical care services, including radiology services, respiratory therapy, occupational medicine and physical medicine and rehabilitation. Until recently, the Debtor also provided general surgical services. The Debtor also has operated an ambulatory care center in Waterford, Michigan.

The causes for the Chapter 11 filing are: (i) Debtor has struggled to attract or retain the kind of medical practices necessary to fill the hospital's bed count, and (ii) nearby competition from larger hospitals such as St. Joseph Mercy Hospital in Pontiac and McLaren Pontiac General Hospital.  The Debtor has had severe financial problems. For the year ending December 31, 2013, the Debtor had gross revenue of $29,268,000 and a net loss of $8,900,000. These losses were ongoing through the filing of the chapter 11 case.

**B.  The Principals**.

1. Board of Directors

The Debtor currently has a three-member board of directors consisting of Dr. Yatinder Singhal, Dr. Anuj Mittal, and Dr. Michael Short. The three board members are also members of the Debtor and are, or have been, practicing physicians at the Debtor. The Debtor's Statement of Financial Affairs discloses that the directors received the following compensation in the one year prior to the Petition Date:

| Director | Compensation | Board Fees |
|---|---|---|
| Dr. Singhal | $112,690.44 | $20,001 |
| Dr. Mittal | $116,500.04 | $4,167 |
| Dr. Short | $40,761.02 | $12,501 |

The payment of board fees was discontinued in June, 2015. Upon the appointment of the Chapter 11 Trustee, the Debtor discontinued the payment of fees to the board members for serving as directors of their medical departments. The existing directors of the Debtor will not be affiliated with the Reorganized Debtor or receive any compensation from the Reorganized Debtor, except that Dr. Singhal will continue to head the psychiatric clinic at the Hospital, and he will also invest $500,000 for a 5% interest in the class B interests of the Reorganized Debtor.  Because the Proponent is not an insider of the Debtor, further information regarding the compensation or other remuneration, including fringe benefits,, provided to the members of the board pre-petition is not available.

16

2. <u>Management</u>

John Ponczocha is the Debtor's Chief Executive Officer. Mr. Ponczocha was appointed Chief Executive Officer in July, 2013. He receives an annual compensation of $220,000 and participates in the Debtor's Benefit Plan.  Proponent is not aware of any extraordinary fringe benefits offered to Mr. Ponczocha.

The Debtor's pre-petition Chief Financial Officer resigned during the pendency of the Bankruptcy Case. Mr. Brian Hardin was appointed interim Chief Financial Officer. He is paid on an hourly basis and receives $160 per hour for services rendered to the Debtor.

The Plan contemplates that existing management will not continue on and after the Effective Date.

C.  Describe the Debtor's business, its industry group and the causes of the Chapter 11 filing.

Debtor is Michigan's first acute-care, for-profit hospital with physician ownership. Debtor's main facility is located in the city of Pontiac, Michigan. It is a licensed 304-bed hospital that provides, primarily, behavioral and family medicine, including 24-hour urgent care, to patients residing in the surrounding communities. The Debtor provides other medical care services, including radiology services, respiratory therapy, occupational medicine and physical medicine and rehabilitation. Until recently, the Debtor also provided general surgical services. The Debtor also has operated an ambulatory care center in Waterford, Michigan.

The causes for the Chapter 11 filing are: (i) Debtor has struggled to attract or retain the kind of medical practices necessary to fill the hospital's bed count, and (ii) nearby competition from larger hospitals such as St. Joseph Mercy Hospital in Pontiac and McLaren Pontiac General Hospital.  The Debtor has had severe financial problems. For the year ending December 31, 2013, the Debtor had gross revenue of $29,268,000 and a net loss of $8,900,000. These losses were ongoing through the filing of the chapter 11 case.

**III.    Post-petition events of significance.**

A.      Disclose all post-petition transfers outside the ordinary course of business.

Proponent is unaware of any post-petition transfers outside the ordinary course of business.

17

B.  Provide summaries of the important details of cash collateral, post-petition financing and adequate protection orders.

On September 17, 2015, the Bankruptcy Court entered its Final Order (I) Authorizing (A) Use of Cash Collateral Pursuant to 11 U.S.C. 363, and (B) Granting of Security Interests, Superpriority Claims, and Adequate Protection, and (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(c) (the "Cash Collateral Order") [Doc 130]. Under the Cash Collateral Order: (i) the Debtor is authorized to use the cash collateral of Crittenton, CMS and Michigan (the "Prepetition Cash Collateral Creditors"); (ii) the Prepetition Cash Collateral Creditors received, as adequate protection for any diminution in the value of their collateral, perfected replacement liens in the same property of the Debtor's estate as held by the Prepetition Cash Collateral Creditors prior to the Petition Date; and (iii) as additional adequate protection the Prepetition Cash Collateral Creditors were granted superpriority administrative expenses status under Bankruptcy Code § 507(b). CMS and the State of Michigan reserved all rights under the Cash Collateral Order.

On September 16, 2015, the Court entered a Final Order (i) Authorizing the Debtor to Obtain Postpetition Financing on a Senior Secured, Superpriority Basis, (ii) Authorizing the Use of Cash Collateral, and (iii) Granting Adequate Protection to Prepetition Secured Parties [Doc 131]. This DIP loan was capped at $1,500,000.

On October 19, 2015 the Chapter 11 Trustee filed a Motion for Order Amending Final Order (I) Authorizing the Debtor to Obtain Postpetition Financing on a Senior Secured, Superpriority Basis, (II) Authorizing the Use of Cash Collateral,(III) Granting Adequate Protection to Prepetition Secured Parties and (IV) Scheduling of a Final Hearing to amend the terms of the DIP loan to increase availability to $2,000,000 and modify certain terms of the DIP loan to provide covenant relief to the Debtor.

C.  Explain any litigation arising or continuing during the case, or which may be pending in any Court.

A chapter 11 Trustee has been appointed, along with a patient advocate. Except as set forth herein, Proponent is unaware of any litigation arising or continuing during the case, or which may be pending in any Court.

