**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

In Re:

OAKLAND PHYSICIANS MEDICAL         Case No. 15-51011-wsd
CENTER, L.L.C. d/b/a DOCTORS'          Chapter 11
HOSPITAL OF MICHIGAN, a Michigan
limited liability company,                       Hon. Walter Shapero

                 Debtor.
_____/

**SANT PARTNERS, LLC'S POST-TRIAL BRIEF IN SUPPORT OF CONFIRMATION**
**OF THIRD AMENDED COMBINED DISCLOSURE STATEMENT AND**
**PLAN OF REORGANIZATION OF OAKLAND PHYSICIANS MEDICAL**
**CENTER, L.L.C. PROPOSED BY SANT PARTNERS, LLC**

Sant Partners, LLC ("Sant") submits this *Post-Trial Brief in Support of Entry of an Order Confirming the Third Amended Combined Disclosure Statement and Plan of Reorganization of Oakland Physicians Medical Center, L.L.C. Proposed by Sant Partners, LLC* [Docket No. 268] (as it may be amended or modified, the "Sant Plan")[1] pursuant to section 1129 of Title 11 of the United States Code (the "Bankruptcy Code").

**PRELIMINARY STATEMENT**

Through the testimony and exhibits presented at trial (the "Confirmation Hearing"), Sant has met its burden of establishing by a preponderance of the evidence that the Sant Plan satisfies the requirements for confirmation set forth in section 1129 of the Bankruptcy Code. In

---

[1] The various objections to the Sant Plan were filed to Sant's *Second Amended Combined Disclosure Statement and Plan of Reorganization of Oakland Physicians Medical Center, L.L.C., Proposed by Sant Partners* [Docket No. 268]. On December 15, 2015, Sant filed its proposed *Third Amended Combined Disclosure Statement and Plan of Reorganization of Oakland Physicians Medical Center, L.L.C., Proposed by Sant Partners, LLC* [Docket No. 364]. Prior to the date of closing arguments regarding confirmation of the Sant Plan, Sant will file an amended version of the *Third Amended Combined Disclosure Statement and Plan of Reorganization of Oakland Physicians Medical Center, L.L.C., Proposed by Sant Partners, LLC*. Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Sant Plan.

1

support of confirmation of the Sant Plan, Sant incorporates herein by reference *Sant Partners, LLC's Memorandum of Law in Support of an Order Confirming Third Amended Combined Disclosure Statement and Plan of Reorganization of Oakland Physicians Medical Center, L.L.C. Proposed by Sant Partners, LLC* (the "Memorandum of Law") [Docket No. 361].[2]

The Sant Plan represents the culmination of significant efforts by multiple parties-in-interest to reach a fair and equitable resolution of myriad complex business and legal issues. These efforts have resulted in a plan which provides significant value for the Debtor's stakeholders and a vehicle for the Debtor's successful emergence from chapter 11.

The Sant Plan clearly meets the feasibility requirements of section 1129(a)(11) of the Bankruptcy Code. Sant has demonstrated both a viable business plan and access to sufficient liquidity to fund the Reorganized Debtor's cash needs until it can become profitable. Indeed, Sant has already funded its portion of the Sant Plan through the debtor-in-possession financing it has provided during the case. And, as co-investor under the Sant Plan, Dr. Jawad Shah is providing an incremental: (i) investment of $375,000 in cash to fund a portion of the Sant Plan; and (ii) $8 million line of credit that can be drawn upon as of the Effective Date. Still further, Sant and Dr. Shah (together with his Flint, Michigan-headquartered Insight Institute of Neurosurgery and Neuroscience) have received commitments from numerous physicians and

---

[2] Confirmation of the Sant Plan is further supported by: (i) the *Omnibus Response to Objections to Third Amended Combined Disclosure Statement and Plan of Reorganization of Oakland Physicians Medical Center, L.L.C. Proposed By Sant Partners, LLC* (the "Response") [Docket No. 368]; (ii) the *Declaration of Sanyam Sharma in Support of Confirmation of Plan of Reorganization Proposed by Sant Partners, LLC* [Docket No. 375] (the "Sharma Declaration"); (iii) the *Declaration of John Ponczocha with Respect to Confirmation of Combined Disclosure Statement and Plan of Reorganization of Oakland Physicians Medical Center* [Docket No. 369] (the "Ponczocha Declaration"); and (iv) the *Declaration of Kevin A. Berry with Respect to Confirmation of Combined Disclosure Statement and Plan of Reorganization* [Docket No. 366] (the "Berry Declaration," together with the Sharma Declaration and the Ponczocha Declaration, the "Declarations"), each of which are incorporated herein by reference.

2

physician groups who are eager to join the Reorganized Debtor—and bring new patients, practices and revenues to the Reorganized Debtor—after the Effective Date. And the Reorganized Debtor will benefit from Dr. Shah's significant experience in building, expanding and administering a high volume, successful neurosurgery and neuroscience center.

While the Sant Plan provides a structure that will allow the Debtor to permanently stabilize its capital structure and working capital needs, confirmation of the Save the Hospital Group Plan (the "SHG Plan") would jeopardize everything that the Debtor stands to accomplish.[3] In particular, the Save the Hospital Group ("SHG") has failed to demonstrate that it has actual commitments for the purported $6,000,000 to $10,000,000 of new equity contributions promised under the SHG Plan and needed to make the payments and provide the financial support required under it. In fact, SHG has failed to produce evidence that most of the alleged capital "commitments" to fund its plan are more than mere non-binding expressions of interest. Testimony at the Confirmation Hearing established that SHG's own projections show that, on the effective date of the SHG Plan, insufficient funding would exist to pay the plan obligations then due. Indeed, the SHG Plan is little more than an ill-conceived construction of smoke and mirrors with only enough actual substance behind it to, at best, repay Sant's DIP Facility and provide nominal additional liquidity to the Debtor.

And critically, even if SHG had demonstrated actual financing commitments in amounts sufficient to consummate its plan—which it clearly did not do—for the reasons discussed below,

_____

[3] The SHG Plan is the *Second Amended Combined Plan of Reorganization and Disclosure Statement filed by the Save the Hospital Group* [Docket No. 266]. On December 11, 2015, Sant filed the *Combined Objection of Sant Partners, LLC to Final Approval of the Disclosure Statement and Confirmation of Plan of Save the Hospital Group* [Docket No. 336] (the "Sant Objection"), which Sant incorporates herein by reference.

the SHG Plan structure is a clear violation of the federal Stark Law, rendering the plan patently not confirmable on its face.

