UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In Re:

OAKLAND PHYSICIANS MEDICAL   Case No. 15-51011-wsd
CENTER, L.L.C. d/b/a DOCTORS'  Chapter 11
HOSPITAL OF MICHIGAN, a Michigan
Limited Liability Company,

                Debtor.
_____/

**POST-CONFIRMATION-HEARING BRIEF OF
SAVE THE HOSPITAL GROUP**

      Save the Hospital Group, by undersigned counsel, hereby submits this brief in support of confirmation of its Second Amended Combined Plan of Reorganization and Disclosure Statement, Doc 266. The objections to confirmation of the Save the Hospital plan have been settled, except for feasibility issues. *See* Doc 408, Statement of Save the Hospital Group Regarding Objections to Confirmation.

      We respectfully submit that Save the Hospital Group had a better showing of feasibility at the evidentiary hearings on December 22-23, 2015. For that, and the other reasons set forth on the following pages, Save the Hospital Group's plan should be preferred over the plan of Sant Partners, LLC ("Sant"). Save the Hospital Group's plan should be confirmed.

## COMPARISON

|  | Save the Hospital Plan | Sant Plan |
|---|---|---|
| Funding | Equity<br>Equity financing is preferable to debt.[1] | Debt |
| New money | $3,000,000 on effective date[2] | $375,000 on effective date[3] |
| Commitment of funds | $5,950,000 committed, with proof of funds[4] | Dr. Shah to loan up to $8 million in future at 8% with $50,000 upfront fee. Dr. Shah does not have proof of funds.[5] He is not irrevocably committed to finance.[6] |
| Ability to recruit physicians to hospital.[7] | Dr. Greg Naman, a local, Detroit-area physician, testified to a well-thought out plan to recruit a diversified group of physicians to the hospital to build patient volume.[8] | Dr. Shah, a Flint neuro-surgeon, with most of his ties to several Flint hospitals, testified he would bring sufficient Flint specialists to Pontiac to fill up the beds, straining credulity.[9] |
| Experience running hospital | Dr. Greg Naman testified to his hospital experience.[10] | Neither Mr. Sharma[11] nor Dr. Shah[12] has experience. |
| The public interest[13] | Save the Hospital plan supported[14] by Hon. Walter Moore, former mayor of Pontiac and Oakland County Commissioner and by Rev. Charles Bender, Pontiac Pastor | Not mentioned at confirmation hearing by Sant. |

---

[1] Report of Senate Banking Committee, Congressional Session: 84-1 (March, 1955).

[2] Save the Hospital's Exhibit 56, admitted into evidence, shows $3,000,000 investment on the effective date. A portion will be used to pay off Sant's DIP loan. See footnote 1 of Exhibit 56.

[3] Mr. Sharma admitted on cross-examination that only $375,000 from Dr. Shah would be forthcoming on the effective date. Sant will convert $1.5 million of its DIP loan to equity. Doc 413, Transcript, at p. 184.

[4] Declaration of Sheldon S. Toll, filed with this Brief.

[5] Dr. Shah admitted on cross-examination that he did not have immediately available funds. Doc 413, Transcript, at p. 139, lines 13-15.

[6] Doc 413, Transcript, p. 140, lines 1-7, and p. 185, line 19 to p. 186, line 22.

[7] Sant admits that the "Reorganized Debtor can only survive if it is able to retain and attract physicians." Declaration of Mr. Sharma, Doc 375, p. 10, ¶ 34, admitted into evidence at the confirmation hearing.

[8] Doc 414, Transcript, at p. 27, line 12, to p. 28, line 2.

[9] Doc 413, Transcript, at p. 133, lines 24-25: "I definitely have loyalties to my practice there [Flint], and the hospitals."

[10] Doc 414, Transcript, at p. 24, line 19 to p. 25, line 3.

[11] Doc 413, Transcript, at p. 146, line 24: "we're not running the hospital."

