# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In re:

| | |
|---|---|
| OAKLAND PHYSICIANS MEDICAL CENTER, L.L.C. d/b/a DOCTORS' HOSPITAL OF MICHIGAN, a Michigan limited liability company, | Chapter 11<br>Case No. 15-51011-wsd<br><br>Hon. Walter Shapero |

Debtor.

_____/

## POST-TRIAL BRIEF OF DOCTORS IN OPPOSITION TO CONFIRMATION OF AMENDED PLAN OF SANT PARTNERS, LLC

SILVERMAN & MORRIS, P.L.L.C.
Thomas R. Morris (P39141)
Karin F. Avery (P45364)
Attorneys for Yatinder Singhah, M.D. and Michael J. Short, M.D.
30500 Northwestern Highway, Suite 200
Farmington Hills, Michigan 48334
(248) 539-1330;  Fax:  (248) 539-1355

# TABLE OF CONTENTS

**Page**

Index of Authorities ............................................................. iii

Facts .................................................................................. 1

   1.   Sant sought and obtained the plan procedures order and preliminary approval of the Second Sant Plan ....................................... 1

   2.   The Third Sant Plan was filed to replace the Second Sant Plan ........ 3

   3.   The December 22 confirmation hearing ........................................... 3

Discussion ......................................................................... 9

   A.   Dr. Shah's testimony must be disallowed ........................................ 9

   B.   The Third Sant Plan does not comply with § 1127 .......................... 14

   C.   Sant failed to establish feasibility ....................................... 15

   D.   The Court should reconsider its final approval of Sant's disclosure statement ...................................................................... 18

   E.   Sant's Plan was not proposed in good faith and was proposed by means forbidden by law ..................................................... 19

   F.   The Third Sant Plan does not comply with § 1129(a)(5) ................. 21

   G.   The Third Sant Plan provides for an improper third-party release .... 21

   H.   The SHG Plan should be confirmed ............................................... 22

Conclusion ........................................................................ 23

## INDEX OF AUTHORITIES

**Cases**                                                                                      **Page**

*In re Beyond.com.corp*,
289 B.R. 138, 144-45 (Bankr. N.D. Cal. 2003) ....................................................    21

*In re Cara Corp.*,
992 Bankr. LEXIS 672, 1992 WL 88189 (Bankr. E.D. Pa. 1992) ......................    20

*In re D.H. Overmeyer Telecasting Co.*,
47 B.R. 823, 824 (Bankr. N.D. Ohio 1985) .........................................................    22

*In re Dow Corning Corp.*,
280 F.3d 648, 658 (6th Cir. 2002) ........................................................................    22

*In re Jeppson*,
66 B.R. 269, 292 (Bankr. D. Utah 1986) .............................................................    18

*Roberts ex. rel. Johnson v. Galen of Virginia, Inc.*,
325 F.3d 776, 782 (6th Cir. 2003) ........................................................................    13

*In re Rook Broadcasting of Idaho, Inc.*,
154 B.R. 970, 976 (Bankr. D. Idaho 1993) .........................................................    18

*In re SPM Mfg. Corp.*,
984 F.2d 1305, 1315 (1st Cir. 1993) ....................................................................    21

*In re Shefa, LLC,*
535 B.R. 165, 178 (E.D. Mich. 2015) ..................................................................    15

*In re Tucker Freight Lines, Inc.,*
62 B.R. 213, 215 (Bankr. W.D. Mich. 1986) ........................................................    19

*Woods v. City Nat. Bank & Trust Co. of Chicago*,
312 U.S. 262, 268 (1941) .....................................................................................    19


**Statutes**

U.S.C. § 1102 .......................................................................................................    19
U.S.C. § 1125 .......................................................................................................    14, 18

**Statutes (cont'd)**                                                    **Page**

U.S.C. § 1127 ................................................................................     14
U.S.C. § 1127(c) ...........................................................................   13, 14
U.S.C. § 1129(a)(1) .......................................................................     20
U.S.C. § 1129(a)(3) .......................................................................   19, 20
U.S.C. § 1129(a)(5) .......................................................................     21
U.S.C. § 1129(a)(9)(A) ..................................................................     20
U.S.C. § 1129(a)(11) .....................................................................     17
U.S.C. § 1129(b)(1) .......................................................................     20