18

**IV.     Assets and Liabilities.**

A.      Provide a liquidation analysis

According to the Disclosure Statement of Sant Partners, LLC, the Liquidation Analysis was prepared by the Debtor's financial advisor for use by any party-in interest to propose a plan of reorganization for Debtor. The assumptions supporting the Liquidation Analysis are set forth in the notes included with the Liquidation Analysis. With full reservation of rights, we attach as **Exhibit  B** the Liquidation Analysis attached to the Sant Partners, LLC Plan.  Proponent believes that the Liquidation Analysis prepared by the Debtor's financial advisor is plausible and Proponent's Plan meets the "best interest" test of section 1129(a)(7) of the Bankruptcy Code. Further, Proponent believes that the members of each impaired class will receive at least as much under the Plan as they would in a liquidation in a hypothetical chapter 7 case. Because Proponent intends to continue operations of the Hospital and improve operations, Creditors will receive a better recovery through the distributions contemplated by its Plan.

B. The risks, conditions and assumptions regarding the stated values.

A liquidation analysis is essentially a projection.  Projections are based, in whole or in part, on a forecast of future events.  A forecast, by its nature, is speculative and includes estimates and assumptions which may prove to be wrong, or which may be materially different from actual future results.  Risk factors include, but are not limited to, unforeseen micro or macro economic developments, business or casualty losses, the present uncertainty of the health care market, and the future availability, or lack thereof, of financing by third parties.

19

C.  All potential claims and causes of action, including claims against insiders and avoidance actions.  For each such cause of action, estimate the value of any expected recovery and the expected costs of such litigation.  If the Debtor does not intend to pursue any such claims, state the reasons.

There are potential avoidance actions against insiders of the Debtor preferential transfers and for transfers made without reasonable equivalent value in return. The value of such claims is unknown.  The plans proposed by other plan sponsors propose a trust to pursue these claims to fund an unspecified payment to Class 7 General Unsecured Creditors from the proceeds of litigation.  Proponent's Plan preserves all Rights of Action and Avoidance Actions, see Plan, section 9.4. However, at present Proponent believes that its Plan will be sufficiently funded by $6 million in equity contributions pursuant to signed letters. See section **V. D** below for more details. Therefore, Proponent believes that bringing such litigation will not be necessary, because litigation is expensive and its outcome is uncertain. If such litigation were brought, Proponent believes that such litigation could be referred to attorneys who would handle it for a 33-1/3% continent fee.  For example, if $1 million were recovered by such litigation, the cost of litigation would be $333,333.

D.      If any debt is guaranteed by anyone or if anyone is liable with the Debtor on any debt, identify: (1) the guarantor or co-Debtor; (2) the nature and amount of debt involved and the balance due; (3) the collateral securing the debt or the guaranty, and (4) the value of such collateral.

Proponent does not believe there are any co-Debtors in this case.

## V.      Details regarding implementation of the plan.

A.      Provide meaningful summaries or financial information in a consistent format for at least the following periods:

1.  Three years pre-petition, if possible.

The Debtor stated that it is in severe financial distress, and that for the year ending December 31, 2013, the Debtor had gross revenue of $29,268,000.00 and a net loss of

20

$8,900,000.00 and that these losses continued through and after calendar year 2014. Proponent does not have additional detail regarding the Debtor's prepetition financial condition, but the Debtor has acknowledged that it has struggled from its formation to attract or retain the kind of medical practices necessary to fill the hospital's bed count.

2. Post-petition to latest date possible.

The Debtor has not filed monthly operating reports, but on a cash flow basis the Debtor has continued to lose money. A summary of the Debtor's cash flow during the pendency of the Chapter 11 Case, which was prepared by the Debtor's financial advisor, is attached to the Sant plan as Schedule 2.

3. If the Plan proposes that the Debtor will continue in business, projections for the period of the Plan, together will assumptions underlying those projections; and including, by class, payments required to be made under the Plan during the projected periods.

The Plan proposes that the Hospital will continue in business. Projections for a 5-year period of payment proposed by the Plan together with assumptions underlying those projections are attached as **Exhibit C**. The projections are based, in whole or in part, on a forecast of future events. A forecast, by its nature, is speculative and includes estimates and assumptions which may prove to be wrong, or which may be materially different from actual future results. Risk factors include, but are not limited to, unforeseen micro or macro economic developments, business or casualty losses, the present uncertainty of the health care market, and the future availability, or lack thereof, of financing by third parties.

21

B. If the Plan proposes that the business will continue, state who will be in charge and the annual compensation to be paid to each, including fringe benefits.

**Board of Managers**

| Name | Position | Annual Comp.[1] | Fringes |
|---|---|---|---|
| Shakib Halabu, DDS | Board of Managers | $20,000.00 | none |
| Greg Naman, MD | Board of Managers | $20,000.00 | none |
| Ted Naman, MD | Board of Managers | $20,000.00 | none |

**Officers**

| Name | Position | Annual Comp.[2] | Fringes[3] |
|---|---|---|---|
| Greg Naman, MD | Chief Medical Officer | $340,000.00 | $35,000.00 |
| Ted Naman, MD | Chief Medical Information Officer | $315,000.00 | $30,000.00 |
| John Oram | Director of Community and Government Relations | $150,000.00 | $15,000.00 |
| Steve Hood | Director of Strategic Business Development | $150,000.00 | $15,000.00 |

---

[1] Based on a study of board compensation by Tenet Healthcare, one of the nation's leading healthcare services companies.

[2] Based on a study of physician executive median compensation for the year 2011 by Cejka Executive Search.

[3] Medical insurance, group life insurance, disability insurance.

C. State the tax ramifications for the continuing entity if the Plan is confirmed.

The continuing entity will be taxed as a limited liability company. Proponent does not believe that confirmation of the Plan will result in tax ramifications for the continuing entity.

**NO RULING HAS BEEN OBTAINED FROM THE IRS WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN AND NO OPINION OF COUNSEL HAS BEEN OBTAINED BY THE PLAN PROPONENT WITH RESPECT THERETO. ACCORDINGLY, NO REPRESENTATIONS OR ASSURANCES ARE BEING MADE WITH RESPECT TO THE FEDERAL INCOME TAX CONSEQUENCES AS DESCRIBED HEREIN.**

**CERTAIN HOLDERS OF CLAIMS MAY BE SUBJECT TO SPECIAL RULES NOT ADDRESSED IN THIS SUMMARY OF FEDERAL INCOME TAX CONSEQUENCES. THERE ALSO MAY BE STATE, LOCAL OR FOREIGN INCOME TAX CONSIDERATIONS APPLICABLE TO EACH HOLDER OF A CLAIM OR INTEREST WHICH ARE NOT ADDRESSED HEREIN. EACH HOLDER OF A CLAIM AFFECTED BY THE PLAN SHOULD CONSULT, AND RELY UPON, ITS OWN TAX ADVISOR REGARDING THE SPECIFIC TAX CONSEQUENCES OF THE PLAN WITH RESPECT TO THAT HOLDER'S CLAIM.**

23

D.    Description of the Plan Proponent.

The Proponent, Save the Hospital Group, is an assumed name for a group of individuals that is in formation. The present members of the group are set forth below. The group was brought together for the purpose of saving the Hospital through implementing the Plan.  On the Effective Date of Proponent's Plan, the following persons, by paying the indicated funding amount to the Reorganized Debtor, will become equity security holders of the Reorganized Debtor.