But even if the Court were to nevertheless determine that both the Sant Plan and the SHG Plan meet the legal requirements for confirmation—which is not possible because SHG failed to establish feasibility and the SHG Plan violates federal law—the Sant Plan is the superior option. Not only is the Sant Plan void of the lack of feasibility and illegality of the SHG Plan, as explained in detail below, the majority of creditors—in both number and claim amount—have expressed a clear preference for the Sant Plan. That result was entirely expected because, in addition to its feasibility, the Sant Plan preserves a significant number of avoidance actions and the proceeds thereof for pursuit by unsecured creditors, while the proponents of the SHG Plan have made clear that such causes of action will not be pursued (and thus, under the SHG Plan, their value to the estate will be lost).

Accordingly, the Court should confirm the Sant Plan and deny confirmation of the SHG Plan.

## **ARGUMENT**

As set forth in the *Notice of Status of Objections Against Combined Disclosure Statement and Plan of Reorganization of Oakland Physicians Medical Center, L.L.C. Proposed by Sant Partners, LLC* [Docket No. 407], Sant has resolved almost all of the objections to the Sant Plan. The only objections that remain are from present or former plan proponents—SHG, Drs. Short[4] and Singhal, and Global Health Organization Consulting, Inc. (collectively, the "Objecting Parties"). For the reasons set forth below, these objections are without merit and should be overruled.

---

[4] Although Dr. Short is not a plan proponent, he is named as a potential defendant in the Trust Causes of Action provided to the Liquidating Trust under the Sant Plan.

4

# I.    The Court Should Confirm the Sant Plan

## A.    The Sant Plan is Feasible

1.    As set forth in the Memorandum of Law, section 1129(a)(11) of the Bankruptcy Code, a plan of reorganization may be confirmed only if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11).   The evidence presented at the Confirmation Hearing demonstrates that not only is the Sant Plan feasible—it is the only feasible plan presented to creditors and the Court.

2.    SHG contests the feasibility of the Sant Plan on grounds that Sant will acquire 100% of the ownership of the Reorganized Debtor and that the lack of physician ownership will prevent the recruitment of practitioners and patient volume to the Reorganized Debtor. *Objection of Save the Hospital Group to (i) Confirmation of Plan of Reorganization of Sant Partners, LLC, as Amended; and (ii) Final Approval of Disclosure Statement of Sant Partners, LLC* [Docket No. 345] (the "SHG Objection") at pp. 3-4.[5]  As explained in the Response, even if these objections once had merit, they are moot because Dr. Shah is now an investor in the Reorganized Debtor under the Sant Plan.  Further, Mr. Sanyam Sharma and Dr. Shah testified at the Confirmation Hearing as to Dr. Shah's ability to significantly enhance hospital revenues, as well as to attract numerous additional physicians and groups of physicians that would join the hospital once, and only if, the Sant Plan is confirmed.  Sharma Declaration at ¶ 49; Hr'g Tr. Dec.

---

[5] Global Health Organization Consulting, Inc. also objects to the feasibility of the Sant Plan [Docket No. 347].

22, 2015 at p. 104, ll. 4-6 (Dr. Shah); p. 181, ll. 9, 11, 13-14 (Mr. Sharma).[6] Both Mr. Sharma

and Dr. Shah also provided uncontroverted evidence that the financial projections set forth in the

Sant Plan are achievable and conservative. Sharma Declaration at ¶¶ 42, 45, 49; Hr'g Tr. Dec.

22, 2015 at p. 108, l. 18 (Dr. Shah); p. 152, l. 25 – p. 153, l. 9 (Mr. Sharma); p. 162, ll. 3-11 (Mr.

Sharma).

3.     To be clear, the Objecting Parties have not questioned Sant's ability to fund the

Sant Plan—and for good reason. Sant has already demonstrated its ability to fund its portion of

the equity purchase price in the Sant Plan through its prior and current funding of the DIP

Facility. In addition, Dr. Shah testified that, on the Effective Date, he will invest $375,000 in

cash that is immediately available in his personal bank accounts, and that he will provide the

Reorganized Debtor with an $8 million line of credit through Amana Credit Holdings, Inc.,

which has already been committed without contingencies. *See* Exhibit 41.

4.     Sant also introduced testimony evidence that, among other things: (i) based on its

experience and affiliation with the Infrahealth Group of companies, it is able to identify

significant cost-saving opportunities and implement the necessary operational restructuring of

the Debtor's administrative operations; and (ii) based on its affiliation with St. Martinus

University, Faculty of Medicine, it has the unique synergistic ability to generate new revenues

from the Reorganized Debtor's medical education and clinical rotation programs. Sharma

Declaration at ¶¶ 11-12.

5.     The Sant Plan is therefore fully funded and allows the Reorganized Debtor to

conduct and expand business operations. Therefore, confirmation of the Sant Plan is not likely

to be followed by liquidation or the need for further reorganization.

_____

[6] The transcripts containing the testimony from the Confirmation Hearing that is cited herein are
attached to this Post-Trial Brief as **Exhibit A** (Dec. 22, 2015) and **Exhibit B** (Dec. 23, 2015).

**B.     The Sant Plan Was Proposed in Good Faith**

6.     SHG objects to the Sant Plan on the grounds that the Sant Plan was not proposed in good faith because of "Sant's overly aggressive loan-to-own strategy."  SHG Objection at ¶13. As explained in the Response, this argument is based on a gross misstatement of the facts and circumstances of Sant's actions during the case and a flawed interpretation of caselaw.  Sant's actions have been approved by the Court and, if anything, have substantially benefitted all creditors by allowing the Debtor to continue operating and encouraging a competitive bidding process that resulted in four plans of reorganization being filed and a series of increased proposed creditor recoveries.