[12] Doc 413, Transcript, at p. 136, lines 2-3: "but certainly not running an entire hospital."

[13] Consideration of the public interest is not a statutory criterion for confirmation in non-railroad cases. *In re Merco Joint Venture LLC*, 2002 Bankr. LEXIS 780, *10, 48 Collier Bankr. Cas. 2d (MB) 927 (Bankr. E.D.N.Y. 2002). However, because the Debtor is a hospital and a fixture in the City of Pontiac, we submit that it is important for this Court to take into account the public interest of Pontiac.

[14] Doc 414, Transcript, at p. 21,

## DEBTOR'S $25 MILLION IN UNBILLED RECEIVABLES

The elephant in the room in this case is the hospital's enormous backlog of unbilled receivables totaling $25 million.[15] Sant holds itself out as an expert in billing and collections.[16] However, Mr. Sharma admitted on cross-examination, at the confirmation hearing, that little or nothing had been done to collect upon those receivables.[17] If Sant really had an interest in saving the hospital, then surely it would have made sincere efforts to collect upon the receivables, rather than forcing the Debtor to continue borrowing money from Sant. Were this Court to confirm the Sant plan, there would be a windfall accruing to Sant consisting of $25 million in uncollected receivables. As a court of equity, we submit this Court cannot condone Sant's inequitable conduct. The Save the Hospital plan should be confirmed.

## SANT'S USE OF ITS DIP LOAN TO STAMPEDE THE PARTIES AND THE COURT

Sant has also engaged in inequitable conduct regarding its DIP loan. Sant, using the threat to pull its DIP loan, which we contend was made in bad faith,[18] compelled this Court to set up a window of less than 60 days for confirmation of its plan, and competing plans, if any, with a confirmation hearing set for December 17. Further, in the renewal of its DIP loan only to January 15, 2016, to which we objected, Sant is still using its DIP loan to stampede the parties and the Court. Save the Hospital Group has twice offered by buy Sant's DIP loan, once in

---

[15] Doc 413, Transcript, at p. 176.

[16] Sant disclosure statement, Doc 268, at p. 58: "as part of the Debtor's operational restructuring during the pendency of the Chapter 11 Case, members of the Infrahealth Group of companies [Sant] were contracted to perform the Debtor's billing function."

[17] Doc 413, Transcript, at p. 176.

[18] We submit that the threat of Sant to pull its loan on December 31, 2015 was made in bad faith by Sant. This bad faith is shown by Sant's plan support agreement with Crittenton Hospital (Doc 306), which refers to a plan confirmation deadline of February 1, 2016 and a consummation deadline of March 1, 2016. *Id*. at p. 4.

November 2015, and a second time in late December 2015, when Sant would only extend its loan to January 15, 2016. Save the Hospital Group stands ready to buy Sant's DIP loan now, in the interests of equity and justice, to allow for an orderly plan confirmation process. Save the Hospital's plan should be confirmed, and Sant's plan should be denied confirmation.

**BALLOT PREFERENCE VOTES SUPPORT SAVE THE HOSPITAL, NOT SANT**

According to the balloting report, which was admitted into evidence at the confirmation hearing as Exhibit 13, the plan preference vote was as follows:

|  | Votes | % | Dollars | % |
|---|---|---|---|---|
| Sant | 30 | 55.6% | $7,028,366 | 60.8% |
| Save the Hospital Group | 23 | 42.6% | $4,520,588 | 39.1% |

However, as is clear from the balloting report itself and the testimony of Mr. Klamser, who prepared the report, the report gives raw data only, without any qualitative analysis. For example, Dr. Jolly, who supports Sant, cast 4 ballots asserting preference for Sant, *see* Ballot nos. 7, 12, 13, and 14. The Court should note that each of these ballots lists the identical email address for the person casting the ballot, i.e. drjollymd@yahoo.com. In addition, Crittenton Hospital was counted as preferring the Sant plan twice, once in Class 3 and once in Class 7. Backing out this double counting of preference votes, the preference vote was 26 for Sant and 23 for Save the Hospital Group.