**Federal Rules**

F.R. Civ.P. 26(a) ...........................................................................     12
F.R. Civ. P. 26(e) ..........................................................................     12
F.R. Civ. P. 37(c) ..........................................................................     12
F.R.B.P. 3017 ................................................................................     18
F.R.B.P. 3017(a) ...........................................................................     14
F.R.B.P. 7026 ................................................................................     12
F.R.B.P. 7037 ................................................................................     12
F.R.B.P. 9014(c) ...........................................................................     12
F.R.B.P. 9014(d) ...........................................................................     12

**Other References**

Black's Law Dictionary, 5th Edition ...................................................     10

Michael J. Short, M.D. and Yatinder Singhal, M.D. ("Doctors"), by and through their attorneys, Silverman & Morris, P.L.L.C., submit this brief in opposition to final approval of, and confirmation of, the Third Amended Combined Disclosure Statement and Plan of Reorganization of Oakland Physicians Medical Center, L.L.C. proposed by Sant Partners, LLC ("Sant").

## Facts

### 1.  Sant sought and obtained the Plan Procedures Order and preliminary approval of the Second Sant Plan.

On October 21, 2015, Sant filed a motion entitled "Sant Partners, LLC's Motion for Entry of an Order (I) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Plan, Including (A) Approving Form of Solicitation Procedures, (B) Approving the Form and Notice of the Confirmation Hearing, (C) Establishing Record Date and Approving Procedures for Distribution of Solicitation Packages, (D) Approving Forms of Ballots, (E) Establishing Deadline for Receipt of Ballots, and (F) Approving Procedures for Vote Tabulations; (II) Establishing Deadline and Procedures for Filing Objections to Confirmation of the Plan; and (III) Granting Related Relief" (the "Plan Procedures Motion", Docket # 190).  In its Plan Procedures Motion, Sant sought the entry of an order establishing detailed procedures for fast-track confirmation of the plan of reorganization which it filed along with the Plan Procedures Motion.

1

On November 17, 2015, Sant filed its Second Amended Combined Disclosure Statement and Plan of Reorganization (the "Second Sant Plan", Docket # 268).

The Court, on November 18, 2015, granted preliminary approval to the Second Sant Plan as a disclosure statement (Docket #274). On the same day, the Court issued an "Order Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Competing Plans and Granting the Rate of Relief" (the "Plan Procedures Order", Docket # 276), granting relief pursuant to the Plan Procedures Motion.

The Plan Procedures Order required, *inter alia*, the filing by each plan proponent on or before December 3, 2015, of a witness list disclosing the names of witnesses for the confirmation hearing and a description of the areas of testimony. The order specified, in ¶15, as follows:

> The confirmation hearing will be an evidentiary hearing. Any party in interest that … intends to offer testimony in the form of live testimony or a declaration, in support of, or to oppose, confirmation of a Plan shall file a designation of potential witnesses and the topics of testimony of such witnesses on or before **December 3, 2015**. Potential witnesses shall be made available for deposition prior to **December 11, 2015**.

The Second Sant Plan, along with the other plans, was mailed to creditors with the Plan Procedures Order, ballots and other documents on or about November 21, 2015.

2

## 2.  The Third Sant Plan was filed to replace the Second Sant Plan.

Sant filed on December 15, 2015, its Third Amended Combined Disclosure Statement and Plan of Reorganization (the "Third Sant Plan", Docket # 364).  Sant now seeks confirmation of the Third Sant Plan.

The Third Sant Plan differs materially from the Second Sant Plan.  It alters the treatment of the claims of CMS, Crittenton, the WRC and certain taxing authorities.  It directly affects the class of unsecured creditors by eliminating Article X of the Second Sant Plan which had provided for an Oversight Committee to monitor the administration by the Liquidating Trust Trustee of the Trust Causes of Action.  The business model of the Reorganized Debtor was also altered significantly as will be explained below.  No order permitting Sant to modify the Second Sant Plan has been entered.

Sant filed on December 16, 2015, a late witness list (Docket # 371) designating Kevin Berry, John Ponczocha, and Sanyam Sharma as its witnesses for the confirmation hearing.

## 3.  The December 22 confirmation hearing.

A hearing on confirmation of the Third Sant Plan was conducted on December 22, 2015.  At that hearing, the Court heard the testimony of Sant's listed witnesses as well as of Dr. Jawad Shah.  The Doctors objected to the introduction by Sant of Dr. Shah's testimony.

3

Mr. Berry, who is employed by a firm which serves as financial consultant for the trustee, was relied upon by Sant to establish that a liquidation analysis had been prepared.  His testimony did not materially advance Sant's claim that its plan meets the requirements for confirmation, but he did establish that the Debtor has incurred losses post-petition and has continued to incur losses during the time that Sant has been financing the operations and providing consulting services to the trustee.