Class A Interests[4]

| Name | Funding Amount | Percentage of Interests |
|------|----------------|-------------------------|
| Shakib Halabu | -$0- | 25% |
| Greg Naman | -$0- | 25% |
| Ted Naman | -$0- | 25% |
| John Oram | -$0- | 25% |

Class B Interests[5]

| Name | Funding Amount, signed letter | Percentage of Interests |
|------|-------------------------------|-------------------------|
| Shakib Halabu | $500,000.00 | 5% |
| Greg Naman | $500,000.00 | 5% |
| Ted Naman | $500,000.00 | 5% |
| Ali Karim | $500,000.00 | 5% |
| Yatinder Singhal | $500,000.00 | 5% |
| Elias Kassab | $1,000,000.00 | 10% |
| Jawad Shah | $1,000,000.00 | 10% |
| Tahir Khan | $1,000,000.00 | 10% |
| Reserved for future investors | $4,000,000.00 | 40% |

---

[4] Voting rights, but having other rights normally attributed to preferred stock.  Generally, Class A Interests will be entitled to the first 20% of any distributions.

[5] Non-voting, and having other rights normally attributed to non-voting common stock.  Generally, Class B Interests will be entitled to the remaining 80% of any distributions.

24

**BUSINESS PLAN**

An experienced medical management team will run the Hospital after the Effective Date, consisting of:

    i.  Greg Naman, MD, who will be the Medical Director of the Hospital

        1.  Currently sits on the Michigan Pioneer ACO executive committee and is the acting Chief Financial Director of the Michigan Pioneer ACO

        2.  Has 15 years of experience with medical group management including work flow management, general operations, marketing, and dealing with medical compliance issues.

        3.  Has 10 years of experience in managing and billing for ancillary services including radiology, physical therapy, laboratory services, and pharmacy

        4.  Has over 5 years of experience in mergers and acquisitions of medical practices.

    ii.  Ted Naman, MD

        1.  Has 15 years of experience with medical group management including operations and business growth and development.

        2.  Has 12 years of extensive experience with IT based solutions including software design, programming and implementation as well as IT infrastructure and IT implementation

        3.  Has over 7 years of experience in Lean and project management

    iii.  Ali Karim

1. Attorney by training, with over a decade of ambulatory surgery center (ASC) management and operations experience
2. Experienced in compliance and regulations reviews
3. Networking, recruitment, and negotiations expert
4. Experienced in designing, planning and oversight of clinically integrated networks (CIN)

The new management team are local business and community leaders (not remote, i.e. Sharma's principals are from Texas). They are interested in stability and growth of the business. Their main goal and interest is to maintain hospital services for the community and for growth in the surrounding area. They are committed to the community, with plans for community outreach and population health management. They will use of technology as well as community outreach to improve the overall health of the surrounding population served.

New management will review and renew contracts that are favorable and needed for operations. They will reduce costs by reviewing service lines that are not financially producing or have excess expenditures. They will enhance revenue by introducing new service lines needed for the community. They will continue and improve the education of the Internal Medicine residents.

**Marketing and community outreach**:  New management will:

a. Develop a team for population health management
    i. Role is to educate the community and survey the neighborhood
b. Develop a team of Healthcare Navigators for the community to increase enrollment in health plans
c. Market to local physicians, business owners, and medical insurances to gain business
d. Market and strategically partner with state leading hospital systems for specialists that are not represented in the area; namely, pediatric sub-specialists

**Growth plans for the Hospital**:

a. Develop an integrated care center
b. Develop specialty clinics in the community that will feed the hospital. These will be brought in to the
    i. Pediatric specialty
    ii. Nephrology and renal diseases including dialysis
    iii. Vascular disease center including endovascular center

26

      iv.  Gastroenterology including endoscopy center

      v.  Elder care

b.  Develop a team for strategic partnerships with other hospitals and ancillary medical service companies

      i.  Recruit top pediatric, medical, and surgical sub-specialties from local and nationally recognized medical centers

          1.  Example will be to bring in Pediatric specialties from Children's Hospital of Michigan to the Medical Office Building (MOB).

          2.  Bring in surgical and medical subspecialists

c.  Re-open floors for care of the elderly including skilled nursing facility (SNF) care

      i.  Use some of the hospital space for SNF care. This will drive business to the hospital and keep the hospital length of stay days lower

      ii.  Will open space for a homecare for the elderly project. Space will be used to deliver workshops for the elderly for home preparedness. State of the art tracking and testing will be provided to individuals to assess their level of capacity to stay at home. This is important to decrease readmissions and for community building.

d.  Launch specialty lab services and specialty pharmacy services

**VI.**    **Legal requirements:**

*A.*    *Voting procedures*

*Under the Bankruptcy Code, the only classes that are entitled to vote to accept or reject a plan are classes of claims, or equity interests, that are impaired under the plan. Accordingly, classes of claims or interests that are not impaired are <u>not</u> entitled to vote on the plan.*

*Creditors that hold claims in more than one impaired class are entitled to vote separately in each class. Such a creditor will receive a separate ballot for all of its claims in each class (in accordance with the records of the Clerk of the Court) and should complete and sign each ballot separately. A creditor who asserts a claim in more than one class and who has not been provided with sufficient ballots may photocopy the ballot received and file multiple ballots.*

*Votes on the plan will be counted only with respect to claims: (a) that are listed on the Debtor's Schedules of Assets and Liabilities <u>other</u> than as disputed, contingent or unliquidated; or (b) for which a proof of claim was filed on or before the bar date set by the Court for the filing of proofs of claim (except for certain claims expressly excluded from that bar date or which are allowed by Court order).*