7.     Sant was clear from the start that is was providing the Debtor with a needed post-petition debtor-in-possession financing facility as a bridge to meet the Debtor's imminent cash needs during the pendency of the case, for the purpose of confirming and consummating a plan of reorganization in which Sant would obtain an equity stake in the Reorganized Debtor.  After full disclosure of these objectives, and at the request of the Debtor, the DIP Facility was approved by the Court.  It was only after the Debtor's default under the DIP Facility—a default which the Debtor's counsel acknowledged—that the Court appointed Mr. Simon as chapter 11 trustee.  Had the Debtor obtained new debtor-in-possession financing at any point prior to its default, exclusivity could have been preserved and Mr. Simon's appointment may not have been necessitated.

8.     SHG attempts to analogize Sant's actions in the Chapter 11 Case with those by a third-party in the case of *In re The Free Lance-Star Publishing Co. of Fredericksburg, VA*, 512 B.R. 798 (Bankr. D. Va. 2014).  This is no more than misleading and erroneous.  In *Free Lance*, a creditor sought to credit bid its alleged secured claim for certain assets, despite the fact that the creditor did not have a valid lien or security interest on those assets.  In fact, unbeknownst to the

debtor, the creditor filed a financing statement with respect to assets that were never part of its collateral package. In addition, the creditor pressured the debtor to shorten the marketing process for the sale of the debtors' assets, and to place language in the marketing materials that conspicuously advertised the creditor's (ultimately disallowed) credit bid rights. *Id*. at 806. As a result, the court found that a "perfect storm" existed in which: (i) the creditor was less than fully-secured; (ii) the creditor's overly zealous loan-to-own strategy "depressed enthusiasm" for the assets; and (iii) the creditor's actions had a negative impact on the auction, which resulted in the court's decision to limit the creditor's credit bid. *Id*. at 808. And yet, even under those egregious circumstances, the court still allowed the creditor to credit bid with respect to the assets on which the creditor had a valid secured claim. *Id*.

9. Sant's actions here could not be more distinct from those described in *Free Lance*. Sant's security interest in the Debtor's assets is undisputed as it was granted by the Court pursuant to the *Final Order (I) Authorizing the Debtor to Obtain Postpetition Financing on a Senior Secured, Superpriority Basis, (II) Authorizing the Use of Cash Collateral, (III) Granting Adequate Protection to Prepetition Secured Parties and (IV) Scheduling a Final Hearing* [Docket No. 131]. In addition, Sant's actions were not designed to discourage parties from bidding on the Debtor's assets. To the contrary, a representative of the chapter 11 trustee, Kevin Berry—along with the Debtor—met with or spoke to five separate groups of potential plan proponents. *See* Berry Declaration at ¶9. This process resulted in competing plans of reorganization, as well as both Sant and SHG enhancing the consideration to be paid to creditors pursuant to their respective plans. Sant's actions—completely transparent and approved by the Court—have achieved the goals of chapter 11 by maximizing creditor recoveries and the likelihood of a successful reorganization of the Debtor.

8

10. Finally, as explained in more detail below, the preference of the Sant Plan over the SHG Plan by a majority of creditors is a testament to the overall fairness and transparency of the Sant Plan, as well as an acknowledgment by the Debtor's claimholders that the Plan has been proposed in good faith and for proper purposes.

## II.    The SHG Plan Should Not Be Confirmed

### A.    The SHG Plan Is Not Feasible

11. While the evidence presented at the Confirmation Hearing clearly established the feasibility of the Sant Plan, the record fails to demonstrate the feasibility of the SHG Plan.

12. As explained in the Sant Objection and the Memorandum of Law, a plan proponent has an obligation to provide the court and interested parties with sufficient information to make the feasibility determination. *See In re Shefa, LLC*, 535 B.R. at 176; *In re Walker*, 165 B.R. 994, 1005 (Bankr. E.D. Va. 1994). Courts in this district have made it clear that a plan is not sufficiently concrete as to be feasible if it contains a financing contingency, and the SHG Plan is fraught with such contingencies. *In re Made in Detroit*, 299 B.R. 170, 177 (Bankr. E.D. Mich. 2003).

13. The plan proponent bears the burden to present evidence to sufficiently demonstrate feasibility. *In re Greate Bay Hotel & Casino, Inc*., 251 B.R. 213, 226 (Bankr. D.N.J. 2000). At the Confirmation Hearing, the sole witness for SHG—Dr. Greg Naman—testified that of the $10 million in funding promised under the SHG Plan, at most, only $3.75 million is committed, with the remaining $6 million being no more than non-binding expressions of interest or non-binding letters of intent. Hr'g Tr. Dec. 23, 2015 at p. 36, ll. 10-12; p. 41, l. 7. Moreover, with respect to the allegedly committed portion of the SHG financing, none of the documents evidencing the availability of those funds have been filed with the Court or made

available to parties-in-interest to review. Therefore, SHG has failed to demonstrate by a preponderance of the evidence that it has any committed financing available.

14. When asked why the remaining portion of the funding for the SHG Plan is not committed, Dr. Naman cited the speed of this case and the holiday season. Hr'g Tr. Dec. 23, 2015 at p. 36, l. 23 – p. 37, l. 1. This seems disingenuous at best as SHG filed its initial *Combined Plan of Reorganization and Disclosure Statement* on November 1, 2015 [Docket No. 217], meaning that SHG has had nearly two months to shore up its financing. Since Dr. Naman's testimony did not identify when and on what basis (either not subject to contingencies or subject only to achievable contingencies) its alleged financial commitments might become firm, the financing supporting the SHG Plan is, at best, purely speculative.

15. Despite Dr. Naman's inability to provide a firm timeline as to when SHG might have firm commitments for the remainder of its financing or any information about the sources thereof, Dr. Naman testified that a "substantial amount" of the $10 million in largely uncommitted financing promised under the SHG Plan will be needed by the in SHG's first year of operations. Hr'g Tr. Dec. 23, 2015 at p. 65, l. 13; p. 65, l. 25 – p. 66, l. 2.

16. Because SHG has not demonstrated that it has actual commitments for the equity contributions contemplated under the SHG Plan, the plan is not feasible and the Court should deny confirmation of the SHG Plan.

**B.      The SHG Plan Was Not Proposed in Good Faith**

17. Section 1129(a)(3) of the Bankruptcy Code precludes confirmation of a plan that has not been proposed in good faith or is by any means forbidden by law. The SHG Plan fails with respect to each of these points.