Further, the balloting report counted the plan preference votes of insider medical staff. A total of 17 insider medical staff cast ballots totaling $3.739 million preferring Sant. A total of 6 insider medical staff cast ballots totaling $1.597 million for Save the Hospital Group. In order to determine the non-insider preference for the competing plans, this Court should subtract the preference votes of insider medical staff who voted for one side or the other. That process shows the non-insider plan preference vote to be, as follows:

|  | Votes | % | Dollars | % |
|---|---|---|---|---|
| Sant | 9 | 35% | $3,289,366 | 53% |
| Save the Hospital Group | 17 | 65% | $2,923,588 | 47% |

Thus, if this Court considers the non-insider preference for the competing plans, it appears that an overwhelming majority of non-insiders, 65%, showed a preference for the Save the Hospital plan. In dollar amount, Sant got 53% vs. 47%. However, Sant's dollar amount includes the Crittenton Hospital claim of $3.1 million. That single plan preference vote skewers the dollar amount in favor of Sant. Therefore, we believe it is fair to say that the non-insider plan preference overwhelmingly favors the Save the Hospital plan.

## SUPPORT OF CREDITORS' COMMITTEE

The Creditors' Committee entered into a lock-up with Sant. We submit that the Creditors' Committee, consisting solely of insider physicians of the hospital, is not representative of the entire unsecured creditor body in this case.

Save the Hospital Group initially proposed a better treatment for unsecured creditors than Sant, i.e. 10% over ten years guaranteed by Save the Hospital vs. uncertain recovery from a litigation trust proposed by Sant. Before the plans were mailed to creditors, Save the Hospital group shortened the 10% payout period to five years. After the plans were mailed, Sant met with the Creditors' Committee, and agreed to a four year period and a guaranteed recovery for the class of $1.6 million. However, at the confirmation hearing, Save the Hospital Group stated that its intent was to meet or exceed anything offered by Sant, and therefore it will pay unsecured

10% or $1.6 million, whichever is higher, over four years, in at the same pay rates promised by Sant to the Creditors' Committee.[19]

Further, the Creditors' Committee appears to be unduly fixated on pursuing avoidance claims through a post-confirmation trust. Sant admits that "the likely net proceeds of all of the potential avoidance actions was likely somewhere in the range of $500,000 to $1,600,000, at the high end."[20] Save the Hospital Group is offering unsecureds $1.6 million or 10%, whichever is higher. Sant admits that the avoidance litigation has "the potential [for] long-term harm to the Reorganized Debtor."[21] Save the Hospital Group has concluded that, since it is offering unsecureds everything they could get through avoidance litigation, foreclosing potential long-term harm to the hospital by not pursuing avoidance litigation is preferable. Thus, we believe that the choices made by the Creditors Committee to support the Sant plan are not in the best interests of the entire creditor body. Save the Hospital Group's plan is preferable to Sant's, and should be confirmed.

---

[19] Doc 414, Transcript, at p. 9.
[20] Declaration of Mr. Sharma, Doc 375, p. 9 at ¶ 29, admitted into evidence at confirmation hearing.
[21] *Id.*, p. 10 at ¶ 33.

## CONCLUSION

Save the Hospital Group had the better feasibility presentation.  Further, Sant's conduct in this case has been inequitable.  This court should confirm the plan of Save the Hospital Group.

                Respectfully submitted,

                /s/ S. S. Toll
                **SHELDON S. TOLL PLLC**
                Counsel for Save the Hospital Group
                Sheldon S. Toll (P-21490)
                29589 Northwestern Hwy., Ste. 100
                Southfield, MI 48034
                (248) 797-9111
                sst@lawtoll.com

Dated:  January 5, 2016