Mr. Ponczocha, who is employed by the Debtor as its chief executive officer, was relied upon by Sant only to establish that the Debtor's records disclosed certain payments to insider and non-insider creditors of the Debtor.

Dr. Shah testified that under the Third Sant Plan, he is to be the sole source of additional funding for the Reorganized Debtor by means of a capital contribution of $375,000.00 and a line of credit of up to $8 million.  (Transcript of 12/22/15 confirmation hearing, hereinafter "Tr." at 117).  He is to be the chief medical officer responsible for the medical aspects of the operation of the hospital, including medical practices, regulatory matters, clinical safety, medical outcomes and sustainability.  (Tr. at 100-101).  He is to be the person to ensure that there are "no issues, financial or otherwise."  (Tr. at 101).  He is also to be responsible for new revenue described in the financial projections accompanying the Third Sant Plan as "Neuro/pain".  (Tr. at 156, 162).  These revenues are projected by Sant to "ramp up" within several months of the anticipated effective date of the Third Sant Plan to approximately $36 million per

4

year, or approximately 68% of the Reorganized Debtor's projected revenue for the period of August, 2015 through 2020 which is covered by its new financial projections. (Figures shown in financial projections filed on December 17, 2015 at Docket # 375, pp. 18-24). Dr. Shah's testimony revealed that the business model upon which the Second Sant Plan was based had changed materially and that he is to be the driving engine of Sant's new business model.

The Third Sant Plan dropped from its financial projection (i) revenues designated as "CMS"; and (ii) a portion of revenues designated as "QAAP". (Tr. at 164, 176). These revenues were a significant portion of the revenues projected under the Second Sant Plan. They were projected to be 52% of revenues in the year 2020, for example. (Figures shown in financial projections filed on November 17, 2015 at Docket # 268, pp. 99-104).

The projected expenditures required under the Third Sant Plan to reach the higher projected revenues were increased by $11,030,051 for the last ten months of 2016, a 56% increase in projected cash disbursements for that partial year. By 2020, the increase in projected expenditures is forecast to be $20,339,032, an 80.6% increase in projected cash disbursements for that year. (Compare "Cash Disbursements – Total" figures in financial projections filed on November 17, 2015 at Docket # 268, pp. 99-104, against those filed on December 17, 2015 at Docket # 375, pp. 18-24).

5

The Plan Co-Sponsor Agreement entered into between Sant and Dr. Shah (Docket # 332, marked as Exhibit 55 but not admitted) states that Dr. Shah is to provide to the Reorganized Debtor a line of credit in the amount of $8 million and that he "has and will maintain such funds on an immediately available basis." Dr. Shah's testimony revealed that he neither has the funds under his control nor is he unconditionally obligated to provide such funding. (Tr. at 139-142).

The final witness called by Sant was its chief executive officer, Sanyam Sharma. Mr. Sharma's testimony was disclosed in Sant's witness list as "regarding the negotiation and formulation of the [Second] Plan and Disclosure Statement, [and] the . . . projection attached to the Disclosure Statement as Schedule 3 . . .." Mr.Sharma's direct examination was submitted in the form of his sworn declaration dated December 17 (Docket # 375) which instead of discussing the Second Sant Plan and the financial projection disseminated to creditors for voting, discussed the Third Sant Plan and the new financial projection intended to depict future operations of the hospital under Dr. Shah's direction. On cross-examination of Mr. Sharma, the following additional matters were revealed:

-That Mr. Sharma, a 24-year-old college graduate, is not a medical doctor, has never been a chief financial officer or chief executive officer of a hospital and has never worked in a hospital. (Tr. at 145-146).

6

-That his father, Sanjay Sharma, who is the president of St. Martinus medical school and who is referred to in the Declaration as "Dr. Sharma", holds a degree in computer science and is not a medical doctor.  (Tr. at 148).

-That Sanyam Sharma prepared the financial projections but was provided information by Dr. Shah which was used to project the Reorganized Debtor's "Neuro/pain" revenues.  (Tr. at 153).  However, Dr. Shah, according to his testimony, did not communicate with Mr. Sharma for the development of the expense projections.  (Tr. at 127).  Mr. Sharma did not know how many physicians would be required in order to generate the projected revenues.  (Tr. at 161).  Mr. Sharma admitted that essential figures in the financial projections were developed by Dr. Shah.  (Tr. at 152-153).