*However, any vote by a holder of a claim will not be counted if such claim has been disallowed or is the subject of an unresolved objection, absent an order of the Court allowing such claim for voting purposes pursuant to 11 U.S.C. § 502 and Bankruptcy Rule 3018.*

*Voting on the plan by each holder of a claim or interest in an impaired class is important. After carefully reviewing the plan and disclosure statement, each holder of such a claim or interest should vote on the enclosed ballot either to accept or to reject the plan, and then return the ballot by mail to the debtor's attorney by the deadline previously established by the Court.*

*Any ballot that does not appropriately indicate acceptance or rejection of the plan will not be counted.*

*A ballot that is not received by the deadline will not be counted.*

*If a ballot is damaged, lost, or missing, a replacement ballot may be obtained by sending a written request to the debtor's attorney.*

*B.    Acceptance*

*The Bankruptcy Code defines acceptance of a plan by an impaired class of claims as acceptance by the holders of at least two-thirds in dollar amount, and more than one-half in number, of the claims of that class which actually cast ballots. The Bankruptcy Code defines acceptance of a plan by an impaired class of equity interests as acceptance by holders of at least two-thirds in number of the equity interests of that class that actually cast ballots. If no creditor or interest holder in an impaired class votes, then that class has not accepted the plan.*

*C.    Confirmation*

*11 U.S.C. § 1129(a) establishes conditions for the confirmation of a plan. These conditions are too numerous and detailed to be fully explained here. Parties are encouraged to seek independent legal counsel to answer any questions concerning the Chapter 11 process.*

*Among the several conditions for confirmation of a plan under 11 U.S.C. § 1129(a) are these:*

*1.    Each class of impaired creditors and interests must accept the plan, as described in paragraph VI.B., above.*

2.      *Either* each holder of a claim or interest in a class must accept the plan, *or* the plan must provide at least as much value as would be received upon liquidation under Chapter 7 of the Bankruptcy Code.

D.      *Modification*

The debtor reserves the right to modify or withdraw the plan at any time before confirmation.

E.      *Effect of confirmation*

If the plan is confirmed by the Court:

1.      *Its terms are binding on the debtor, all creditors, shareholders and other parties in interest, regardless of whether they have accepted the plan.*

2.      *Except as provided in the Plan:*

(a)      *In the case of a corporation that is reorganizing and continuing business:*
(1)      *All claims and interests will be discharged.*

(2)      *Creditors and shareholders will be prohibited from asserting their claims against or interests in the debtor or its assets.*

[SIGNATURES ON NEXT PAGE]

22

                                        **SAVE THE HOSPITAL
                                        GROUP**
                                        Proponent


                                        ___/s/ Shakib Halabu___
                                        Shakib Halabu, DDS
                                        Authorized Agent


___/s/ S. S. Toll_____
**SHELDON S. TOLL PLLC**
Sheldon S. Toll (P21490)
29580 Northwesterm Hwy., Suite 100
Southfield, MI 48034
(248) 797-9111
sst@lawtoll.com

ATTORNEY FOR PROPONENT

# Exhibit A



**DETROIT MEDICAL CENTER**

*always there.*

November 12, 2015

Andrei Soran
Executive Vice President &
Chief Operating Officer

DMC Market Office
3990 John R Street, 8 Brush Center
Detroit, MI 48201-2018
313.745.6097 office
313.966.7569 fax

Drs. Greg Naman and Ted Naman

Dear Drs. Naman:

This letter will summarize various areas of potential assistance the Detroit Medical Center and it's member hospitals may provide to support your leadership as part of Doctor's Hospital of Michigan located in Pontiac, Michigan. The DMC provides this letter of support contingent upon Drs. Greg Naman and Ted Naman direct involvement in leadership of the new entity.

All potential support areas summarized below are also contingent on the development and execution of appropriate support and services agreements(s) as approved by legal counsel. The potential support areas reflect the following:

**Business/Corporate support**:
1. Advisory board participation
2. Technology consultation and interfacing to provide an integrated network
3. Assist with ancillary testing including mobile MRI, if available

**Medical care support**:
1. Share best practices and provide guidance to quality committees
2. Physicians/specialists from an academic center to round on patients
3. Set up specialty clinic(s) on-site for agreed upon services if the market is appropriate. For example pediatric specialty clinic, diabetic clinic, weight management clinic, etc.
4. Become the quaternary care center for advanced medical and surgical cases as need arises

**Educational support:**
1. Contribute to residency education oversight
2. Allow for other sites for resident physicians to visit
3. Participate in research

Thank you for the opportunity to support your efforts to re-establish Doctors Hospital of Michigan as a viable health care facility providing services to meet the community needs in the greater Pontiac area.

Sincerely,

Andrei Soran
Chief Operating Officer
The Detroit Medical Center

www.dmc.org
Children's Hospital of Michigan • Detroit Receiving Hospital • DMC Surgery Hospital • Harper University Hospital •
Huron Valley –Sinai Hospital • Hutzel Women's Hospital • Kresge Eye Institute • Rehabilitation Institute of Michigan •
Sinai-Grace Hospital • University Laboratories

In partnership with the Karmanos Cancer Center

# Exhibit B

Oakland Physicians Medical Center, L.L.C.
d/b/a Doctor's Hospital of Michigan, Debtor
Hypothetical Liquidation Analysis
As of September 30, 2015