### 1. The SHG Plan Violates the Federal Stark Law

18. Federal law provides for specific requirements concerning physician ownership and investment in hospitals. 42 C.F.R. §411.362. Known as the Stark Law (the "Stark Law"), the purpose of the law is to govern physician self-referral for Medicare and Medicaid patients, which is the practice of a physician referring a patient to a medical facility in which he has a financial interest, including ownership or investment. The Stark Law seeks to eliminate this inherent conflict of interest, as a physician's ability to benefit from a referral could encourage an over-utilization of services and increased health care costs.

19. The SHG Plan violates at least two provisions of the Stark Law.

A. First, the Stark Law requires that "Any ownership or investment interests that the hospital offers to a physician owner or investor are not offered on more favorable terms than the terms offered to a person who is not a physician owner or investor." CFR §411.362(b)(4)(ii).

B. Second, the Stark Law requires that "The hospital (or any owner or investor in the hospital) does not directly or indirectly provide loans or financing for any investment in the hospital by a physician or owner or investor." CFR §411.362(b)(4)(iii).

The evidence presented at the Confirmation Hearing demonstrates a clear violation of each of these two requirements by SHG and the SHG Plan, thereby making the SHG Plan patently not confirmable.

A. First, Dr. Naman testified that the $500,000 for his equity commitment to SHG in exchange for 5% of the Class B equity in the SHG reorganized debtor and the $500,000 for the equity commitment of Dr. Ted Naman, also in exchange for 5% of the Class B equity in the SHG reorganized debtor are being loaned to each of them by Dr. Shakib Halabu—who himself is committing $2 million for 20% of the Class B equity in the SHG reorganized debtor.

11

Hr'g Tr. Dec. 23, 2015 at p. 95, ll. 8-11. This expressly violates the Stark Law's prohibition against any investor in a hospital either directly or indirectly providing loans or financing for an investment in the hospital to another physician or owner or investor.[7]

        B.     Second, Dr. Naman testified that he and Dr. Ted Naman will receive Class A interests in the Reorganized Debtor for no additional consideration. Hr'g Tr. Dec. 23, 2015 at p. 44, ll. 2, 4. The receipt by these doctors of Class A equity for no additional consideration runs afoul of the Stark Law's requirement that no ownership interests may be offered to a physician owner or investor on more favorable terms than those offered to a person who is not a physician owner or investor.

        As either of these violations of the Stark Law is sufficient alone to render the SHG Plan not confirmable, the Court must deny confirmation of the SHG Plan pursuant to Section 1129(a)(3) of the Bankruptcy Code as its structure is forbidden by law.

        **2.**     **The Proposed Modifications to the SHG Do Not Cure the Absence of Good Faith**

    20.   As explained in detail in the Memorandum of Law and the Sant Objection, the SHG Plan was not proposed in good faith, and SHG's proposed revisions to its plan do not remedy its flaws. At the Confirmation Hearing, SHG announced that it will modify its plan so that the release and exculpation provisions mirror those in the Sant Plan. While at first glance this might appear to be a step in the right direction as it will at least preserve hundreds of thousands, if not millions, of dollars of potential claims for fraudulent transfers and insider transactions against members of the board of directors of the Debtor, SHG's subsequent statements make clear that, from a practical perspective, these modifications are illusory at best.

---

[7] Dr. Naman acknowledged that while he has sought advice from counsel as to issues involving the Stark Law, at no point did he obtain advice regarding whether the loans being provided by Dr. Halabu caused a violation of the law. Hr'g Tr. Dec. 23, 2015 at p. 95, ll. 15, 24.

Specifically, SHG's statements show that if the SHG Plan is confirmed, SHG does not intend to pursue any of these causes of action. Hr'g Tr. Dec. 23, 2015 at p. 14, ll. 14-25. Similarly illusory is the SHG's position that although the group is not interested in pursuing these potential causes of action, the revised SHG Plan would preserve the causes of action in the event of a subsequent "chapter 33" or chapter 7 bankruptcy filing. Hr'g Tr. Dec. 23, 2015 at p. 14, ll. 14-25. What SHG failed to disclose, however, is that by the time of any future bankruptcy filing by SHG, these causes of action could be well beyond the applicable statutes of limitations, thereby leaving them worthless to any future bankruptcy estate. Further, such proposed retention would not benefit existing general unsecured creditors who are receiving a fixed recovery under the SHG Plan, and any subsequent bankruptcy case would simply further dilute recoveries to such creditors.

21.     While it is true that parties-in-interest may ultimately determine that it would be uneconomical or disruptive to the operations of the Reorganized Debtor to pursue a particular cause of action, justice demands that allegations of fraud and looting of a community asset like this hospital be investigated and pursued for the benefit of creditors, and not merely swept under the rug by the very targets of those investigations. For these causes of action to have any value to creditors at all, they need to be investigated now—before they are rendered worthless by the application of statutes of limitation. Any action to the contrary taken by SHG is not in good faith, and should necessitate the Court's denial of confirmation of the SHG Plan.

## III.     The Sant Plan Should be Confirmed Over the SHG Plan

22.     As explained in the Memorandum of Law, even if the Court were to determine that both the Sant Plan and the SHG Plan may be confirmed, section 1129(c) of the Bankruptcy Code only permits the confirmation of a single plan. 11 U.S.C. § 1129(c). In a situation where more than one plan is confirmable (for the reasons explained above, this is not the case here) to

determine which plan to confirm, courts must consider, among other things: (i) the preferences of creditors and equity security holders; (ii) the treatment of creditors and holders of equity interests; and (iii) the feasibility of each plan. *In re TCI2 Holdings, LLC*, 428 B.R. 117, 182 (Bankr. D.N.J. 2010). The evidence presented at the Confirmation Hearing makes clear that an analysis of each of these factors strongly favors confirmation of the Sant Plan.