-That the projections which accompanied the Second Sant Plan assumed the receipt of revenues from CMS and therefore implied that Sant had reached an agreement with the federal government for CMS to terminate its recoupment which has deprived the hospital of a substantial part of its cash flow.  (Tr. at 164-166).

-That Sant "dropped" from the Third Sant Plan the proposal under the Second Sant Plan that it establish and rely upon revenues from a recuperative clinic.  (Tr. at 155-156).

-That the hospital has suffered a cash shortfall since Sant began funding its operations in an amount in excess of $1.5 million.  (Tr. at 150).

-That Dr. Short and Dr. Singhal, who currently operate the psychiatric department of the hospital which generates significant revenues, have not agreed to work for Sant should its plan be confirmed. (Tr. at 153-154). As Dr. Naman stated in his testimony regarding the SHG plan, currently the majority of the utilization of the hospital is the psychiatry department. (Tr., 12/23/15 at 27).

-That Common Ground, the source of most psychiatric patients for the hospital, would not be required to continue to send patients to the hospital were Sant to take over the hospital. (Tr. at 155).

-That the development of medical-student clinical rotations as a source of revenue will require the establishment or re-establishment of many departments or services in the hospital. (Tr. at 158-160).

-That Sanyam Sharma had no factual basis for the statement made in his declaration that the Debtor's board of directors "was and is irreconcilably conflicted and unable to act in the best interests of the Debtor's estate" and its creditors. (Sharma Declaration ¶18). He had not studied the board's actions and had not reviewed the minutes of the board of directors. He had never served on a board of directors of a hospital, does not have a law degree, had never managed a hospital, let alone one with a judgment against it for several million dollars, and could not point to a specific breach of duty by the existing board. (Tr. at 169). He could not state under oath that the board of directors had not retained Butzel Long to negotiate with CMS

8

despite his statement in his written declaration that "upon information and belief, the Debtor did not engage in any substantive discussions with CMS." (Sharma Declaration, ¶21; Tr. at 172).

-That Sant's disclosure statement failed to disclose $2.6 million held by the state of Michigan. (Tr. at 189).

-That Dr. Shah will hold a veto over any post-confirmation funding, and can demand at any time that the Reorganized Debtor or Sant refund his capital contribution and any amounts loaned by Dr. Shah. (Tr. at 186).

-That Sant may withdraw its plan in the event that Sant does not obtain the necessary regulatory approvals. (Tr. at 196).

## Discussion

### A.    Dr. Shah's testimony must be disallowed.

Sant attempted to satisfy its burden of proof for plan modification and confirmation by relying upon its surprise witness, Dr. Shah. The rules do not permit Sant to introduce the testimony of this undisclosed witness.

Dr. Shah was not listed on Sant's witness list. Nor was he mentioned in the Second Sant Plan. The Third Sant Plan, filed on December 15 after the December 11 ballot, deposition and plan-objection deadline, provided the first manifestation of Dr. Shah's involvement with Sant, but not even the Third Sant Plan disclosed Sant's new reliance upon Dr. Shah. Sant's witness list omitted Dr. Shah even though it was filed

9

thirteen days after the witness list was due and after the Third Sant Plan had been filed.

The Doctors objected to Sant's reliance on the testimony of Dr. Shah for three reasons.  First, he was not listed in Sant's witness list as required by the Plan Procedures Order.  Second, objecting parties, including the Doctors, were denied the opportunity to investigate or depose Dr. Shah.  Third, the creditors were deprived of the opportunity to consider and vote on the Third Sant Plan which relies upon Dr. Shah's financing of and involvement in the proposed reorganized hospital operations. The disclosure provisions of the Second Sant Plan granted preliminary approval by the Court and disseminated to creditors made no mention of Sant's new proposed ownership structure, financing source, and business model.  The financial projections upon which the creditors based their plan acceptances or rejections were materially different.  Sources of revenue constituting 43% of projected revenues under the Second Sant Plan disappeared.  In place of those revenues were new revenue sources constituting 68% of the revenues upon which the Third Sant Plan would rely.  New and additional expenses constituting 55% of projected expenses under the Third Sant Plan were added to the financial projections.  Projected expenses under the Third Sant Plan are up to more than 80% higher than under the Second Sant Plan.

Sant's attorneys claimed that Dr. Shah was a "rebuttal witness" and that his testimony was not "key".  Neither claim is true.  Dr. Shah was not called to rebut any

10

other testimony. No other testimony had been offered. Sant's claim that his testimony was offered to "rebut" objections to the Third Sant Plan is false because Sant has the burden of proof regarding confirmation of its plan. Moreover, rebuttal evidence is defined by Black's Law Dictionary as "evidence given to explain, repel, counteract, or disprove facts given in evidence by the adverse party." (Black's Law Dictionary, 5th Ed.).