| Description | Estimated Balance Sheet 09/30/15 | Chapter 7 Liquidation Recovery | | Notes |
|---|---|---|---|---|
| | | Low | High | |
| **STATEMENT OF ASSETS** | | | | |
| | | | | |
| Current Assets | | | | |
| Cash and Cash Equivalents | 265,926 | 265,926 | 265,926 | 100% of cash. |
| | | | | |
| Accounts Receivable - Net | | | | |
| Estimated Medicare | 718,355 | 101,677 | 130,699 | |
| Estimated Medicaid | 451,417 | 63,894 | 82,131 | |
| All Other | 3,295,788 | 466,489 | 599,641 | |
| | | | | |
| Accounts Receivable - Net | 4,465,559 | 632,060 | 812,471 | Under one year A/R at ranges of 15% to 25%. |
| | | | | |
| Inventory (pharmaceuticals and general medical) | 60,000 | 3,000 | 6,000 | Value per Schedules (inventory book value is likely overstated); low = 5%; high = 10%. |
| Prepaid Expenses | 84,921 | 0 | 0 | Assume all pre-paids are fully amortized by end of liquidation or otherwise unrecoverable. |
| Other Current Assets (MD's meals, misc A/R, etc.) | 40,819 | 0 | 0 | Assume no value in liquidation. |
| | | | | |
| Total Current Assets | 4,917,226 | 900,986 | 1,084,397 | |
| | | | | |
| Property and Equipment | | | | |
| Land, Buildings and Improvements | | | | |
| Doctor's Hospital (461 West Huron, Pontiac, MI) | | 0 | 395,529 | SEV $841,550 less 6% broker fee (0% low, 50% high). |
| Waterford Ambulatory Care Center | | 445,891 | 557,364 | SEV $592,940 less 6% broker fee (80% low, 100% high). |
| Other Parcels (Pontiac, MI) | | 70,872 | 94,496 | Total SEV $118,120 less 6% broker fee (60% low, 80% high). |
| | | | | |
| Total Land, Buildings and Improvements | 3,024,967 | 516,763 | 1,047,388 | |
| Equipment and Vehicles | 2,107,500 | 105,375 | 210,750 | Value per Schedules; no appraisals; low = 5%; high = 10%. |
| Construction in Progress | 517,240 | 0 | 0 | Account is misstated and would have no value in liquidation. |
| Less: Accumulated D&A | (1,655,146) | 0 | 0 | |
| | | | | |
| Property and Equipment, Net | 3,994,561 | 622,138 | 1,258,138 | |
| | | | | |
| Other Assets | | | | |
| Bed License | 0 | 0 | 0 | Non-transferable. |
| Certificate of Needs | 0 | 0 | 0 | Non-transferable. |
| Residency Program | 0 | 0 | 0 | Non-transferable. |
| Avoidance Actions | 0 | 0 | 0 | Debtor has not investigated. |
| | | | | |
| Total Other Assets | 0 | 0 | 0 | |
| | | | | |
| Total Assets | 8,911,787 | 1,523,124 | 2,342,535 | |
| | | | | |
| Estimated Costs of Chapter 7 Liquidation | | | | |
| Chapter 7 Trustee Fees and Professional Fees | | 300,000 | 250,000 | Estimate. |
| Retention Pay | | 200,000 | 100,000 | Low = $100k / month for 2 months; high = $100k / month for 1 month. |
| Wind-down Costs (utilities, record retention, etc.) | | 600,000 | 300,000 | Low = $100k / month for 6 months; high = $100k / month for 3 months. |
| | | | | |
| Total Estimated Costs of Liquidation | | 1,100,000 | 650,000 | |
| | | | | |
| Estimated Asset Value Available for Distribution | | 423,124 | 1,692,535 | |

Oakland Physicians Medical Center, LLC.
d/b/a Doctor's Hospital of Michigan, Debtor
Hypothetical Liquidation Analysis
As of September 30, 2015

| Description | Estimated Balance Sheet 09/30/15 | Chapter 7 Liquidation Recovery Low | High | Notes |
|---|---|---|---|---|
| Estimated Asset Value Available for Distribution | | 423,124 | 1,692,535 | |
| | | | | |
| Pre-Petition Secured Debt | | | | |
| Crittenton | | 4,000,000 | 4,000,000 | |
| CMS (Medicare overpayments) | | 6,700,000 | 6,700,000 | |
| State of Michigan (Medicaid overpayments and unpaid QAAP taxes) | | 1,909,000 | 1,909,000 | |
| Waterford Township (real property taxes) | | 63,481 | 63,481 | |
| Oakland County (water bill and real property taxes on hospital) | | 893,203 | 893,203 | |
| Oakland County (real property taxes on non-hospital parcels) | | 14,209 | 14,209 | |
| Oakland County (personal property taxes) | | 91,737 | 91,737 | |
| | | | | |
| Total Pre-Petition Secured Debt | | 13,671,630 | 13,671,630 | Per Schedules. |
| | | | | |
| Gross Proceeds Available for Pre-Petition Secured Debt | | | | |
| Crittenton (cash, other A/R, inventory, Waterford property) | | 1,117,825 | 1,365,450 | |
| CMS (Medicare A/R) | | 101,677 | 130,699 | |
| State of Michigan (Medicaid A/R) | | 63,894 | 82,131 | |
| Waterford Township (Waterford property) | | 63,481 | 63,481 | |
| Oakland County (Doctor's Hospital) | | 0 | 395,529 | |
| Oakland County (other parcels - Pontiac, MI) | | 14,209 | 14,209 | |
| Oakland County (equipment and vehicles) | | 91,737 | 91,737 | |
| | | | | |
| Total Gross Proceeds Available for Pre-Petition Secured Debt | | 1,452,823 | 2,143,235 | |
| | | | | |
| Estimated Net Costs of Liquidation | | | | |
| Total Estimated Costs of Liquidation | | (1,100,000) | (650,000) | |
| Plus: Contribution of Unencumbered Assets to Liquidation Costs | | 70,301 | 199,300 | |
| | | | | |
| Total Estimated Net Costs of Liquidation | | (1,029,699) | (450,700) | |
| | | | | |
| Pro Rata Allocation of Net Costs of Liquidation to Pre-Petition Secured Debt | | | | |
| Crittenton | | (792,267) | (287,140) | |
| CMS (Medicare overpayments) | | (72,064) | (27,485) | |
| State of Michigan (Medicaid overpayments and unpaid QAAP taxes) | | (45,285) | (17,271) | |
| Waterford Township (real property taxes) | | (44,993) | (13,349) | |
| Oakland County (water bill and real property taxes on hospital) | | 0 | (83,176) | |
| Oakland County (real property taxes on non-hospital parcels) | | (10,071) | (2,988) | |
| Oakland County (personal property taxes) | | (65,019) | (19,291) | |
| | | | | |
| Allocation of Net Costs of Liquidation to Pre-Petition Secured Debt | | (1,029,699) | (450,700) | |