### 1. Feasibility

23. As set forth above, the financing commitments under the Sant Plan are not subject to contingencies other than the confirmation and consummation of the Sant Plan and its proponents have a viable plan in place for a successful reorganization of the Debtor. With Dr. Shah's practice and new physician groups eager to join the Reorganized Debtor, new patients will follow, leaving no question as to the feasibility of the Sant Plan. To the contrary, the successful consummation of the SHG Plan is a high stakes bet fraught with uncertainty. SHG has failed to demonstrate that it has actual commitments for the equity contributions and financing needed to make the SHG Plan work—and indeed, Dr. Naman testified at the Confirmation Hearing that such funds are speculative. In addition, SHG has not presented a plan that will be funded in a way that is permitted by federal law and, instead, the funding scheme proposed under the SHG Plan violates federal law. Accordingly, there is no doubt that the Sant Plan is clearly feasible while the SHG Plan is not.

### 2. The Sant Plan Provides More Favorable Treatment to Creditors

24. As a whole, the Sant Plan provides creditors with equal or higher recoveries than under the SHG Plan. For example, the Sant Plan provides a negotiated settlement with Crittenton that is the preferred treatment of Crittenton over that provided by the SHG Plan, and Crittenton made its preference for the Sant Plan clear on the record at the Confirmation Hearing.

14

25.    With respect to the holders of Class 7 General Unsecured Claims, the Sant Plan offers creditors guaranteed cash recoveries to the Trust in the amount of at least $1,600,000. This guaranty essentially matches the recovery provided by SHG.  But unlike the SHG Plan, under the Sant Plan the Trust is created for the benefit of unsecured creditors and the Trust will receive and is entitled to pursue the Trust Causes of Action.  SHG has stated it will not pursue these causes of action.  While the initial estimate was that recoveries under the Trust Causes of Action would fall within the $500,000 to $1,600,000 range, as set forth on the record of the Confirmation Hearing, additional Causes of Action related to the Debtor's clinical rotation program have been identified and will be provided to the Trust.  Hr'g Tr. Dec. 22, 2015 at p. 197, ll. 16, 19, 24.  These additional Causes of Action have the potential to generate recoveries in excess of this initial estimate. Hr'g Tr. Dec. 22, 2015 at p. 197, l. 16.  Therefore the significant potential upside associated with the Trust Causes of Action makes the Sant Plan a superior alternative for unsecured creditors.

26.    As a result, the Creditors' Committee and Crittenton each signed Plan Support Agreements in support of the Sant Plan and Crittenton and a majority of the members of the Creditors' Committee voted to reject the SHG Plan.  *See* Plan Support Agreement dated as of December 2, 2015 between the Plan Sponsor and Crittenton [Docket No. 306]; Plan Support Agreement dated as of December 7, 2015 between the Plan Sponsor and the Committee [Docket No. 310].

### 3.    The Majority of Creditors Prefer the Sant Plan

27.    The majority of creditors who voted on the plans prefer the Sant Plan to the SHG Plan.  As detailed in the *Certification of UpShot Services LLC Regarding Tabulation of Votes in Connection With the Second Amended Plan of Reorganization of the Debtor Dated November 2, 2015* [Docket No. 362], of the 54 creditors expressing a preference, 55.6% preferred the Plan

15

(representing 60.8% in dollar amount), and only 42.6% (representing 39.1% in dollar amount) preferred the SHG Plan.

28.     With respect to holders of Class 7 Claims in particular, 57.9% (representing 65.6% in dollar amount) voted to accept the Plan, as opposed to only 45.8% (representing 49.9% in dollar amount) voting to accept the SHG Plan.  If, however, the Class 7 Claims held by individuals subject to the Trust Causes of Action are not counted in determining preferences, the dollar amount of the Class 7 General Unsecured Creditors voting to accept the Sant Plan jumps up overwhelmingly to approximately 86%, and the dollar amount of the Class 7 General Unsecured Creditors voting to accept the SHG Plan decreases sharply to approximately a mere 24%.  This demonstrates a significant preference by the creditor body as a whole for the Sant Plan over the SHG Plan.

## IV.     SHG's Request for Mediation is Merely a Delay Tactic

29.     At the conclusion of Confirmation Hearing, SHG requested—for the first time— that the Court compel mediation to see if a settlement is possible through a combination of the competing plans.   Sant respectfully submits that mediation is not appropriate under the circumstances.  Despite SHG's contention to the Court that a combination of the plan proponents could be formed, the parties do not need a mediator to facilitate these discussions.  This is a pure business decision that is outside of the scope of what can be accomplished through mediation, and the plan proponents are capable of making this determination on their own.  It cannot and should not be forced upon them.

30.     Indeed, Sant and SHG have already had several unsuccessful discussions concerning whether a combination is possible—including at least one such discussion after the conclusion of the Confirmation Hearing.  They have been unable to reach acceptable terms and Sant has determined that there is no basis to proceed with further discussions at this time.  That

16

said, neither confirmation nor consummation of either plan would foreclose the admission of additional members into the Reorganized Debtor if the parties later come to believe that a partnership is beneficial. Requesting compelled mediation is simply a delay tactic by SHG, which will accomplish nothing more than increasing the significant administrative burden of the Debtor's continued languishing in bankruptcy.

31. Notably, the manner of this request demonstrates its disingenuousness. If SHG had a sincere desire to combine, it would have initiated such discussions with Sant while the parties were together through a four-day Confirmation Hearing. Instead, without notice and without raising its request beforehand, SHG sprung its suggestion to mediate on Sant and the Court at the conclusion of the Confirmation Hearing.

32. SHG's request for compelled mediation should be denied.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

## CONCLUSION

For the foregoing reasons, and in light of all of the evidence submitted at the Confirmation Hearing, Sant respectfully requests that the Court confirm the Sant Plan and deny confirmation of the SHG Plan.

Respectfully Submitted,

HONIGMAN MILLER SCHWARTZ AND COHN LLP

By: /s/ E. Todd Sable
    E. Todd Sable (P54956)
    Glenn S. Walter (P79853)
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226
Telephone: (313) 465-7548
Email: tsable@honigman.com

*Counsel for Sant Partners, LLC*

Dated: January 5, 2016

18

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

In Re:

OAKLAND PHYSICIANS MEDICAL        Case No. 15-51011-ws
CENTER, L.L.C. d/b/a DOCTORS'         Chapter 11
HOSPITAL OF MICHIGAN, a Michigan
limited liability company,                       Hon. Walter Shapero

                 Debtor.
_____/

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on January 5, 2016, I electronically filed the *Sant Partners, LLC's Post-Trial Brief in Support of Confirmation of the Third Amended Combined Disclosure Statement and Plan of Reorganization of Oakland Physicians Medical Center, L.L.C. Proposed by Sant Partners, LLC* with the Clerk of the Court which sends notice by operation of the Court's electronic filing service to all ECF participants registered to receive notice in this case.