Dr. Shah's testimony showed that he was in fact Sant's most important witness. Dr. Shah will be essential to the Reorganized Debtor's operations should Sant's plan be confirmed. He is to be the hospital's medical director. He is to "take on the primary responsibility to insure" the successful operation and to "oversee and insure that there is a proper medical practice, that all of regulatory issues are strictly adhered to, that there's good clinical safety, that there are excellent clinical outcomes, and at the same time ensuring that that is done in a sustainable way… and to make sure that the hospital does not have any issues, financial or otherwise." (Tr. at 100-101). Under the Third Sant Plan, Dr. Shah is to be the Reorganized Debtor's primary generator of business. The increased projected expenditures under the Third Sant Plan reflect Dr. Shah's significance to the Third Sant Plan.

"Key" describes Dr. Shah's proposed role at the hospital under Sant's plan. The revenue projected by Sant to be received from its clinical rotations education of medical students, which is approximately 5% of projected cash receipts in the year

11

2020, is dependent upon the build-up of hospital departments and services, which in turn is dependent upon Dr. Shah's success. Without a build-up of those departments or services, Mr. Sharma admitted, most of the services which are to provide an educational setting for future medical students, will not exist. Under the Third Sant Plan, the entire business of the hospital would depend upon Dr. Shah. He is to be the source of financing for the Debtor's operations and expansion, with the discretion to lend or choose not to lend the required funds.

The Court, in the Plan Procedures Order, required the listing of witnesses and the identification of the areas of their testimony. This requirement is governed by F.R.Civ.P. 26(a) and (e), F.R.B.P. 7026 and F.R.B.P. 9014(d). Pursuant to F.R.Civ.P. 37(c), made applicable to this contested matter by F.R.B.P. 9014(c) and F.R.B.P. 7037, "if a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that . . . witness at a hearing, or at a trial, unless the failure was substantially justified or is harmless."

Sant's failure to list Dr. Shah was not substantially justified. Dr. Shah was not listed by Sant even though its (already late) witness list was filed after the Third Sant Plan had been filed. It was Sant's choice to abandon its Second Sant Plan in favor of the Third Sant Plan, and if Sant were to claim that it was necessary to replace the Second Sant Plan, that "necessity" was due to the indefinite terms of the Second Sant Plan. The Third Sant Plan represents a modification for which disclosure to the

12

creditors, and voting, is required under § 1127(c). The explanation for Sant's surprise witness is its desire for shortcuts which work to its benefit. This desire is not a justification. It does not justify a surprise witness and does not justify the suspension of the requirements of the Bankruptcy Code or the deprivation of the rights of creditors to know what (and whom) they are voting for, and to afford them adequate information upon which to base a decision to accept or reject the new plan.

For those same reasons, Sant's failure to list Dr. Shah as a witness and to afford the Doctors and others the opportunity to investigate and depose him was not harmless. Dr. Shah's testimony was wide-ranging and his role so central to the Third Sant Plan that there were countless areas which the parties opposing Sant's plan could have investigated. Those areas include Dr. Shah's present neurological-philosophical medical empire which, according to his testimony, occupies 600,000 square feet of office space; his claim that he could receive a loan for $8 million from a private lender in Canada upon his request; his history and reputation as a practitioner at the hospital; and the countless assumptions which were ingredients in the projected revenues and expenses. The burden was on Sant to show that its violation was either justified or harmless. *Roberts ex. rel. Johnson v. Galen of Virginia, Inc.*, 325 F.3d 776, 782 (6th Cir. 2003). Sant failed to do so.

13

## B. The Third Sant Plan does not comply with § 1127.

The Doctors had objected to Sant's Plan Procedures Motion because it sought to create a false emergency to convince the Court to take shortcuts over required procedures, specifically the approval of a disclosure statement after notice and opportunity for a hearing as provided in F.R.B.P. 3017(a). There was no emergency. The filing by Save the Hospital Group ("SHG"), as well as the filing of two other plans which were later withdrawn, proved that there are alternatives to Sant's plan and to Sant's financing.