*Oakland Physicians Medical Center, L.L.C.*
*d/b/a Doctor's Hospital of Michigan, Debtor*
*Hypothetical Liquidation Analysis*
*As of September 30, 2015*

| Description | Estimated Balance Sheet 09/30/15 | Chapter 7 Liquidation Recovery | | Notes |
|---|---|---|---|---|
| | | Low | High | |
| **Net Proceeds Available for Pre-Petition Secured Debt** | | | | |
| Crittenton (cash, other A/R, inventory, Waterford property) | | 325,559 | 1,078,310 | |
| CMS (Medicare A/R) | | 29,613 | 103,214 | |
| State of Michigan (Medicaid A/R) | | 18,609 | 64,860 | |
| Waterford Township (real property taxes) | | 18,488 | 50,132 | |
| Oakland County (water bill + real property taxes - DHOM) | | 0 | 312,353 | |
| Oakland County (real property taxes - non-hospital parcels) | | 4,138 | 11,221 | |
| Oakland County (personal property taxes) | | 26,718 | 72,446 | |
| **Total Net Proceeds Available for Pre-Petition Secured Debt** | | 423,124 | 1,692,535 | |
| | | | | |
| **Excess (Deficiency) on Pre-Petition Secured Debt** | | | | |
| Crittenton | | (3,674,441) | (2,921,690) | |
| CMS (Medicare overpayments) | | (6,670,387) | (6,596,786) | |
| State of Michigan (Medicaid overpayments and unpaid QAAP taxes) | | (1,890,391) | (1,844,140) | |
| Waterford Township (real property taxes) | | (44,993) | (13,349) | |
| Oakland County (water bill + real property taxes on hospital) | | (893,203) | (580,850) | |
| Oakland County (real property taxes - non-hospital parcels) | | (10,071) | (2,988) | |
| Oakland County (personal property taxes) | | (65,019) | (19,291) | |
| **Total Excess (Deficiency) on Pre-Petition Secured Debt** | | (13,248,506) | (11,979,095) | |
| | | | | |
| **DIP Loan** | | 920,000 | 920,000 | $870,000 loan as of 9/30 plus $50,000 commitment fee. |
| Liquidation Proceeds Available | | 0 | 0 | |
| **Excess (Deficiency) on DIP Loan** | | (920,000) | (920,000) | |
| | | | | |
| **Administrative and Priority Claims** | | | | |
| Post-petition A/P and Accrued Expenses | | 500,000 | 500,000 | Estimated as of 9/30. |
| Unsecured Priority Claims (Payroll taxes, McLaren Health Plan) | | 841,241 | 841,241 | Per Schedules. |
| Asserted Unsecured Priority Claims (Unemployment taxes) | | 886,507 | 886,507 | Per Proofs of Claim and as Reconciled by Debtor. |
| **Total Administrative and Priority Claims** | | 2,227,748 | 2,227,748 | |
| Liquidation Proceeds Available | | 0 | 0 | |
| **Excess (Deficiency) on Administrative and Priority Claims** | | (2,227,748) | (2,227,748) | |
| | | | | |
| **Total Estimated Trade and General Unsecured Claims** | | 13,191,933 | 13,191,933 | Per Schedules. |
| Liquidation Proceeds Available | | 0 | 0 | |
| **Excess (Deficiency) on Trade and General Unsecured Claims** | | (13,191,933) | (13,191,933) | |

*Oakland Physicians Medical Center, L.L.C.*
*d/b/a Doctor's Hospital of Michigan, Debtor*
*Hypothetical Liquidation Analysis*
*As of September 30, 2015*

| Description | Amount of Claim | | Estimated Recovery | | Estimated Recovery % | |
|---|---|---|---|---|---|---|
| | Low | High | Low | High | Low | High |
| **Pre-Petition Secured Debt** | | | | | | |
| Crittenton | 4,000,000 | 4,000,000 | 325,559 | 1,078,310 | 8% | 27% |
| CMS (Medicare overpayments) | 6,700,000 | 6,700,000 | 29,613 | 103,214 | 0% | 2% |
| State of Michigan (Medicaid overpayments and unpaid QAAP taxes) | 1,909,000 | 1,909,000 | 18,609 | 64,860 | 1% | 3% |
| Waterford Township (real property taxes) | 63,481 | 63,481 | 18,488 | 50,132 | 29% | 79% |
| Oakland County (water bill and real property taxes on hospital) | 893,203 | 893,203 | 0 | 312,353 | 0% | 35% |
| Oakland County (real property taxes on non-hospital parcels) | 14,209 | 14,209 | 4,138 | 11,221 | 29% | 79% |
| Oakland County (personal property taxes) | 91,737 | 91,737 | 26,718 | 72,446 | 29% | 79% |
| **Total Pre-Petition Secured Debt** | 13,671,630 | 13,671,630 | 423,124 | 1,692,535 | 3% | 12% |
| DIP Loan | 920,000 | 920,000 | 0 | 0 | 0% | 0% |
| Estimated Administrative and Priority Claims | 2,227,748 | 2,227,748 | 0 | 0 | 0% | 0% |
| Estimated Allowed Trade and GUC | 13,191,933 | 13,191,933 | 0 | 0 | 0% | 0% |

# **Exhibit C**

Business principle: Organizations tend to take on the characteristics of their leaders. This basic business and operational principle is at the strategic core of the Plan of Reorganization and Disclosure Statement submitted by Save the Hospital Group (SHG).  This differentiates the SHG Plan from all others.

SHG leaders, Drs. Greg and Ted Naman, bring healthcare vision, skills and recognized capability to this initiative that are unique in the state of Michigan and, in fact, the nation.

Undergoing dramatic transformation, healthcare is complex, fragmented and uncertain. There is intense focus on delivering *and measuring* improved quality care, better outcomes, and lower costs at all levels of the healthcare value chain.  These, along with collaborative leadership skills, have become the critical success factors in the industry. Drs. Greg and Ted Naman, (and their entities EPIC PLLC, NuWell, PLLC, and NMN, PLLC) are acknowledged Physician-Technology-Business subject matter experts (SME) at the forefront of this change.

Driven by deep local presence, they have the established respect, relationships and broad support to timely relaunch, reposition and successfully lead Doctors' Hospital.  Specifically, this includes Strategic Partnerships in Southeast Michigan with Physician, Healthcare System, Payer, Community, Nonprofit, Foundation, Government and Financial allies.  (See Exhibit A, letter from DMC)

Primary Care Physician (PCP) support is critical.  On average an individual PCPs generates $2 million of hospital revenue annually.  Naman high-volume, state-of-the-art, technology-rich PCP practices alone (i.e., present practices and in-negotiation acquisitions), have the ability to drive $24 million.