HONIGMAN MILLER SCHWARTZ AND COHN LLP

By: /s/ E. Todd Sable
      E. Todd Sable (P54956)
      Glenn S. Walter (P79853)
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226
Telephone: (313) 465-7548
Email: tsable@honigman.com

*Counsel for Sant Partners, LLC*

Dated: January 5, 2016

19

**EXHIBIT A**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:                          .    Case No. 15-51011
                                .    (wsd)
OAKLAND PHYSICIANS MEDICAL      .
CENTER, LLC                     .
                                .    Detroit, Michigan
    Debtor in Possession.       .    December 22, 2015
                                .

. . . . . . . . . . . . . . .

EVIDENTIARY HEARING RE: CONFIRMATION ISSUES
BEFORE THE HONORABLE WALTER SHAPERO
TRANSCRIPT ORDERED BY:  GLENN WALTER

APPEARANCES:

For Sant Partners LLC:      Honigman, Miller, Schwartz & Cohn
                            By: E. TODD SABLE
                                GLENN WALTER
                                660 Woodward Ave., Suite 2290
                                Detroit, MI 48226
                                (313) 465-7548

For Health Care             Allard & Fish, PC
Ombudsman:                  By: DEBORAH FISH
                                2600 Buhl Bldg.
                                535 Griswold
                                Detroit, MI 48226

For United States           Office of the U.S. Attorney
(HHS):                      By: KEVIN ERSKINE
                                211 W. Fort St., Suite 2001
                                Detroit, MI 48226

For Save the Hospital       By: SHELDON TOLL
Group:                          2000 Town Center
                                Ste 2100
                                Southfield, MI 48075

For Michigan Department     By: TRAVIS COMSTOCK
of Health & Human               525 W. Ottawa, 3rd Floor
Services:                       Lansing, MI 48909

1  chance to review those.

2  A.   Yes, I've had a chance to review them.

3  Q.   Can you tell me what they are?

4  A.   Those are physicians that are willing to come to the

5  hospital to practice there if of course we end up taking

6  responsibility for the hospital.

7  Q.   Let me scale that back a moment.  Were these letters

8  written to you?

9  A.   These letters were written to I believe both myself

10  and the Sant Partners.  Yes, both myself and the Sant

11  Partners, correct.

12  Q.   Are you familiar with each of the doctors who signed

13  these letters?

14  A.   Yes, I am.

15  Q.   And it's your testimony that each of these doctors

16  would intend to apply for privileges to the Debtor's

17  hospital and to refer patients there if the Sant Partners

18  is confirmed?

19  A.   Yes, correct.

20  Q.   What type of practices do these doctors have?

21  A.   There's a variety of different practices.  There's

22  anesthesiology, there are primary care physicians, plus

23  there are surgeons.  There is an obstetrician, a

24  neurologist; so there's a variety of different specialties.

25          MR. SABLE:  Your Honor, I'd move for the admission

1 in this projection?

2 A.    Yes, I can.  So on the left side, the service line,

3 we're mentioning a variety of different procedures that

4 could be done at the hospital.  And then the next is the

5 number of cases that we would intend to see or do per

6 month.  And then the next line of course is the revenue per

7 case, and then the total revenue per physician for the

8 combined number of cases, and then the number of physicians

9 that we have that would be involved in those cases, and

10 finally the total revenue and all that coming down to a

11 total number at the end of $2,958,660.  So really this is a

12 breakdown and explanation of how we arrived at that number.

13 Q.    How you arrived at the 2,958,660 number?

14 A.    Correct.

15 Q.    And that's monthly projection?

16 A.    That's a monthly projection, correct.

17 Q.    Would you say that this is aggressive or conservative?

18 A.    I think this is extremely conservative.

19 Q.    Why do you think it's extremely conservative?

20 A.    We based our revenue per case on projections from

21 Medicare.  And when you look at the different types of

22 procedures one can do, even within this there's variations.

23 So when you do a brain surgery or craniotomy, it can be a

24 very superficial brain tumor, or it could be something very

25 deep, and all of these are reimbursed differently depending

1    A.    A number of things.  It's been enhanced from the, you

2    know, partnership with Dr. Shah, and the contemplated

3    effective date was sort of conservatively pushed back to

4    March.  And we addressed some of the concerns raised by

5    CMS, the state, and other parties.

6    Q.    Now you said in Paragraph 41 of your statement that,

7    "To demonstrate the feasibility of a business plan in

8    consultation with the Debtor's financial advisor, I

9    prepared financial projections," correct?

10   A.    I mean that's what's written there, but I think that

11   more specifically it's that I used some run rate budgets

12   that he had prepared and then sort of showed him this

13   projection to make sure that it is sort of not completely

14   (indiscernible) --

15   Q.    The figures to the projected revenues were not

16   supplied to Mr. Berry, were they?

17   A.    They are extrapolated from the figures provided by Mr.

18   Berry.

19   Q.    When you project, for example, on the last page of

20   your cash flow projections, over 35-and-a-half million

21   dollars of revenue in year 2024 neuro/pain, that's not a

22   figure that Mr. Berry came up with, is it?

23   A.    No, sir.

24   Q.    Is that a figure that you came up with?

25   A.    This is a figure that was reached in collaboration

1  what will be required, are not in these projections, are
2  they?
3  A.   So if you look at the neuro pain line where we've
4  established sort of the -- this 50 percent level for
5  expenses, the run rate cost given to, spoken with Dr. Shah
6  were closer to 10 or 20 percent, so what we did was
7  overstate the expenses associated just to sort of make sure
8  that we are conservative enough to ensure that, you know,
9  that we're solvent and consequently profitable without
10  having exact knowledge about sort of every nut and bolt
11  necessary.
12  Q.   Dr. Jolly is an existing equity owner, isn't that a
13  fact?
14  A.   I believe so.
15  Q.   And in Paragraph 38 of your sworn statement, you say
16  that he has to retain an equity interest in the reorganized
17  Debtor, isn't that a fact?
18  A.   Paragraph 36?
19  Q.   Thirty-eight.
20  A.   Thirty-eight.
21  Q.   In approximately the middle of that paragraph, doesn't
22  it say:
23      "Recently we became aware of a potential strategic
24      business advantage to having at least one existing
25      equity owner retain an equity interest in the

1  A.   Yes.

2  Q.   Have you made any arrangements with any physicians for

3  sweat equity or --

4  A.   No, sir.

5  Q.   What?

6  A.   No, sir.

7  Q.   Are you attracting any specialists to the hospital

8  other than Dr. Shah?