The Doctors also criticized Sant's plan as being an indefinite outline of points for further discussion. The Third Sant Plan shows that to have been the case. The Second Sant Plan was intended as a placeholder to preserve for Sant the opportunity to negotiate a plan to be thrust upon the creditors without meaningful notice. Further aggravating the lack of disclosure, the Third Sant Plan bears little resemblance to the Second Sant Plan from the standpoint of future business operations and feasibility.

Sant is free to modify its plan, but it must comply with the requirements of § 1127, among which is the requirement that the "proponent of a modification . . . comply with section 1125 of this title with respect to the plan as modified." § 1127(c). The compliance by the Second Sant Plan with the disclosure requirements of § 1125 was questionable and was questioned by the Doctors and others. The failure of the Third Sant Plan to comply with § 1125 is clear. The Third Sant Plan cannot therefore

14

be considered for confirmation without compliance with the disclosure requirements, notice to creditors, and re-balloting.

### C. Sant failed to establish feasibility.

Even with Dr. Shah's testimony, Sant failed to establish that the Third Sant Plan meets the requirements for confirmation. Without his testimony, Sant's failure is even more apparent.

The legal standard for feasibility was summarized recently by the district court in *In re Shefa, LLC,* 535 B.R. 165, 178 (E.D. Mich. 2015) as follows:

> [C]reditors should not be expected to be bound by the terms of plans entailing visionary schemes which promise creditors more than the debtor can possibly deliver." *In re Arts Dairy, LLC,* 432 B.R. 712, 716-17 (Bankr. N.D. Ohio 2010) (citing *In re Danny Thomas Props. II Ltd. P'ship,* 241 F.3d 959, 963 (8th Cir.2001)). Therefore, while "the proponent of a Chapter 11 plan need not show that success is guaranteed[,]" it must demonstrate that there is "a reasonable assurance of commercial viability," *id.* at 717, and "a 'reasonable probability' that the debtor will be able to make all of the payments to creditors according to the terms provided in the plan." *In re Waterford Hotel, Inc.* 497 B.R. 255, 263 (Bankr. E.D. Mich. 2013) (quoting *Trenton Ridge Investors,* 461 B.R. at 478).

Sant has not demonstrated a "reasonable assurance of commercial viability" or a "reasonable probability" that the Reorganized Debtor will be able to make the payments called for in the Third Sant Plan. The Third Sant Plan, cobbled together as the creditors were considering the Second Sant Plan, depends upon Dr. Shah for money, management and business generation, yet is subject both to his lender's ability and willingness to lend him $8 million and his unilateral choice to fund or not fund the

15

operations.  The Third Sant Plan essentially calls for Dr. Shah to have the option to see if the reorganization might be profitable for him, and to walk away from it if it is not to his liking.  The Third Sant Plan may not be a "visionary scheme", but it comes close.  Sant failed to provide a reasonable assurance of commercial viability.

The fact that Dr. Shah had at one time been a member, among a number of physicians, of the SHG, illustrates the demonstrated difference between the feasibility of the Third Sant Plan and the SHG plan.  The exit by Dr. Shah from the SHG did not result in an amendment to the SHG plan because the reorganization contemplated by SHG did not depend upon Dr. Shah for its success.  Rather, according to the testimony of Dr. Naman, who is professionally involved in medical-practice structuring, the SHG has goals in line with other hospitals in the nation, to acquire peripheral outpatient centers, multi-specialty centers, and an integrated delivery network of facilities to form a source of patients for the hospital.  (Tr., 12/23/15 at 27).  In contrast to the stability demonstrated by the SHG's plan despite Dr. Shah's disembarkation from the SHG plan, the degree to which his joining of Sant changed its projected revenues and expenses was analogous to a large man carrying heavy bags of rocks alighting into a small canoe.  The projected revenues and expenses under the Third Sant Plan were altered greatly by taking Dr. Shah aboard.  This demonstrates the dependency of the Third Sant Plan on the efforts of one physician, and the resulting

16

financial fragility of Sant's Third Plan. It shows, by contrast, the relative stability and financial robustness of the SHG plan.

The Third Sant Plan violates 11 U.S.C. § 1129(a)(11), which requires a plan to be feasible. The testimony reveals that under the Third Sant Plan the Reorganized Debtor is likely to require further reorganization. The testimony showed that the hospital is operating at a loss. A significant infusion of capital, medical and managerial talent, and, most importantly, business in the form of increased utilization of the facility, is required. For the Third Sant Plan to keep the hospital out of the mire of further financial reorganization would require each of those elements. The heavy reliance of the Third Sant Plan on the business origination and management of Dr. Shah shows that it is not more likely than not that Sant has the ability to bring together each of the elements necessary for success. No financial analysis had been prepared to determine that the Third Sant Plan could work without Dr. Shah's involvement. The Third Sant Plan depends not only upon Dr. Shah's ostensibly remarkable and unique abilities but his desire to commit financially and professionally to the reorganization. Perhaps it is a visionary scheme.