The strategic understanding of the quantitative and collaborative future of healthcare and the ability to mobilize broad support, drive the following assumptions.

(For additional information regarding Drs. Naman medical, medical technology, and business profiles, please see summary at the end of this note).


Effective Date.   The Projections attached herein assume a December 31, 2015 effective date.

Claims. The Projections assume that the Debtor's Schedules accurately reflect the amount and priority of pre-Petition Date Claims.


Opening Cash Balance.  Assumes $2,500,000.00 investment plus billings and A/R collections minus payment to DIP loan repayment

Cash receipts.  Existing service line revenues were calculated using the 10-week budget prepared and provided by the Debtor's financial advisor as amended by the resident (on-site) Trustee Agent. I.e. the best available projection of near and medium-term existing revenue streams.

Incremental revenue. SHG projects significant increases in incremental revenue resulting from multiple efficiency and new service line initiatives. These include 1) coding and billing optimization and improved yield, 2) vertical integration of services and ancillaries: Reference, pathology and advanced Labs, 3) home healthcare, dialysis center, infusion center, physical therapy, etc.

Cash disbursements

Gross payroll. Increase in employment costs related to the provision of incremental services.

Contractors. Includes contractor cost for the provision of the above services, as well as, Hospital operational management services

Information Technology.  Assumes significant restructuring of information and communication technology (ICT). Includes comprehensive design deployment of ICT architecture, including Health Information technology, directed internally by Dr. Ted Naman.  Includes Healthcare Strategic Partner participation.

Insurance. Includes initial assessment of cost and scope all existing insurance coverages. Anticipates cost of enhanced coverage in selected areas.

Marketing. Includes costs of Strategic Partnering initiatives described in this document and in the plan submission.

Professional Fees. Includes consulting and advisory fees to establish baseline opening financial statements, audits, departmental budgets and systems, tax return preparation and real-time diagnostic information and management information system,

Other operating administrative.

Capital investment. Includes both operational (surgical, imaging, IT) and site -related capital expenditures (building refurbishment, safety and security expenditures)

Chapter 11 payments

CMS and Michigan Recoupment. Includes projected recoupment based on assumed payment plans with CMS and state of Michigan related to CMS Overpayment Claim and Michigan Overpayment Claim, respectively. It is a condition precedent to the Effective Date of the plan that the Plan Sponsors and CMS and the state of Michigan, respectively, will have agreed to a payment plan, but no such agreement has been reached as of the time of this submission.

Other Cash Disbursements. Multiple projects related to array of relaunch initiatives: Facility, individual department (modernizations and restarts), site improvements, safety and security.

*Driving the numbers…*

<u>Medical and Operational Foundation of *Core Value Proposition*</u>

- Deep Local Presence,
- Medical and Operational Innovation,
- Strategic Partnerships (assured market effectiveness),
- Collaborative [peer] Leadership

<u>Dr. Greg Naman, M.D.</u>
Internal Medicine and Pediatric Medicine,
Double Board Certified
Partner in EPIC Primary Care, PLLC,
NuWell, PLLC, and NMN, PLLC
Patient Centered Medical Home
#1 Practice in Quality Metrics, Michigan
Pioneer ACO, Michigan Pioneer ACO
Ranked #1 Pioneer ACO in US by CMS.
Member of the Board of Directors, Michigan
Pioneer ACO
Chief Financial Officer of Michigan Pioneer
ACO
Medical Six Sigma Lean Focus
Leads Practice Acquisition Group and Business
Development at EPIC
Graduate of Wayne State University School of
Medicine

<u>Dr. Ted Naman, M.D.</u>
Internal Medicine and Pediatric Medicine,
Double Board Certified
Partner in EPIC Primary Care, PLLC,
NuWell PLLC, and NMN, PLLC
Patient Centered Medical Home
#1 Practice in Quality Metrics, Michigan Pioneer
ACO, Michigan Pioneer ACO
Ranked #1 Pioneer ACO in US by CMS.
Clinical Associate Professor
Department of Medicine, Wayne State University
School of Medicine
Microsoft Certified Systems Architect
Separately, twice offered positions to lead
Medical Information Technology at two separate
national hospital systems
Graduate of Wayne State University School of
Medicine

PLLC, and NMN, PLLC
Patient Centered Medical Home
#1 in Quality Metrics, Michigan Pioneer ACO,
Michigan Pioneer ACO ranked #1 Pioneer ACO
in US by CMS.
Member of the Board of Directors, Michigan
Pioneer ACO
Chief Financial Officer of Michigan Pioneer
ACO
Medical Six Sigma Lean Focus
Leads Practice Acquisition Group and Business
Development at EPIC
Graduate of Wayne State University School of
Medicine

PLLC, and NMN, PLLC
Patient Centered Medical Home
#1 in Quality Metrics, Michigan Pioneer ACO,
Michigan Pioneer ACO ranked #1 Pioneer ACO
in US by CMS.
Clinical Associate Professor
Department of Medicine, Wayne State University
School of Medicine
Microsoft Certified Systems Architect
Separately, twice offered positions to lead
Medical Information Technology at two separate
national hospital systems
Graduate of Wayne State University School of
Medicine