9  A.   Yes, sir.

10 Q.   Yeah.  Do you know who they are?

11 A.   Yes, Dr. Hares (phonetic) is a psychiatrist.

12 Q.   All right.

13 A.   There are a number of urologists that have also

14 provided support.

15 Q.   I'm talking to -- I should have confined that question

16 to specialists in surgery.

17 A.   In surgery.

18 Q.   Yes.

19 A.   Yes, we're speaking to a number of people.

20 Q.   All right.  But you haven't -- you haven't concluded

21 any arrangements with them yet, is that correct?

22 A.   Not concluded any arrangements with them, no, sir.

23 Q.   Okay.  Do you know whether Dr. Shah has an ambulatory

24 surgery center in Flint?

25 A.   I don't think he does.  I'm not entirely sure.

1   Q.   Okay, and if you're not able to get the regulatory

2   issues, you withdraw your plan, what happens to the

3   patients that are currently at the reorganized Debtor?

4   A.   We'll figure out some way to accommodate them.

5           MR. COMSTOCK:   Okay.   No further questions, Your

6   Honor.

7           THE COURT:   Any other cross-examination?

8           Redirect.

9               REDIRECT EXAMINATION - 4:32 p.m.

10  BY MR. WALTER:

11  Q.   You indicated when Ms. Berg was questioning you that

12  it recently came to your attention that there may be some

13  causes of action that would make the 1.6 million dollar

14  estimate be smaller; that it may exceed 1.6 million, is

15  that correct?

16  A.   Yes, sir.

17  Q.   And is that specifically referring to the clinical

18  rotation payments that we were discussing?

19  A.   Yes, sir.

20  Q.   And did you hear me proffer earlier this morning that

21  we had agreed that the Trust causes of action would be

22  amended to include pursuing causes of action related to the

23  clinical rotation?

24  A.   Yes, sir.

25  Q.   And that's your understanding of our deal with the

**EXHIBIT B**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:                              .    Case No. 15-51011
                                    .    (wsd)
OAKLAND PHYSICIANS MEDICAL          .
CENTER, LLC,                        .    Detroit, Michigan
                                    .    December 23, 2015
                                    .
        Debtor in Possession.       .
. . . . . . . . . . . . . . .

    CONTINUED EVIDENTIARY HEARING RE: CONFIRMATION ISSUES
            BEFORE THE HONORABLE WALTER SHAPERO
          TRANSCRIPT ORDERED BY: GLENN WALTER

APPEARANCES:

For Sant Partners,              Honigman, Miller
LLC:                            By:  E. TODD SABLE, ESQ.
                                GLENN WALTER, ESQ.
                                600 Woodward Avenue
                                Suite 2290
                                Detroit, MI 48226


For Health Care                 Allard & Fish, PC
Ombudsman:                      By:  DEBORAH FISH, ESQ.
                                2600 Buhl Building
                                Detroit, MI 48226


For The United                  Office of the U.S. Attorney
States (HHS):                   By: KEVIN ERSKINE, AUSA
                                211 W. Fort Street
                                Suite 2001
                                Detroit, MI 48226


For Save the Hospital           By: SHELDON TOLL, ESQ.
Group:                          2000 Town Center
                                Suite 2100
                                Southfield, MI 48075

```
 1   objections, it has just bare recitals that it looks like
 2   from a Horn Book, basically saying that the plan is not
 3   confirmable.
 4        So while we haven't settled that objection, we
 5   don't believe it's meritorious, and that's Sant's position
 6   also, I believe.
 7        Last but not least is Sant's -- Oh, no, and -- I
 8   omitted one.  The trustee's objection to our plan --
 9        THE COURT:  Is that the U.S. Trustee?
10        MR. TOLL:  U.S. Trustee, yes, the U.S. Trustee.
11        That's Document 333, and we are making changes to
12   the exculpation and the release provisions, which I think
13   was part of her objection.
14        The other part of her objection, and it's where our
15   plan differs from the Sant plan, is that while we're not
16   going to -- our plan preserves causes of action, we don't
17   intend to pursue them for reasons that will be explained in
18   a minute, but we agree to attach to our confirmation order,
19   the list of all the alleged causes of action in the event
20   that there's either a Chapter 33 of Doctors' Hospital, or a
21   Chapter 7 of Doctors' Hospital in the future, both of which
22   we don't contemplate, but out of an abundance of caution we
23   don't want to cause these causes of action to be lost by
24   not specifying them at the time of confirmation of this
25   plan.
```

1 because we pitched and shown this to them. They're very

2 interested. These people are very invested to come in with

3 us, so I understand the commitments and that I know which

4 groups have committed already.

5 Q. Does Save The Hospital Group have proof of funds from

6 these investors?

7 A. They do have.

8 Q. What is the total amount of funds that they -- for

9 which proof was submitted to Save The Hospital Group?

10 A. We have committed 3.75 million, as well as intents

11 from the other groups, another, boy, almost 6 million

12 dollars. So we're at just shy of 10 million dollars.

13 Q. So you're here, to my understanding, to say that

14 there's -- certain funds have been based upon written

15 commitments?

16 A. Correct.

17 Q. And how much is that?

18 A. That is almost 4 million dollars.

19 Q. All right.

20 And so other -- the other funds, the approximately 6

21 million that you mentioned, are those subject to anything

22 in writing?

23 A. We do have letter of intents for those. With the very

24 rapid court proceedings, was not able to reach, and with

25 the holidays, everybody, to be able to get the firm

1    commitments.