Without Dr. Shah's testimony, Sant is left with the testimony of Mr. Sharma to make a case for feasibility. Mr. Sharma's testimony demonstrated that he had relied upon Dr. Shah as the source of vital elements of the financial projection. Mr. Sharma was unable to verify the financial projection and to establish a basis for it. Mr. Sharma

17

had no first-hand knowledge about the availability of the financing to be provided by Dr. Shah. Mr. Sharma's testimony revealed his lack of experience in the hospital industry. With or without Dr. Shah's testimony, Sant failed to establish that confirmation is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor.

### D. The Court should reconsider its final approval of Sant's disclosure statement.

Pursuant to 11 U.S.C. § 1125 and F.R.B.P. 3017, the purpose of a disclosure statement is to "give all of the creditors a source of information such that they may make an informed choice regarding approval or rejection of the plan." *In re Rook Broadcasting of Idaho, Inc.*, 154 B.R. 970, 976 (Bankr. D. Idaho 1993). *See also* Fed. R. Bankr. P. 3017, Notes of Advisory Committee on 1991 Amendments (even unimpaired classes who are not entitled to vote on the plan must be provided a disclosure statement to enable them "to make informed judgments as to whether to object to confirmation because of lack of feasibility or other grounds . . . ."). Congress intended the disclosure statement "to be the primary source of information upon which creditors and shareholders would make an informed judgment about a plan of reorganization." *In re Jeppson*, 66 B.R. 269, 292 (Bankr. D. Utah 1986). Although the Court ruled that each of the competing plans had been sent to creditors with an adequate disclosure statement, the evidence regarding the Third Sant Plan shows that even if disclosures had been adequate as to

18

the Second Sant Plan, the "moving target" represented by the Third Sant Plan could not have been the subject of adequate disclosure. It was not even distributed to creditors. Creditors voted on the Second Sant Plan, and the modification of that plan represented by the Third Sant Plan should not be permitted.

### E. Sant's plan was not proposed in good faith and was proposed by means forbidden by law.

The Third Sant Plan was proposed by means forbidden by law, in violation of 11 U.S.C. § 1129(a)(3). In a Notice of Filing of Plan Support Agreement (Docket # 310), it was disclosed that the Committee reached an agreement with Sant whereby the Committee would support **only** the Third Sant Plan, notwithstanding any changes made to any other plan, and would not negotiate with any other plan proponent. This violates 11 U.S.C. § 1102, which imposes upon a creditors' committee the duty to "provide access to information for creditors . . . and to solicit and receive comments from . . . creditors . . . ." A creditors' committee has a fiduciary duty to the class of creditors it represents. *See, e.g., Woods v. City Nat. Bank & Trust Co. of Chicago*, 312 U.S. 262, 268 (1941) (committees are fiduciaries); *In re Tucker Freight Lines, Inc.,* 62 B.R. 213, 215 (Bankr. W.D. Mich. 1986) (committee owes fiduciary duty to all unsecured creditors). In the context of competition between competing plans, a committee's fiduciary duty is fulfilled by seeking the best deal for creditors among competing plan proponents. For the committee to wed itself to one plan proponent is

an abdication of the committee's power to negotiate for better treatment.[1]  For a

committee to do so is a violation of the duties imposed upon it by law.  When Sant

proposed its Third Sant Plan by these means, Sant violated § 1129(a)(1).  The scheme

between Sant and the Committee is so audacious that it is without precedent in the

reported cases, but it is nonetheless a violation of the paired requirements of good

faith and lawfulness.  In *In re Cara Corp.*, 1992 Bankr. LEXIS 672, 1992 WL 88189

(Bankr. E.D. Pa. 1992), the bankruptcy court denied confirmation of a plan proposed

by a creditors' committee which sought a "cram down" of its plan notwithstanding the

failure of the plan to gain acceptance by the class of unsecured creditors.  "We

consider [it to be] improper, inequitable, and violative of 11 U.S.C.