Oakland Physicians Medical Center
Cash Flow Projection 2016-2020

| Description | Yr1 2016 | Yr2 2017 | Yr3 2018 | Yr4 2019 | Yr5 2020 |
|---|---|---|---|---|---|
| Open Cash Balance [1] | $ 864,000.00 | $ 63,780.89 | $ 101,302.33 | $ 1,583,006.29 | $ 4,408,317.46 |
| **Cash Receipts** | | | | | |
| CMS (PRP) [2] | $ 5,880,000.00 | $ 6,762,000.00 | $ 7,776,300.00 | $ 8,942,745.00 | $ 10,284,156.75 |
| OCMH (PRP) | $ 4,560,000.00 | $ 5,244,000.00 | $ 6,030,600.00 | $ 6,935,190.00 | $ 7,975,468.50 |
| QAAP (PRP) | $ 6,300,000.00 | $ 7,245,000.00 | $ 8,331,750.00 | $ 9,581,512.50 | $ 11,018,739.38 |
| Other Payors (PRP) | $ 8,160,000.00 | $ 9,384,000.00 | $ 10,791,600.00 | $ 12,410,340.00 | $ 14,271,891.00 |
| EPIC PC/Outpt Med Clinics | $ 5,313,015.36 | $ 6,375,618.43 | $ 7,331,961.20 | $ 8,065,157.32 | $ 8,871,673.05 |
| New/Enhanced Services [3] | $ 4,477,000.00 | $ 4,924,700.00 | $ 5,417,170.00 | $ 5,958,887.00 | $ 6,554,775.70 |
| Rental Income | $ 260,000.00 | $ 286,000.00 | $ 314,600.00 | $ 346,060.00 | $ 380,666.00 |
| OIHN | $ 562,152.00 | $ 562,152.00 | $ 562,152.00 | $ 562,152.00 | $ 562,152.00 |
| Total Cash Receipts | $ 35,512,167.36 | $ 40,783,470.43 | $ 46,556,133.20 | $ 52,802,043.82 | $ 59,919,522.37 |
| **Cash Disbursements - Operations** | | | | | |
| Gross Payroll | $ 16,229,060.48 | $ 18,338,838.35 | $ 20,722,887.33 | $ 23,416,862.68 | $ 26,461,054.83 |
| Professional Fees | $ 1,404,000.00 | $ 1,586,520.00 | $ 1,792,767.60 | $ 2,025,827.39 | $ 2,289,184.95 |
| Employee Benefits | $ 1,491,511.03 | $ 1,685,407.46 | $ 1,904,510.43 | $ 2,152,096.79 | $ 2,431,869.37 |
| Contractors | $ 1,065,365.02 | $ 1,203,862.47 | $ 1,360,364.60 | $ 1,537,211.99 | $ 1,737,049.55 |
| IT | $ 1,166,000.00 | $ 1,317,580.00 | $ 1,488,865.40 | $ 1,682,417.90 | $ 1,901,132.23 |
| CMH Disbursements | $ 540,000.00 | $ 540,000.00 | $ 540,000.00 | $ 540,000.00 | $ 540,000.00 |
| Utilities [3] | $ 1,598,047.53 | $ 1,598,047.53 | $ 1,598,047.53 | $ 1,598,047.53 | $ 1,598,047.53 |
| Insurance | $ 360,000.00 | $ 406,800.00 | $ 459,684.00 | $ 519,442.92 | $ 586,970.50 |
| License and Regulatory Fees | $ 612,000.00 | $ 691,560.00 | $ 781,462.80 | $ 883,052.96 | $ 997,849.85 |
| Maintenance/Repair | $ 600,000.00 | $ 600,000.00 | $ 600,000.00 | $ 600,000.00 | $ 600,000.00 |
| EPIC PC/Outpt Center Rent | $ 375,000.00 | $ 375,000.00 | $ 375,000.00 | $ 375,000.00 | $ 375,000.00 |
| New/Enhanced Servics Expense [4] | $ 1,343,100.00 | $ 1,969,880.00 | $ 2,166,868.00 | $ 2,383,554.80 | $ 2,621,910.28 |
| Marketing | $ 560,000.00 | $ 560,000.00 | $ 560,000.00 | $ 560,000.00 | $ 560,000.00 |
| Other Operating and Admn | $ 3,906,338.41 | $ 4,492,289.17 | $ 5,166,132.55 | $ 5,941,052.43 | $ 6,832,210.29 |
| **Cash Disbursments - Other** | | | | | |
| Capital Investment | $ - | $ - | $ - | $ - | $ - |
| QAAP Payments | $ 1,030,000.00 | $ 1,184,500.00 | $ 1,362,175.00 | $ 1,566,501.25 | $ 1,801,476.44 |
| Cash Disbursements - Total | $ 32,280,422.47 | $ 36,550,284.99 | $ 40,878,765.24 | $ 45,781,068.65 | $ 51,333,755.83 |
| **Chapter 11 Payments** | | | | | |
| Trust Property | $ - | $ - | $ - | $ - | $ - |
| Non-Priority Tax Claims | $ - | $ - | $ - | $ - | $ - |
| CMS Recoupment | $ 1,800,000.00 | $ 1,800,000.00 | $ 1,800,000.00 | $ 1,800,000.00 | $ 1,800,000.00 |
| State of Michigan Recoupment | $ 480,000.00 | $ 480,000.00 | $ 480,000.00 | $ 480,000.00 | $ 480,000.00 |
| WRC Service Claim | $ 158,852.00 | $ 158,852.00 | $ 158,852.00 | $ 158,852.00 | $ 158,852.00 |
| Priority Tax Claims | $ 533,868.00 | $ 533,868.00 | $ 533,868.00 | $ 533,868.00 | $ 533,868.00 |
| Michigan Unemployment Insurance | 297,324.00 | 297,324.00 | 297,324.00 | 297,324.00 | 297,324.00 |
| New Crittenton Note | $ 434,520.00 | $ 434,520.00 | $ 434,520.00 | $ 434,520.00 | $ 434,520.00 |
| General Unsecured Creditors | $ 163,700.00 | $ 327,400.00 | $ 327,400.00 | $ 327,400.00 | $ 491,100.00 |
| Professional Fee Claims | $ 163,700.00 | $ 163,700.00 | $ 163,700.00 | $ 163,700.00 | $ 163,700.00 |
| Chapter 11 Payments - Total | $ 4,031,964.00 | $ 4,195,664.00 | $ 4,195,664.00 | $ 4,195,664.00 | $ 4,359,364.00 |
| **Exit Facility** | | | | | |
| Exit Facility Borrowing | $ - | $ - | $ - | $ - | $ - |
| Exit Facility Availability | $ - | $ - | $ - | $ - | $ - |
| End Cash Balance | $ 63,780.89 | $ 101,302.33 | $ 1,583,006.29 | $ 4,408,317.46 | $ 8,634,720.01 |
| Net Cash Inflow (Outflow) | $ (800,219.11) | $ 37,521.45 | $ 1,481,703.96 | $ 2,825,311.17 | $ 4,226,402.55 |

[1] Opening balance assumes approximately $2.5 million of funds from investors plus billings and A/R collections, minus Sant DIP loan repayment

[2] Previous billing collections rate enhanced from 27% to 38% by new management/ownership established billing collections rates

[3] Energy, and other expenses, efficiency audits to national benchmarks

[4] New and enhanced services will include but not limited to: reference lab, pharmacy, infusions, home health care, skilled nursing facilities