2              MR. TOLL:  No further questions, Your Honor.

3              THE COURT:  Cross-examination.

4                        CROSS-EXAMINATION

5    BY MR. WALTER:

6    Q.   Good morning, Dr. Naman.

7    A.   Good morning.

8    Q.   My name's Glenn Walter.  I represent Sant Partners,

9    LLC.

10        Mr. Toll asked you a series of questions about what

11   Sant did or did not do.

12        Do you know who's in control of the hospital right

13   now?

14   A.   In control would be the trustee; and there's a

15   receiver in place; there's a CEO; there's a comptroller.

16        The Sant Partners have been providing DIP lending, and

17   they have communication and relationship within the

18   building, and access to these individuals on a daily basis,

19   from what I understand.

20   Q.   Right.

21        But they don't have any operational control.  They can

22   consult.  They can advise.  They're there as a DIP lender.

23   They don't make any executive decisions.

24   A.   Correct, from what -- the understanding.

25   Q.   Okay.  Thank you.

1  over the year's period of time or 10 years' period of time.

2  Q.   Well, let's talk about this commitment.

3       Six of the communities, indication of interest.  Now,

4  meaningless, right, as a legally binding matter.  You

5  didn't say, "I'm making a capital call, give me your

6  money"?

7  A.   Correct.

8  Q.   Okay.  So we're down to 3.75.

9       Who's made those capital -- those hard capital

10  commitments?

11  A.   A handful of (unintelligible).

12  Q.   Who?

13  A.   Myself; my brother, Dr. Ted Naman; and Dr. Shakib

14  Halabu; Dr. Darude (phonetic); and Mr. Goldman.

15  Q.   And what are (phonetic) those sound commitments

16  require?  So Day 1, who's writing how much of a check?

17  A.   So we'd be able to put in 3.75 million in at that --

18  at Day 1.

19  Q.   Person-by-person basis.

20  A.   Oh.

21  Q.   Of that group of people, who is legally required to

22  write a check in what amount?

23  A.   So 2 million dollars by Dr. Halabu; Dr. Darude for

24  500,000; myself for 500,000; Dr. Ted Naman for 500,000, and

25  Goldman for 250,000.

1  interest for zero consideration?

2  A.    For Class A, --

3  Q.    Yes.

4  A.    Correct.

5  Q.    Okay.

6      Is John Orm (phonetic) still receiving interest?

7  A.    I believe so, yes.

8  Q.    And I understand your role in it.  I understand Mr.

9  Halabu is writing the check.

10      What's Mr. Orm's role in this whole thing?

11  A.    Mr. Orm has been able to get us in, in a short order,

12  to some individuals to be able to talk about the center

13  date and CONs, and to help us in terms of getting into

14  certain areas so we can communicate, so.

15      He does some market research, as well, those kinds of

16  initiatives.

17  Q.    Okay.

18      Can you look at page 22, please?

19  A.    Twenty-two?

20  Q.    Can you read -- Do you see where it indicates Mr. Orm

21  will be an officer?  Will you read that line, please?

22  A.    Sure.

23      "John Orm, Director of Community and Government

24      Relations."

25  Q.    And how much was he compensated for that?

1  Q.  But you elected not to do the month-to-month even

2  though it was (unintelligible)?

3  A.  I guess, yes.

4  Q.  Yeah.  That's fine.

5      What's the cash -- You have an opening cash balance of

6  $80,000 which, on Day 1, probably that's over-expended, you

7  go through you have to write a check for taxes, you have to

8  write a check to the water board, you have to write, you

9  know, a check to Crittenton, have to write a check to

10  unsecured creditors and those professional fees.

11      So Day 1 you're kind of underwater, right, unless you

12  get additional funding above the 3.75?

13  A.  Correct.

14  Q.  Okay.

15      And that's all the -- everything from 3.75 is

16  (unintelligible) letters of interest?

17  A.  At this point.

18  Q.  Okay.

19      And have you -- How much of the capital call do you

20  think will be utilized in Year 1?

21  A.  Well, I don't think that we're going to have to,

22  again, from my estimates, pull the whole full 10 million

23  dollars.

24  Q.  Any of it?

25  A.  A substantial amount early, and then hopefully back to

1  dividends towards the end.  It's not it's --  Again, as
2  investors we're well aware this is a long-term deal for us.
3  Q.   So you're going to rely on the 6 million dollars and
4  you only have letters of intent?
5  A.   And operations.
6  Q.   And operations, okay.
7       Have you ever filed for personal bankruptcy in the
8  last 5 years?
9  A.   I don't believe -- Yes.
10 Q.   Or ever?
11 A.   Yes.
12 Q.   And you aware of any other member of the Save The
13 Hospital Group that's filed (unintelligible) ever?
14 A.   I don't know of all the other partners.
15 Q.   That you're aware of?
16 A.   That I'm aware of.
17 Q.   Are you aware if your brother did?
18 A.   Oh, I'm sorry, my brother, yes.
19 Q.   Are you aware -- Have any businesses controlled by
20 members of Save The Hospital Group filed for bankruptcy?
21 A.   I believe Dr. Halabu, but I'm not a hundred percent
22 certain --
23 Q.   First, Dr. Sindal has (unintelligible) --
24 A.   Oh, yes.  Yes.  Yes.
25 Q.   Okay.

1   Q.   Morning again.

2        You testified earlier today that Dr. Halabu is an

3   investor in Save The Hospital Group, correct?

4   A.   Correct.

5   Q.   And you testified that Dr. Halabu is providing you a

6   $500,000 loan to acquire equity status at the hospital; is

7   that correct?

8   A.   Correct.

9   Q.   And he's also making a similar loan to your brother,

10  Mr. Ted Naman?

11  A.   Correct.

12  Q.   And you just testified that you have healthcare

13  counsel who advised on certain aspects of the deal; is that

14  correct?

15  A.   Correct.

16  Q.   And advised you on Stark law percentages based on

17  (unintelligible) at Doctor Hospital?

18  A.   Correct.

19  Q.   Okay.

20       Did they advise you on whether or not it was a

21  violation of the Stark law for one investor in a hospital

22  to provide a physician/owner with a loan to acquire that

23  equity?

24  A.   I don't believe we had that conversation, no.

25           MR. WALTER:  No further questions, Your Honor.