§§ 1129(a)(3), (b)(1), for the Committee to press on in the face of this pronouncement

from its constituency. We are somewhat troubled by the fact that, while

the Plan benefits the Committee's counsel, the creditor body itself, as explained

by [one of the witnesses], may not benefit from it." *Id.*  As in *Cara Corp.*,

confirmation of Sant's Plan would benefit the committee members and its counsel by

exculpating and releasing them.  Confirmation of a plan also provides assurance of the

payment of the fees of the Committee's attorneys because expenses of administration

are required by § 1129(a)(9)(A) to be paid in full.  As in *Cara Corp.* the class of

---

[1] This abdication is further evidenced by the broad releases that were initially granted to committee members under the Second Sant Plan.  These releases were scaled back in response to objections filed by the Doctors and the US Trustee.

20

unsecured creditors did not accept the plan for which confirmation is sought. The Third Sant Plan is not, of course, the Committee's plan, but the Committee did agree to support it and no other plan even if another plan were to be amended so as to be more favorable to the Committee's constituency. Plan Support Agreement, § 2(d),(e). (Docket # 310). The Third Sant Plan was proposed by means forbidden by law and cannot be confirmed.

### F. The Third Sant Plan does not comply with § 1129(a)(5).

The Third Sant Plan violates 11 U.S.C. § 1129(a)(5), which requires the plan proponent to disclose the identity and affiliations of any individual proposed to serve, post-confirmation, as (*inter alia*) a director or officer of the debtor. The Third Sant Plan did not disclose that Dr. Shah is to serve, as he testified, as a director of the Reorganized Debtor. This disqualifies it from confirmation. *In re Beyond.com.corp.*, 289 B.R. 138, 144-45 (Bankr. N.D. Cal. 2003).

### G. The Third Sant Plan provides for an improper third-party release.

The Doctors object to any release or exculpation proposed to be given to the Committee or any Committee member. In light of the plan support agreement, the Doctors are concerned that the Committee may have violated its fiduciary duties to the unsecured creditors. Any cause of action against the Committee and its attorneys would belong to the creditors to whom the Committee owed its duty. See *In re SPM Mfg. Corp.*, 984 F.2d 1305, 1315 (1st Cir. 1993) (Committee is fiduciary for those it

21

represents, not for the debtor or the estate generally); *In re D.H. Overmeyer Telecasting Co.*, 47 B.R. 823, 824 (Bankr. N.D. Ohio 1985). Therefore, such a cause of action would not be property of the estate. Absent unusual circumstances, it is not within Sant's power or the Debtor's power to grant a release binding on third parties. *In re Dow Corning Corp.*, 280 F.3d 648, 658 (6th Cir. 2002) (enjoining non-consenting creditors' claims against non-debtor is drastic measure, appropriate only in unusual circumstances; following factors need to be present: (i) identity of interests between debtor and third party; (ii) third party has contributed substantial assets to reorganization; (iii) injunction is essential to reorganization; (iv) impacted class(es) voted overwhelmingly to accept plan; (v) plan pays substantially all of affected class(es); (vi) non-accepting creditors have opportunity to recover in full; and (vii) court's factual findings are supported by record).

### H.    The SHG Plan should be confirmed.

The testimony showed the SHG Plan to be not only eligible for confirmation, having met the legal requirements for confirmation, but also preferable to the Sant plan. The testimony of Dr. Naman showed that SHG has the depth of commitment and leadership necessary for a successful reorganization. Dr. Naman's impressive qualifications as a medical doctor and medical administrator show the quality of leadership and resources available to the SHG. SHG has the support of an established hospital group, DMC. SHG has proposed a greater equity investment. SHG's

22

financial success, unlike that of the Third Sant Plan, will not be dependent upon the management, lending and business origination of a single medical doctor or of an administrative neophyte with no medical or hospital experience other than the several months he has participated as the representative of Sant as post-petition lender. SHG's Plan is less likely to be followed by the need for further financial reorganization. It would be better for the community and for the creditors.

## CONCLUSION

For all of the reasons explained above, confirmation of the Third Sant Plan should be denied and the Save the Hospital Group's plan, if it is found to be eligible for confirmation, should be confirmed. If it is not found to be eligible for confirmation, neither plan should be confirmed.

Respectfully submitted,

**SILVERMAN & MORRIS, P.L.L.C.**

By: _/s/ Thomas R. Morris_
    Thomas R. Morris (P39141)
    Karin F. Avery (P45364)
Attorneys for Michael J. Short, M.D.
 and Yatinder Singhal, M.D.
30500 Northwestern Highway, Suite 200
Farmington Hills, Michigan 48334
morris@silvermanmorris.com
avery@silvermanmorris.com
(248) 539-1330   Fax: (248) 539-1355

Dated: January 5, 2015

23