UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


In Re:

OAKLAND PHYSICIANS MEDICAL                  Case No. 15-51011-wsd
CENTER, L.L.C. d/b/a DOCTORS'                Chapter 11
HOSPITAL OF MICHIGAN, a Michigan
limited liability company,

     Debtor.
_____/

**THIRD AMENDED COMBINED DISCLOSURE STATEMENT AND PLAN OF
REORGANIZATION OF OAKLAND PHYSICIANS MEDICAL CENTER, L.L.C.
PROPOSED BY SANT PARTNERS, LLC**




HONIGMAN MILLER SCHWARTZ AND COHN LLP
E. Todd Sable
Glenn S. Walter
2290 First National Building
660 Woodward Avenue
Detroit, MI  48226




Dated:  January 11, 2016

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINED TERMS AND RULES OF INTERPRETATION ....................................1

| | | |
|---|---|---|
| 1.1 | *Administrative Claim* | 2 |
| 1.2 | *Allowed* | 2 |
| 1.3 | *Amended Crittenton Note* | 2 |
| 1.4 | *Assumed Contract* | 2 |
| 1.5 | *Assumed Contract List* | 2 |
| 1.6 | *Avoidance Action* | 2 |
| 1.7 | *Bankruptcy Code* | 2 |
| 1.8 | *Bankruptcy Court* | 2 |
| 1.9 | *Bankruptcy Rules* | 2 |
| 1.10 | *Benefit Plans* | 2 |
| 1.11 | *Business Day* | 2 |
| 1.12 | *Cash* | 2 |
| 1.13 | *Cash Collateral Order* | 2 |
| 1.14 | *Causes of Action* | 3 |
| 1.15 | *Chapter 11 Case* | 3 |
| 1.16 | *Chapter 11 Trustee* | 3 |
| 1.17 | *Claim* | 3 |
| 1.18 | *Claims Objection Deadline* | 3 |
| 1.19 | *Class* | 3 |
| 1.20 | *CMS* | 3 |
| 1.21 | *CMS Overpayment Claim* | 3 |
| 1.22 | *Combined Disclosure Statement and Plan* | 3 |
| 1.23 | *Confirmation* | 3 |
| 1.24 | *Confirmation Date* | 3 |
| 1.25 | *Confirmation Hearing* | 3 |
| 1.26 | *Confirmation Order* | 4 |
| 1.27 | *Creditors' Committee* | 4 |
| 1.28 | *Crittenton* | 4 |
| 1.29 | *Crittenton Assumed Affiliation Agreement* | 4 |
| 1.30 | *Crittenton Deficiency Claim* | 4 |
| 1.31 | *Crittenton Loan Documents* | 4 |
| 1.32 | *Crittenton Secured Claim* | 4 |
| 1.33 | *Crittenton 2016-2018 Affiliation Agreement* | 4 |
| 1.34 | *Crittenton 2011-2016 Prepetition Affiliation Agreement* | 4 |
| 1.35 | *Crittenton 2015-2016  Prepetition Affiliation Agreement* | 4 |
| 1.36 | *Cure* | 4 |
| 1.37 | *Debtor* | 4 |
| 1.38 | *DIP Facility* | 4 |
| 1.39 | *DIP Facility Claims* | 5 |
| 1.40 | *DIP Lender* | 5 |

i

| | | |
|---|---|---|
| 1.41 | *DIP Order* | 5 |
| 1.42 | *Disclosure Statement* | 5 |
| 1.43 | *Disputed Claim* | 5 |
| 1.44 | *Distribution Date* | 5 |
| 1.45 | *Effective Date* | 5 |
| 1.46 | *Estate* | 5 |
| 1.47 | *Exculpated Parties* | 5 |
| 1.48 | *Executory Contracts and/or Unexpired Leases* | 5 |
| 1.49 | *Exhibit* | 5 |
| 1.50 | *Executory Contract Objection Deadline* | 6 |
| 1.51 | *Face Amount* | 6 |
| 1.52 | *Final Order* | 6 |
| 1.53 | *General Unsecured Claim* | 6 |
| 1.54 | *Holder* | 6 |
| 1.55 | *Impaired* | 6 |
| 1.56 | *Interest* | 6 |
| 1.57 | *Lien* | 6 |
| 1.58 | *Liquidating Trust Trustee* | 6 |
| 1.59 | *Local Rules* | 6 |
| 1.60 | *Medicare Act* | 7 |
| 1.61 | *Medicaid* | 7 |
| 1.62 | *Michigan* | 7 |
| 1.63 | *Michigan Overpayment Claims* | 7 |
| 1.64 | *New Membership Interests* | 7 |
| 1.65 | *New Credit Facility* | 7 |
| 1.66 | *New Membership Interest* | 7 |
| 1.67 | *Non-Tax Priority Claim* | 7 |
| 1.68 | | 7 |
| 1.69 | *Old Equity Interests* | 7 |
| 1.70 | *Other Secured Claim* | 7 |
| 1.71 | *Periodic Distribution Date* | 7 |
| 1.72 | *Person* | 7 |
| 1.73 | *Petition Date* | 8 |
| 1.74 | *Plan* | 8 |
| 1.75 | *Plan Supplement* | 8 |
| 1.76 | *Plan Sponsor* | 8 |
| 1.77 | *Priority Tax Claim* | 8 |
| 1.78 | *Professional* | 8 |
| 1.79 | *Purchase Price* | 8 |
| 1.80 | *Professional Fee Claim* | 8 |
| 1.81 | *QAAP Taxes* | 8 |
| 1.82 | *Rejected Contract* | 8 |
| 1.83 | *Rejected Contract List* | 8 |
| 1.84 | *Reinstated* | 8 |
| 1.85 | *Released Parties* | 9 |
| 1.86 | *Reserve Surplus* | 9 |

| 1.87 | *Reorganized Debtor* | 9 |
|------|---------------------|---|
| 1.88 | *Retained Actions* | 9 |
| 1.89 | *Sant* | 9 |
| 1.90 | *Schedules* | 9 |
| 1.91 | *Secured Claim* | 9 |
| 1.92 | *SOFAs* | 9 |
| 1.93 | *Transaction Documents* | 9 |
| 1.94 | *Trust* | 9 |
| 1.95 | *Trust Agreement* | 10 |
| 1.96 | *Trust Beneficial Interests* | 10 |
| 1.97 | *Trust Beneficiaries* | 10 |
| 1.98 | *Trust Causes of Action* | 10 |
| 1.99 | *Trust Expenses* | 10 |
| 1.100 | *Trust Guaranteed Cash Payment* | 10 |
| 1.101 | *Trust Property* | 10 |
| 1.102 | *Unclassified Claims* | 10 |
| 1.103 | *Unimpaired* | 10 |
| 1.104 | *U.S. Government* | 10 |
| 1.105 | *UST Fees* | 10 |
| 1.106 | *Waterford Property* | 10 |
| 1.107 | *WPS* | 10 |
| 1.108 | *WRC* | 10 |
| 1.109 | *WRC Secured Claim* | 10 |

ARTICLE II TREATMENT OF UNCLASSIFIED CLAIMS ..................................................11

| 2.1 | *Administrative Claims* | 11 |
|-----|------------------------|----|
| 2.2 | *Priority Tax Claim* | 11 |
| 2.3 | *Professional Fee Claims* | 12 |
| 2.4 | *DIP Facility Claims* | 12 |

ARTICLE III CLASSIFICATION AND TREATMENT OF CLAIMS AND
INTERESTS ..................................................12

| 3.1 | *Introduction* | 12 |
|-----|----------------|----|
| 3.2 | *Summary of Classes* | 13 |
| 3.3 | *Treatment of Classes* | 13 |
| 3.4 | *Alternative Treatment* | 17 |
| 3.5 | *Special Provision Regarding Unimpaired Classes of Claims* | 17 |

ARTICLE IV ACCEPTANCE OF THIS PLAN ..................................................17

| 4.1 | *Classes Entitled to Vote* | 17 |
|-----|---------------------------|----|
| 4.2 | *Acceptance by Impaired Classes* | 17 |
| 4.3 | *Elimination of Classes* | 17 |
| 4.4 | *Cramdown* | 18 |

iii

ARTICLE V MEANS FOR IMPLEMENTATION OF THIS PLAN ...........................................18

    5.1    *Continued Legal Existence and Revesting of Assets.* ...........................................18
    5.2    *Sources of Cash for Distribution* ...........................................18
    5.3    *Issuance of New Membership Interests.* ...........................................18
    5.4    *Section 1145 Exemption.* ...........................................18
    5.5    *Company Action.* ...........................................19
    5.6    *Preservation of Causes of Action.* ...........................................19
    5.7    *Effectuating Documents; Further Transactions.* ...........................................19
    5.8    *Exemption From Certain Transfer Taxes and Recording Fees.* ...........................................19
    5.9    *Further Authorization.* ...........................................19
    5.10    *Dissolution of Creditors' Committee.* ...........................................20
    5.11    *Chapter 11 Trustee* ...........................................20
    5.12    *Cancellation of Existing Securities and Agreements.* ...........................................20
    5.13    *Officers and Directors of Reorganized Debtor.* ...........................................20

ARTICLE VI ALLOWANCE AND RESOLUTION OF CLAIMS ...........................................21

    6.1    *Allowed Claims and Interests.* ...........................................21
    6.2    *Full Satisfaction* ...........................................21
    6.3    *Interest and Penalties on Claims* ...........................................21
    6.4    *Post Confirmation Claim and Asset Resolution.* ...........................................21
    6.5    *Deadline to Object to Claims.* ...........................................21

ARTICLE VII TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES ...........................................22

    7.1    *Assumption/Rejection of Executory Contracts and Unexpired Leases.* ...........................................22
    7.2    *Rejection Damages Claim Deadline* ...........................................23
    7.3    *Cure Amounts.* ...........................................23
    7.4    *Compensation and Benefit Programs.* ...........................................23
    7.5    *Employment Contracts* ...........................................24
    7.6    *Indemnification.* ...........................................24

ARTICLE VIII PROVISIONS GOVERNING DISTRIBUTIONS ...........................................24

    8.1    *Disbursing Agent* ...........................................24
    8.2    *Delivery of Distributions.* ...........................................24
    8.3    *Distribution Reserve* ...........................................24
    8.4    *Distributions Relating to Allowed Insured Claims.* ...........................................25
    8.5    *No De Minimis Distributions* ...........................................25
    8.6    *Unclaimed Trust Distributions* ...........................................25
    8.7    *Defenses; Setoff* ...........................................26
    8.8    *Distributions for Claims Allowed as of the Effective Date* ...........................................26
    8.9    *Means of Cash Payment.* ...........................................26
    8.10    *Withholding and Reporting Requirements.* ...........................................26

ARTICLE IX THE TRUST ...........................................27

9.1     *Transfer of the Trust Property to the Trust.* .......................................................27
9.2     *Purposes of the Trust.* .................................................................................27
9.3     *Trust Agreement.* .....................................................................................27
9.4     *Operations of the Trust.* ............................................................................27
9.5     *Supervision by Chapter 11 Trustee.* ...............................................................29
9.6     *Resignation or Replacement of Liquidating Trust Trustee.* ...............................29
9.7     *Payment of Trust Expenses.* .......................................................................30
9.8     *Distributions.* ..........................................................................................30
9.9     *No Payment of Transfer-Related Fees to the Trust.* ..........................................30
9.10    *Books and Records of Trust.* ......................................................................30
9.11    *Limitations on Liability.* ...........................................................................30
9.12    *No Credit Reporting.* ................................................................................31
9.13    *United States Federal Income Tax Treatment of the Holders of Trust
        Beneficial Interests.* ................................................................................31
9.14    *Termination of the Trust.* ..........................................................................31
9.15    *Trust Guaranteed Cash Payment.* .................................................................32

ARTICLE X INTENTIONAL OMMITED .......................................................................33

10.1    Section has been intentionally omitted. ......................................................33

ARTICLE XI CONFIRMATION AND CONSUMMATION OF THIS PLAN .........................33

11.1    *Condition To Entry of the Confirmation Order* ...............................................33
11.2    *Conditions To Effective Date* .....................................................................33
11.3    *Waiver Of Conditions* ..............................................................................34
11.4    *Notice of Effective Date.* ..........................................................................34

ARTICLE XII EFFECT OF PLAN CONFIRMATION ....................................................34

12.1    *Binding Effect.* ........................................................................................34
12.2    *Revesting of Assets.* .................................................................................34
12.3    *Releases.* ...............................................................................................34
12.4    *Discharge of the Debtor.* ...........................................................................35
12.5    *Injunction.* .............................................................................................35
12.6    *Exculpation and Limitation of Liability* .......................................................36
12.7    *U.S. Government and Michigan* ..................................................................36
12.8    *Term of Bankruptcy Injunction or Stays.* .....................................................37
12.9    *Post-Effective Date Retention of Professionals.* .............................................37

ARTICLE XIII RETENTION OF JURISDICTION ..........................................................37

13.1    *Retention of Jurisdiction.* ..........................................................................37
13.2    *Failure of Bankruptcy Court to Exercise Jurisdiction* .....................................39

ARTICLE XIV MISCELLANEOUS PROVISIONS ..........................................................39

14.1    *Effectuating Documents and Further Transactions.* .........................................39

19147500.12

|       | 14.2  | *Company Action*. | 39 |
|       | 14.3  | *Payment Of Statutory Fees*. | 39 |
|       | 14.4  | *Amendment Or Modification Of This Plan*. | 39 |
|       | 14.5  | *Severability of Plan Provisions* | 40 |
|       | 14.6  | *Successors and Assigns* | 40 |
|       | 14.7  | *Revocation, Withdrawal, or Non-Consummation*. | 40 |
|       | 14.8  | *Notice*. | 40 |
|       | 14.9  | *Governing Law*. | 41 |
|       | 14.10 | *Tax Reporting and Compliance* | 41 |
|       | 14.11 | *Conflicts* | 41 |

| I.   | INTRODUCTION | 42 |
|------|--------------|-----|
|      | A. **Executive Summary** | 42 |
|      | B. **Summary of Classification and Treatment of Claims and Interests** | 43 |

| II.  | DESCRIPTION OF THE DEBTOR | 45 |
|------|---------------------------|-----|
|      | A. **The Debtor** | 45 |
|      | B. **The Principals** | 45 |
|      | C. **The Debtor's Business; Causes for the Chapter 11 Filing** | 47 |

| III. | POST-PETITION EVENTS OF SIGNIFICANCE | 48 |
|------|--------------------------------------|-----|
|      | A. **Patient Care Ombudsman** | 48 |
|      | B. **Use of Cash Collateral** | 48 |
|      | C. **DIP Financing** | 49 |
|      | D. **Appointment of Chapter 11 Trustee** | 50 |
|      | E. **Post-Petition Transfers Outside the Ordinary Course of Business.** | 50 |
|      | F. **Litigation.** | 51 |

| IV.  | SUMMARY OF THE CHAPTER 11 PLAN OF REORGANIZATION | 51 |
|------|---------------------------------------------------|-----|
|      | A. **Treatment of Classes** | 51 |
|      | B. **Implementation Provisions of Plan** | 57 |

| V.   | LIQUIDATION ANALYSIS | 61 |
|------|----------------------|-----|
|      | A. **Best Interest Test/Liquidation Analysis** | 61 |
|      | B. **Preparation of Liquidation Analysis** | 62 |
|      | C. **Potential Causes of Action** | 63 |
|      | D. **Codebtors** | 63 |

| VI.  | DETAILS REGARDING IMPLEMENTATION OF PLAN | 64 |
|------|-------------------------------------------|-----|
|      | A. **Summaries of Financial Information** | 64 |
|      | B. **Principals and Management of Reorganized Debtor** | 65 |
|      | C. **Certain United States Federal Income Tax Consequences of the Plan** | 66 |

19147500.12

**U.S. Federal Income Tax Consequences to the Debtors**...............................................68

**U.S. Federal Income Tax Consequences to Holders** ......................................................68

VII.    LEGAL REQUIREMENTS.............................................................................................70

      **A.**      **Voting Procedures**.........................................................................................70

      **B.**      **Acceptance** ......................................................................................................71

      **C.**      **Confirmation** .................................................................................................71

      **D.**      **Modification**...................................................................................................71

      **E.**      **Effect of Modification** ..................................................................................72

**CERTIFICATE OF SERVICE** ................................................................................................73

19147500.12

**EXHIBITS**

EXHIBIT A -    New Credit Facility Term Sheet
EXHIBIT B -    Amended and Restated Operating Agreement
EXHIBIT C -    Liquidating Trust Agreement
EXHIBIT D -    List of Assumed Contracts
EXHIBIT E -    List of Rejected Contracts
EXHIBIT F -    Amended Crittenton Note
EXHIBIT G -    Trust Causes of Action
EXHIBIT H -    Crittenton Assumed Affiliation Agreement
EXHIBIT I -    Crittenton 2016-2018 Affiliation Agreement

19147500.12

# INTRODUCTION

Sant Partners, LLC (the "**Plan Sponsor**") proposes this plan of reorganization for the resolution of the outstanding Claims against and Interests in the Debtor. Reference is made to the Disclosure Statement combined with this Plan for a discussion of (a) certain information relating to the Debtor, (b) a summary and analysis of this Plan, and (c) certain matters related to the confirmation and the consummation of this Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Plan Sponsor reserves the right to alter, amend, modify, revoke, or withdraw this Plan.

## ARTICLE I

## DEFINED TERMS AND RULES OF INTERPRETATION

*Rules Of Interpretation And Computation Of Time*. For purposes of this Plan, unless otherwise provided herein: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (b) unless otherwise provided in this Plan, any reference in this Plan to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions with any modifications; (c) any reference in this Plan to an existing document or schedule filed or to be filed means such document or schedule, as it may have been or may be amended, modified, or supplemented pursuant to this Plan; (d) any reference to an entity as a Holder of a Claim or Interest includes that entity's successors and assigns; (e) all references in this Plan to Sections and Articles are references to Sections and Articles of or to this Plan; (f) the words "herein," "hereunder," and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (h) subject to the provisions of any contract, certificates of incorporation, by-laws, instrument, release, or other agreement or document entered into in connection with this Plan, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules; (i) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (j) in computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply; (k) "including" means including without limitation;" and (l) with reference to any distribution under this Plan, "on" a date means on or as soon as reasonably practicable after that date.

*Exhibits*. All Exhibits are incorporated into and are a part of this Plan as if set forth in full herein, and, to the extent not annexed hereto, such Exhibits shall be filed with the Bankruptcy Court in the form of a Plan Supplement, no later than seven days prior to the Confirmation Hearing and shall be in form and substance satisfactory to the Plan Sponsor.

*Defined Terms*. As used herein, capitalized terms shall have the meanings set forth below. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

1

1.1     ***Administrative Claim*** means a Claim for costs and expenses of administration of the Chapter 11 Case under sections 503(b) or 507(b) of the Bankruptcy Code.

1.2     ***Allowed*** means: (a) listed in the Schedules in an amount greater than zero and (i) not listed as disputed, contingent or unliquidated, as to which any objection or motion to estimate, equitably subordinate, reclassify, or otherwise limit the recovery thereon has been resolved, and (ii) as to which no proof of claim has been filed; (b) as to which a timely proof of claim has been filed in a sum certain, as to which any objection or motion to estimate, equitably subordinate, reclassify, or otherwise limit the recovery thereon has been resolved; (c) allowed in accordance with Section 502(h) of the Bankruptcy Code; or (d) allowed under this Plan or by Final Order of the Bankruptcy Court.  A claim shall not be deemed Allowed until any period to object to such claim has expired.

1.3     ***Amended Crittenton Note*** means the amended and restated promissory note amended by the Plan in the principal amount of $650,000, the form of which is attached hereto as Exhibit F.

1.4     ***Assumed Contract*** is defined in Section 7.1.

1.5     ***Assumed Contract List*** means the list, attached hereto as Exhibit D, of the Executory Contracts and Unexpired Leases to be assumed under Section 7.1 hereof.

1.6     ***Avoidance Action*** means any claim or cause of action of the Estate arising out of or maintainable pursuant to sections 506(c), 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, 552(b) or 553 of the Bankruptcy Code or under any other similar applicable law, regardless of whether or not such action has been commenced prior to the Effective Date.

1.7     ***Bankruptcy Code*** means title 11 of the United States Code, as now in effect or hereafter amended to the extent such amendments apply to the Chapter 11 Case.

1.8     ***Bankruptcy Court*** means the United States Bankruptcy Court for the Eastern District of Michigan or any other court with jurisdiction over the Chapter 11 Case.

1.9     ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure, as now in effect or hereafter amended to the extent such amendments apply to the Chapter 11 Case.

1.10     ***Benefit Plans*** is defined in Section 7.4 hereof.

1.11     ***Business Day*** means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

1.12     ***Cash*** means legal tender of the United States of America, and equivalents thereof.

1.13     ***Cash Collateral Order*** means the Bankruptcy Court's *Final Order (I) Authorizing (A) Use of Cash Collateral Pursuant to 11 U.S.C. 363, and (B) Granting of Security Interests, Superpriority Claims, and Adequate Protection, and (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(c)* [DE 130].

2

1.14 ***Causes of Action*** means any action, claim, cause of action, controversy, demand, right, action, lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law, or in equity or pursuant to any other theory of law. For the avoidance of doubt. "Causes of Action" include: (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (b) the right to object to Claims or Interests, (c) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code, (d) any claim or defense including fraud, mistake, duress and usury; and any other defenses set forth in section 558 of the Bankruptcy Code, (e) any state or foreign law fraudulent transfer or similar claim; and (f) any cause of action described on the Debtor's Schedules or Statement of Financial Affairs.

1.15 ***Chapter 11 Case*** means the bankruptcy case of the Debtor, Case No. 15-51011-wsd, pending before the Bankruptcy Court.

1.16 ***Chapter 11 Trustee*** means Basil T. Simon, in his capacity as chapter 11 trustee in the Chapter 11 Case or any successor trustee appointed by the United States Trustee and approved by the Bankruptcy Court.

1.17 ***Claim*** means a "claim" as defined in section 101(5) of the Bankruptcy Code.

1.18 ***Claims Objection Deadline*** is defined in Section 6.5 hereof.

1.19 ***Class*** means a category of Claims or Interests, as described in Article III hereof.

1.20 ***CMS*** means The Center for Medicare & Medicaid Services.

1.21 ***CMS Overpayment Claim*** means the claim of CMS for overpayments made to the Debtor under 42 U.S.C. 1395c – 1395i-5 (Part A).

1.22 ***Combined Disclosure Statement and Plan*** means this Second Amended Combined Disclosure Statement and Plan of Reorganization of Oakland Physicians Medical Center Proposed by the Plan Sponsor.

1.23 ***Confirmation*** means the confirmation of this Plan by the Bankruptcy Court pursuant to section 1129 of the Bankruptcy Code.

1.24 ***Confirmation Date*** means the date on which the Confirmation Order is entered on the docket of the Bankruptcy Court.

1.25 ***Confirmation Hearing*** means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

1.26    ***Confirmation Order*** means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

1.27    ***Creditors' Committee*** means the statutory committee of unsecured creditors, appointed in the Chapter 11 Case pursuant to section 1102 of the Bankruptcy Code.

1.28    ***Crittenton*** means Crittenton Hospital Medical Center, a Michigan not-for-profit corporation.

1.29    ***Crittenton Assumed Affiliation Agreement*** means the Crittenton 2011-2016 Prepetition Affiliation Agreement as modified in the form attached as Exhibit H to the Plan.

1.30    ***Crittenton Deficiency Claim*** means the portion of the Claim of Crittenton arising under the Crittenton Loan Documents that is not a Secured Claim.

1.31    ***Crittenton Loan Documents*** means that certain "Loan Agreement" between Crittenton and the Debtor dated April 14, 2011 and all related "Loan Documents" (as such term is defined in the Loan Agreement).

1.32    ***Crittenton Secured Claim*** means the Secured Claim of Crittenton under the Crittenton Loan Documents.

1.33    ***Crittenton 2016-2018 Affiliation Agreement*** means the certain Graduate Medical Education Affiliation Agreement for the 2016-2017 and 2017-2018 academic years in the form attached as Exhibit I to the Plan to be executed by the Reorganized Debtor, by a CMS recognized responsible representative of hospital Medicare provider number 23-0013, and Crittenton on the Effective Date.

1.34    ***Crittenton 2011-2016 Prepetition Affiliation Agreement*** means that certain Graduate Medical Education Affiliation Agreement between Crittenton and the Debtor dated April 14, 2011.

1.35    ***Crittenton 2015-2016 Prepetition Affiliation Agreement*** means that certain Doctors Hospital of Michigan and Crittenton Hospital Medical Center Medicare GME Affiliation Agreement Academic Year July 1, 2015 through June 30, 2016 Projected Counts dated July 14, 2015.

1.36    ***Cure*** means the payment of cash or the distribution of other property (as the parties may agree or the Bankruptcy Court may order), as necessary to cure defaults under an executory contract or unexpired lease of the Debtor and to permit that Debtor to assume the contract or lease under Section 365(a) of the Bankruptcy Code.

1.37    ***Debtor*** means Oakland Physicians Medical Center, L.L.C. d/b/a Doctors' Hospital of Michigan, a Michigan limited liability company.

1.38    ***DIP Facility*** means that certain debtor-in-possession financing facility approved by the DIP Order.

4

1.39    ***DIP Facility Claims*** means the obligations owed to the DIP Lender under the DIP Facility.

1.40    ***DIP Lender*** means Sant Partners, LLC in its capacity as lenders under the DIP Facility.

1.41    ***DIP Order*** means the Bankruptcy Court's Final Order (I) Authorizing the Debtor to Obtain Post-Petition Financing on a Senior Secured, Superpriority Basis, (II) Authorizing the Use of Cash Collateral, and (III) Granting Adequate Protection to Prepetition Secured Parties [DE 131], as amended.

1.42    ***Disclosure Statement*** means the Disclosure Statement contained in this Combined Disclosure Statement and Plan.

1.43    ***Disputed Claim*** means (a) any Claim as to which an objection or request for estimation has been made in accordance with the Bankruptcy Code and the Bankruptcy Rules, or any claim otherwise disputed by the Chapter 11 Trustee, the Liquidating Trust Trustee, the Debtor, the Reorganized Debtor, the Plan Sponsor or other party-in-interest in accordance with applicable law, which objection has not been withdrawn or determined by a Final Order, (b) any Claim scheduled by the Debtor as contingent, unliquidated, or disputed, (c) any Claim which amends a Claim scheduled by the Debtor as contingent, unliquidated, or disputed, or (d) any Claim prior to it having become an Allowed Claim.

1.44    ***Distribution Date*** means the date, occurring on or as soon as practicable after the Effective Date, on which the Liquidating Trust Trustee first makes distributions to holders of Allowed General Unsecured Claims.

1.45    ***Effective Date*** means a Business Day on or after the Confirmation Date specified by the Plan Sponsor on which (a) no stay of the Confirmation Order is in effect and (b) the conditions to effectiveness set forth in Article XI hereof have been satisfied or waived.

1.46    ***Estate*** means the estate of the Debtor created under section 541 of the Bankruptcy Code.

1.47    ***Exculpated Parties*** means each of the following in their capacity as such (a) the Debtor, (b) the Reorganized Debtor, (c) the Creditors' Committee, (d) the members of the Creditors' Committee in their capacity as such, (e) the DIP Lender, (f) the Plan Sponsor, (g) any member of the Infrahealth Group of Companies, (h) the Chapter 11 Trustee, (i) Honigman Miller Schwartz and Cohn LLP, (j) Simon PLC, (k) Dr. Jawad Shah, (l) Simon, Stella & Zingas, P.C., (m) Dr. Sanjay Sharma, (n) Sanyam Sharma, and (o) Priyam Sharma.

1.48    ***Executory Contracts and/or Unexpired Leases*** means all executory contracts and unexpired leases to which the Debtor is a party.

1.49    ***Exhibit*** means an exhibit annexed to the Combined Disclosure Statement and Plan or contained in the Plan Supplement, as such exhibit may be amended, modified or supplemented from time to time.

5

1.50    ***Executory Contract Objection Deadline*** is defined in Section 7.1 hereof.

1.51    ***Face Amount*** means (a) when used in reference to a Disputed Claim, the full stated amount claimed by the holder thereof in any proof of claim timely filed with the Bankruptcy Court, and (b) when used in reference to an Allowed Claim, the amount thereof.

1.52    ***Final Order*** means an order or judgment, the operation or effect of which has not been reversed, stayed, modified, or amended, and as to which order or judgment (or any reversal, stay, modification, or amendment thereof) (a) the time to appeal, seek certiorari, or request reargument or further review or rehearing has expired and no appeal, petition for certiorari, or request for reargument or further review or rehearing has been timely filed, or (b) any appeal, that has been or may be taken or any petition for certiorari or request for reargument or further review or rehearing that has been or may be filed, has been resolved by the highest court to which the order or judgment was appealed, from which certiorari was sought, or to which the request was made, and no further appeal or petition for certiorari or request for reargument or further review or rehearing has been or can be taken for granted.

1.53    ***General Unsecured Claim*** means a Claim against the Debtor that is not an Administrative Claim, DIP Facility Claim, Priority Tax Claim, Non-Tax Priority Claim, Crittenton Secured Claim, CMS Overpayment Claim, Michigan Overpayment Claim, WRC Secured Claim or Other Secured Claim.

1.54    ***Holder*** means a holder of a Claim or Interest, as applicable.

1.55    ***Impaired*** means when used in reference to a Claim or Interest, a Claim or Interests that is in a Class that is impaired within the meaning of section 1124 of the Bankruptcy Code.

1.56    ***Interest*** means the legal, equitable, contractual (including, without limitation, any contractual right to acquire equity in the Debtor contingent upon future events), and other rights of any Person with respect to any membership interest or other ownership interest in the Debtor, whether or not transferable, and any option, warrant, or right to purchase, sell, or subscribe for an ownership interest or other equity security in the Debtor.

1.57    ***Lien*** means any lien, security interest, pledge, title retention agreement, encumbrance, charge, mortgage or hypothecation, other than, in the case of securities and any other equity ownership interests, any restrictions imposed by applicable United States or foreign securities laws.

1.58    ***Liquidating Trust Trustee*** means the trustee of the Trust, or any successor trustee designated or selected in accordance with the terms of the Plan and the Trust Agreement. The initial Liquidating Trust Trustee shall be Basil T. Simon.

1.59    ***Local Rules*** means the local rules of the United States Bankruptcy Court for the Eastern District of Michigan, as now in effect or hereafter amended to the extent such amendments apply to the Chapter 11 Case.

6

1.60     *Medicare Act* means 42 U.S.C. §§ 1395 *et seq.* and all related regulations, policies and procedures.

1.61     *Medicaid* means the program adopted by the State of Michigan 42 CFR 430.10 in conformity with the requirements of Title XIX of the Social Security Act.

1.62     *Michigan* means the Michigan Department of Health and Human Services.

1.63     *Michigan Overpayment Claims* means claims of Michigan for Medicaid overpayments and unpaid QAAP Taxes to the extent such QAAP Taxes are not Priority Tax Claims.

1.64     *New Membership Interests* means the new membership interests to be issued under the Plan and the Amended and Restated Operating Agreement, representing 100% of the equity in the Reorganized Debtor.

1.65     *New Credit Facility* means that certain $8,000,000 revolving financing facility to be entered into between the Reorganized Debtor and Sant Partners, LLC, as agent and lender, and any other lenders party thereto, on the Effective Date, which shall have terms substantially as set forth on term sheet attached hereto as Exhibit A, and all documents, agreements and instruments related thereto.

1.66     *New Membership Interest* means, collectively, the membership interests in the Reorganized Debtor to be issued under the Plan and the Amended and Restated Operating Agreement, representing 100% of the equity interests in the Reorganized Debtor.

1.67     *Non-Tax Priority Claim* means a Claim, other than an Administrative Claim or Priority Tax Claim, which is entitled to priority in payment pursuant to section 507(a) of the Bankruptcy Code.

1.69     *Old Equity Interests* means the Interests, whether or not evidenced by a security, in the Debtor issued and outstanding immediately before the Effective Date.

1.70     *Other Secured Claim* means a Secured Claim that is not a DIP Facility Claim, Crittenton Secured Claim, CMS Overpayment Claim, Michigan Overpayment Claim, or WRC Secured Claim.

1.71     *Periodic Distribution Date* means each of (a) the Distribution Date, (b) the first Business Day occurring as lest six months after the Distribution Date, or such earlier date as the Trustee shall select and (c) the first Business Day occurring at least six months after the immediately preceding Periodic Distribution Date or such earlier date as the Liquidating Trust Trustee shall select.

1.72     *Person* means a "person" as defined in section 101(41) of the Bankruptcy Code and also includes any natural person, corporation, general or limited partnership, limited liability company, joint venture, joint stock company, firm, trust, estate, unincorporated

organization, association, government, governmental agency, or other entity, in each case whether acting in an individual, fiduciary or other capacity.

1.73    ***Petition Date*** means July 22, 2015, the date on which the Debtor filed its petition for relief commencing its Chapter 11 Case.

1.74    ***Plan*** means this chapter 11 plan of reorganization contained in the Combined Disclosure Statement and Plan, including the Exhibits and all supplements, appendices, and schedules hereto, either in its current form or as the same may be amended, modified or supplemented from time to time with the consent of the Plan Sponsor.

1.75    ***Plan Supplement*** means the compilation of the exhibits to the Plan to be filed with the Bankruptcy Court.

1.76    ***Plan Sponsor*** is defined in the Introduction.

1.77    ***Priority Tax Claim*** means a Claim of a governmental unit of the kind specified in sections 502(i), 507(a)(8), or 1129(a)(9)(D) of the Bankruptcy Code.

1.78    ***Professional*** means (a) any professional employed in the Chapter 11 Case pursuant to sections 327, 328, or 1103 of the Bankruptcy Code or otherwise and (b) any professional or other entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Case pursuant to section 503(b)(4) of the Bankruptcy Code.

1.79    ***Purchase Price*** means $1,500,000.

1.80    ***Professional Fee Claim*** means an Administrative Claim of a Professional for compensation for services rendered or reimbursement of costs, expenses, or other charges incurred on or after the Petition Date and prior to and including the Effective Date.

1.81    ***QAAP Taxes*** means Quality Assurance Assessment Program taxes under MCL 333.20161.

1.82    ***Rejected Contract*** is defined in Section 7.1.

1.83    ***Rejected Contract List*** means the list, attached hereto as Exhibit E, of the Executory Contracts and Unexpired Leases to be rejected under Section 7.1 hereof.

1.84    ***Reinstated*** means (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the Holder of such Claim so as to leave the Class including such Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default, (c) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code, (d) reinstating the maturity of such Claim as such maturity existed before such default, (e) compensating the holder of a Claim for any damages incurred as a result of any reasonable reliance by such holder of a Claim on such contractual provision or such applicable law, and (f) not otherwise altering the legal, equitable, or

8

contractual rights to which such Claim entitles the Holder of such Claim; provided, however, that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, and affirmative covenants regarding corporate existence, prohibiting certain transactions, change of control or actions contemplated by this Plan, or conditioning such transactions or actions on certain factors, shall not be required to be cured to achieve reinstatement.

1.85    ***Released Parties*** means each of the following (a) the Creditors' Committee, (b) the members of the Creditors' Committee in their capacity as such, (c) the DIP Lender, (d) the Plan Sponsor, (e) any member of the Infrahealth Group of Companies, (f) the Chapter 11 Trustee, (g) Honigman Miller Schwartz and Cohn LLP, (h) Simon PLC, (i) Dr. Jawad Shah, (j) Simon, Stella & Zingas, P.C., (k) Dr. Sanjay Sharma, (l) Sanyam Sharma, and (m) Priyam Sharma.

1.86    ***Reserve Surplus*** has the meaning set forth in Section 8.3 of the Plan.

1.87    ***Reorganized Debtor*** means the Debtor on and after the Effective Date.

1.88    ***Retained Actions*** means all Causes of Action other than Trust Causes of Action; provided, however, that Retained Actions shall not include those claims, causes of action, rights of action, suits and proceedings, whether in law or in equity, whether known or unknown, released under Article XII herein.

1.89    ***Sant*** means Sant Partners, LLC.

1.90    ***Schedules*** means the schedules of assets and liabilities filed in the Bankruptcy Court by the Debtor, as may be amended from time to time.

1.91    ***Secured Claim*** means a Claim that is secured by a Lien on property in which the Debtor's Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in the applicable Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code.

1.92    ***SOFAs*** means the Statement of Financial Affairs filed by the Debtor.

1.93    ***Transaction Documents*** means, collectively, the New Credit Facility, the Amended and Restated Operating Agreement, the Trust Agreement, the New Crittenton Note, the Crittenton 2016-2018 Affiliation Agreement, the Crittenton Assumed Affiliation Agreement and any agreement, contract, instrument, and other agreement or document executed or delivered in connection with the foregoing.

1.94    ***Trust*** means the trust created pursuant to this Plan and the Trust Agreement, as described in Article IX of the Plan. The Trust will receive all of the Trust Property, conclude the liquidation of such assets, and make distributions to the persons entitled thereto in accordance with the terms of the Plan.

9

1.95     ***Trust Agreement*** means the Liquidation Trust Agreement and Declaration of Trust which will be in substantially the form contained in the Plan Supplement.

1.96     ***Trust Beneficial Interests*** means, collectively, the interests of the holders of Allowed General Unsecured Claims in the Trust and in all distributions to be made by the Trust on account of Allowed General Unsecured Claims. The Trust Beneficial Interests (a) shall be noted in the books and records of the Trust, (b) shall not be evidenced by a writing, and (c) may not be transferred, sold, assigned, hypothecated or pledged, except that they may be assigned or transferred by will, intestate succession or operation of law.

1.97     ***Trust Beneficiaries*** means the holders of Trust Beneficial Interests, as of any point in time.

1.98     ***Trust Causes of Action*** means all Causes of Action of the Debtor or Debtor's Estate against (a) Dr. Yatinder Singhal, (b) Dr. Anuj Mittal, (c) Dr. Michael Short, (d) Dr. Brijinder Gupta, (e) Butzel Long, PC and (f) the Law Offices of Melvin M Raznick, including, without limitation, any Avoidance Actions against such entities and individuals; and all other Causes of Action identified on Exhibit G.

1.99     ***Trust Expenses*** means all costs, expenses and obligations incurred by the Trust, the Liquidating Trust Trustee, or the Liquidating Trust Trustee's Professionals in administering the Trust or in any manner incidental or related thereto.

1.100     ***Trust Guaranteed Cash Payment*** is defined in Section 9.15 hereof.

1.101     ***Trust Property*** means the Trust Guaranteed Cash Payment and the Trust Causes of Action.

1.102     ***Unclassified Claims*** means the Administrative Claims and Priority Tax Claims.

1.103     ***Unimpaired*** means a Claim or Interest that is not Impaired.

1.104     ***U.S. Government*** is defined in Section 12.7.

1.105     ***UST Fees*** is defined in Section 14.3.

1.106     ***Waterford Property*** means the real estate commonly known as 1305 North Oakland Boulevard, Waterford, MI as more specifically described in the mortgage between the Debtor and Crittenton dated April 14, 2011.

1.107     ***WPS*** means the Wisconsin Physicians Service Insurance Corporation.

1.108     ***WRC*** means Oakland County – WRC Wastewater treatment division.

1.109     ***WRC Secured Claim*** means the Secured Claim of the WRC as a water utility in the Allowed amount of $794,265.51.

# ARTICLE II

## TREATMENT OF UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not classified and are not entitled to vote on this Plan.

2.1     ***Administrative Claims***.  On, or as soon as reasonably practicable after, the latest of (a) the Effective Date, (b) the date on which an Administrative Claim becomes an Allowed Administrative Claim, or (c) the date on which an Allowed Administrative Claim becomes payable under any agreement relating thereto, each Holder of such Allowed Administrative Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Administrative Claim, Cash equal to the unpaid portion of such Allowed Administrative Claim.  Notwithstanding the foregoing, (y) any Allowed Administrative Claim based on a liability incurred by a Debtor in the ordinary course of business during the Chapter 11 Case may be paid in the ordinary course of business in accordance with the terms and conditions of any agreement relating thereto and (z) any Allowed Administrative Claim may be paid on such other terms as may be agreed to between the Holder of such Claim and the Debtor or the Reorganized Debtor.

2.2     ***Priority Tax Claim***.  On, or as soon as reasonably practicable after, the later of (a) the Effective Date or (b) the date on which a Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Priority Tax Claim, in the sole discretion of the Reorganized Debtor, (a) Cash equal to the unpaid portion of such Holder's Allowed Priority Tax Claim, (b) payment in accordance with the provisions of section 1129(a)(9)(C) of the Bankruptcy Code over a period not ending later than five years from the Petition Date, or (c) such other treatment as to which the Plan Sponsor, Reorganized Debtor and such Holder shall have agreed upon in writing.

Upon the failure of the Reorganized Debtor to make any payments due on an Allowed Administrative Claim, Allowed Secured Claim, or Allowed Priority Tax Claim owed to a governmental unit that is not cured within 30 days of the mailing of a written notice of default by the such governmental unit to the Reorganized Debtor, such governmental unit may exercise all rights and remedies available to it under non-bankruptcy law for the collection of its entire claim and/or seek appropriate relief in the Bankruptcy Court.

The full Allowed Claim of the Oakland County Treasurer shall receive the treatment provided to Priority Tax Claims notwithstanding that all or a portion of Oakland County Treasurer's Claim would be classified as an Other Secured Claim.  The Allowed Claim of the Oakland County Treasurer shall continue to be secured by the Oakland County Treasurer's statutory lien, and be entitled to interest at the statutory rate of 12% per annum (and the one-time additional administrative fee of 4.0% for the 2015 taxes that get turned over to the Oakland County Treasurer).  *See Mich Comp. Laws Ann* §§ 211.40, 211.59 and 211.78.

Interest on the Michigan Department of Treasury's Allowed Claim shall accrue at the rate of 4.25% per annum.

19147500.12

The Allowed Claim of the Michigan Unemployment Agency shall be treated as a Priority Tax Claim. Interest on the Michigan Unemployment Agency's Allowed Priority Tax Claim shall accrue at the statutory rate of 12% per annum. Taxes owed to the Michigan Unemployment Agency for periods from the Petition Date through the Effective Date shall be Allowed Administrative Claims and paid on or before the latest of (a) 30 days after the Effective Date, and (b) the date such Claim becomes due and payable.

2.4 *Professional Fee Claims*. Professional Fee Claims shall be paid in full in Cash on, or as soon as reasonably practicable after, the allowance of such claims by Final Order of the Bankruptcy Court. Each Professional requesting compensation pursuant to sections 330, 331 or 503(b) of the Bankruptcy Code for services rendered in connection with the Chapter 11 Case prior to the Effective Date shall file with the Bankruptcy Court an application for allowance of final compensation and reimbursement of expenses in the Chapter 11 Case on or before the 45th day following the Effective Date. Without limiting the foregoing, the Reorganized Debtor may pay the charges incurred by the Reorganized Debtor on and after the Effective Date for any Professional's fees, disbursements, expenses or related support services, without application to or approval by the Bankruptcy Court. None of the fees and expenses of the Professionals engaged by the DIP Lender shall be subject to separate approval by the Bankruptcy Court and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto.

2.5 *DIP Facility Claims*. On the Effective Date, the DIP Lender shall satisfy their obligations to fund the Purchase Price to acquire the New Membership Interests through the conversion of DIP Facility Claims in an amount equal to the Purchase Price. To the extent that the Purchase Price is less than the amount of DIP Facility Claims, the unconverted DIP Facility Claims shall be paid in full in Cash on the Effective Date.

## ARTICLE III

## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

3.1 *Introduction*.

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against and Interests in the Debtor. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified, and the respective treatment of such Unclassified Claims is set forth in Article II of this Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim is also placed in a particular Class for the purpose of receiving distributions pursuant to this Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

3.2    ***Summary of Classes***.

| Class | Impaired/Unimpaired; Entitlement To Vote |
|---|---|
| Class 1 - Non-Tax Priority Claims | Unimpaired - Deemed to have accepted this Plan and not entitled to vote |
| Class 2 – Other Secured Claims | Unimpaired - Deemed to have accepted this Plan and not entitled to vote |
| Class 3 – Crittenton Secured Claims | Impaired – Entitled to vote |
| Class 4 – CMS Overpayment Claims | Impaired – Entitled to vote |
| Class 5 – Michigan Overpayment Claims | Impaired – Entitled to vote |
| Class 6 – WRC Secured Claims | Impaired – Entitled to vote |
| Class 7 – General Unsecured Claims | Impaired – Entitled to vote |
| Class 8 - Old Equity Interests | Impaired – Deemed to have rejected this Plan and not entitled to vote |

3.3    ***Treatment of Classes***.

*Class 1 – Non-Tax Priority Claims*

*Claims In Class*:  Class 1 consists of all Non-Tax Priority Claims against the Debtor.

*Treatment*:  Except to the extent that the Holder of an Allowed Non-Tax Priority Claim has agreed to a less favorable treatment of such Claim, on, or as soon as reasonably practicable after the latest of (a) the Effective Date, (b) the date on which such Non-Tax Priority Claim becomes an Allowed Non-Tax Priority Claim, (c) the date on which such Allowed Non-Tax Priority Claim is otherwise due and payable, and (d) such other date as mutually may be agreed to by and between the Reorganized Debtor and the Holder of such Non-Tax Priority Claim, each Holder of an Allowed Non-Tax Priority Claim shall receive, in full and final satisfaction, release, and discharge of, and in exchange for, such Allowed Non-Tax Priority Claim, Cash equal to the unpaid portion of such Allowed Non-Tax Priority Claim.

*Voting*:  Class 1 is Unimpaired and the Holders of Allowed Class 1 Non-Tax Priority Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 1 Non-Tax Priority Claims are not entitled to vote to accept or reject this Plan.

*Class 2 – Other Secured Claims*

*Claims In Class*: Class 2 consists of all Other Secured Claims against the Debtor. (Each Other Secured Claim shall constitute a separate Class numbered 2.1, 2.2, 2.3, etc.)

*Treatment*: On the Effective Date, or as soon thereafter as is reasonably practicable, each Holder of an Allowed Class 2 Other Secured Claim shall, at the option of the Reorganized Debtor, be entitled to the treatment set forth below in option A, B, C, or D. The Reorganized Debtor specifically reserves the right to challenge the validity, nature and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported Liens relating to the Other Secured Claims.

Option A: Allowed Other Secured Claims with respect to which the applicable Debtor elects option A shall be Reinstated. The failure of the Debtor to file an objection, prior to the Effective Date, with respect to any Other Secured Claim that is Reinstated hereunder shall be without prejudice to the rights of the Reorganized Debtor to contest or otherwise defend against such Claim in an appropriate forum when and if such Claim is sought to be enforced. Any Cure amount that the Debtor may be required to pay pursuant to section 1124(2) of the Bankruptcy Code on account of any such Reinstated Other Secured Claim shall be paid on, or as soon as practicable after, the latest of (a) the Effective Date, (b) the date on which such Other Secured Claim becomes Allowed, or (c) such other date as mutually may be agreed to by and between such Holder and the Debtor or Reorganized Debtor.

Option B: Allowed Other Secured Claims with respect to which the Reorganized Debtor elects option B shall be paid in Cash, in full, including any amounts owed under section 506 of the Bankruptcy Code, on, or as soon as reasonably practicable after, the latest of (a) the Effective Date, (b) the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, (c) the date on which such Other Secured Claim is otherwise due and payable and (d) such other date as mutually may be agreed to by and between such Holder and the Reorganized Debtor.

Option C: Allowed Other Secured Claims with respect to which the applicable Debtor elects option C shall be satisfied by the surrender to the Holder of the Claim of the collateral securing the applicable Other Secured Claim.

Option D: Allowed Other Secured Claims with respect to which the applicable Debtor elects option D shall be satisfied in accordance with such other terms and conditions as may be agreed upon by the Reorganized Debtor and the Holder of such Allowed Secured Claim.

The Reorganized Debtor shall be deemed to have elected Option A with respect to all Allowed Other Secured Claims except those with respect to which

14

the Plan Sponsor elects another option in writing prior to the Confirmation Hearing.

*Voting*:  Class 2 is Unimpaired and the Holders of Allowed Class 2 Other Secured Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 2 Other Secured Claims are not entitled to vote to accept or reject this Plan.

*Class 3 – Crittenton Secured Claims*

*Claims In Class*: Class 3 consists of all Crittenton Secured Claims.

*Treatment*:  On the Effective Date, Crittenton shall receive (i) $100,000 in Cash and (ii) the Amended Crittenton Note, which shall continue to be secured by the Waterford Property; other than the Amended Crittenton Note, the related Waterford Property mortgage, and the Crittenton Deficiency Claim, all other obligations to Crittenton under the Crittenton Loan Documents shall be released and discharged.

*Crittenton Prepetition Affiliation Agreement*.  On the Effective Date, the Crittenton 2011-2016 Prepetition Affiliation Agreement, as modified in the form of the Crittenton Assumed Affiliation Agreement, will be assumed. On the Effective Date, the Crittenton 2015-2016  Prepetition Affiliation Agreement will be assumed.  No Cure shall be payable and Crittenton waives any pre-Effective Date defaults.  On the Effective Date, the Reorganized Debtor and Crittenton shall enter into the Crittenton 2016-2018 Affiliation Agreement.

*Voting*:  Class 3 is Impaired.  Pursuant to section 1126 of the Bankruptcy Code, each Holder of an Allowed Class 3 Crittenton Secured Claim is entitled to vote to accept or reject this Plan.

*Class 4 – CMS Overpayment Claim*

*Claims In Class:* Class 4 consists of all CMS Overpayment Claims.

*Treatment*:  On the Effective Date, the CMS Overpayment Claim shall be Reinstated and the participation agreements between the Debtor and CMS shall be deemed assumed.

*Voting*:  *Class* 4  is Impaired.  Pursuant to section 1126 of the Bankruptcy Code, each Holder of an Allowed Class 4 CMS Overpayment Claim is entitled to vote to accept or reject this Plan.

*Class 5 – Michigan Overpayment Claims*

*Claims In Class*: Class 5 consists of all Michigan Overpayment Claims.

Treatment: On the Effective Date, the Michigan Overpayment Claim shall be Reinstated and the participation agreements between the Debtor and Michigan shall be deemed assumed.

*Voting*: Class 5 is Impaired. Pursuant to section 1126 of the Bankruptcy Code, each Holder of an Allowed Class 5 Michigan Overpayment Claim is entitled to vote to accept or reject this Plan.

## Class 6 – WRC Secured Claim

*Claims In Class*: Class 6 consists of all Allowed WRC Secured Claims.

*Treatment*: The WRC shall receive, in full and final satisfaction, release, and discharge of, and in exchange for, the WRC Secured Claim, sixty (60) equal fixed monthly payments of $13,237.76 over a five year period commencing on the first day of the month following the Effective Date. WRC's right to receive payment under the Plan shall continue to be secured by WRC's statutory lien until the obligations to WRC under this Plan have been paid in full by the Reorganized Debtor. Upon the failure of the Reorganized Debtor to make any payments due under this Plan to the WRC that is not cured within 30 days of the mailing of a written notice of default by the WRC to the Reorganized Debtor, the WRC may exercise all rights and remedies available to it under non-bankruptcy law for the collection of its Claim and/or seek appropriate relief in the Bankruptcy Court. The WRC Secured Claim shall not accrue interest for the period after the Petition Date; provided that this interest prohibition on the WRC Secured Claim does not prohibit the application of interest on post-petition water and sewer bills.

*Voting*: Class 6 is Impaired. Pursuant to section 1126 of the Bankruptcy Code, each Holder of an Allowed WRC Secured Claim is entitled to vote to accept or reject this Plan.

## Class 7 – General Unsecured Claims

*Claims In Class*: Class 7 consists of all General Unsecured Claims.

*Treatment*: Each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction, release, and discharge of, and in exchange for, such Allowed General Unsecured Claim its *pro rata* share of the Trust Beneficial Interests.

*Crittenton Deficiency Claim*. The Crittenton Deficiency Claim is deemed an Allowed General Unsecured Claim in the amount of $3,187,978.29.

*Voting*: Class 7 is Impaired. Pursuant to section 1126 of the Bankruptcy Code, each Holder of an Allowed General Unsecured Claim is entitled to vote to accept or reject this Plan.

## Class 8 – Old Equity Interests

16

*Claims In Class*: Class 8 consists of Old Equity Interests and all Claims arising from or related to Old Equity Interests that are subject to subordination under section 510(b) of the Bankruptcy Code.

*Treatment*:   On the Effective Date, all Old Equity Interest shall be cancelled and Holders of Old Equity Interests and Claims arising from or related to Old Equity Interests that are subject to subordination under section 510(b) of the Bankruptcy Code shall not receive or retain any property on account thereof.

*Voting*:   Class 8 is Impaired, and the Holders of Allowed Class 8 Old Equity Interests are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.   Therefore, the Holders of Class 8 Old Equity Interests are not entitled to vote to accept or reject this Plan.

3.4     ***Alternative Treatment***.   Notwithstanding any provision herein to the contrary, any Holder of an Allowed Claim or Interest may receive, instead of the distribution or treatment to which it is entitled hereunder, any other distribution or treatment to which it and the Reorganized Debtor agree.

3.5     ***Special Provision Regarding Unimpaired Classes of Claims***.   Except as otherwise provided in this Plan, nothing shall affect the Debtor's or the Reorganized Debtor's rights and defenses, both legal and equitable, with respect to any Claims in Unimpaired Classes, including, but not limited to, all rights with respect to legal and equitable defenses to setoffs against or recoupments of Claims in Unimpaired Classes.

## ARTICLE IV

## ACCEPTANCE OF THIS PLAN

4.1     ***Classes Entitled to Vote***.   Classes 3, 4, 5, 6, and 7 are entitled to vote to accept or reject this Plan.   By operation of law, Classes 1 and 2 are deemed to have accepted this Plan and are not entitled to vote.   By operation of law, Class 8 is deemed to have rejected this Plan and is not entitled to vote.

4.2     ***Acceptance by Impaired Classes***.   An Impaired Class of Claims shall have accepted this Plan if, not counting the vote of any holder designated under section 1126(e) of the Bankruptcy Code, (a) the Holders of at least two-thirds in amount of the Allowed Claims actually voting in the Class have voted to accept this Plan and (b) the Holders of more than one-half in number of the Allowed Claims actually voting in the Class have voted to accept this Plan.

4.3     ***Elimination of Classes***.   To the extent applicable, any Class that does not contain any Allowed Claims or any Claims temporarily allowed for voting purposes under Bankruptcy Rule 3018, as of the date of the commencement of the Confirmation Hearing, shall be deemed to have been deleted from this Plan for purposes of (a) voting to accept or reject this Plan and (b) determining whether it has accepted or rejected this Plan under section 1129(a)(8) of the Bankruptcy Code.

17

4.4 ***Cramdown***.  To the extent necessary, the Plan Sponsor shall request confirmation of this Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Plan Sponsor reserves the right to modify this Plan to the extent, if any, that confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

## ARTICLE V

## MEANS FOR IMPLEMENTATION OF THIS PLAN

5.1 ***Continued Legal Existence and Revesting of Assets***.  On the Effective Date, the Reorganized Debtor shall be deemed to have adopted the Amended and Restated Operating Agreement and the Debtor will continue to exist after the Effective Date as a Michigan limited liability company.  The Amended and Restated Operating Agreement shall include a provision to prohibit the Reorganized Debtor from issuing non-voting equity securities to the extent necessary to comply with section 1123(a) of the Bankruptcy Code.  In accordance with section 12.2 hereof, and except as otherwise explicitly provided in this Plan, on the Effective Date, all property comprising the Estate (including Retained Actions, but excluding Trust Property), shall revest in the Reorganized Debtor.

5.2 ***Sources of Cash for Distribution***.  All Cash necessary for the Reorganized Debtor to make payments required by this Plan shall be obtained from (a) existing Cash balances, (b) the operations of the Debtor or Reorganized Debtor, (c) the $1,500,000 equity investment by the Plan Sponsor, and (d) borrowings under the New Credit Facility.

5.3 ***Issuance of New Membership Interests***.  On the Effective Date, upon the terms and subject to the conditions set forth in this Plan and the Amended and Restated Operating Agreement, the Reorganized Debtor shall issue, sell and deliver to the Plan Sponsor all of the New Membership Interests.  The aggregate Purchase Price is $1,500,000.  Notwithstanding the foregoing, the Plan Sponsor may, but is not required to, allow other Persons to acquire New Membership Interests, which may be separately classified, on the Effective Date under the Amended and Restated Operating Agreement and the Plan.  If the following conditions are met, the participation of additional new members shall not constitute a material modification of the Plan that requires re-solicitation of the Plan, and a Holder of a Claim that has accepted this Plan shall be deemed to have accepted this Plan as modified: (a) the aggregate Purchase Price is not less than $1,500,000;  (b) the identify of any person to acquire New Membership Interests on the Effective Date is disclosed prior to the Confirmation Hearing; (c)  any amendments to the Amended and Restated Operating Agreement contained in the Plan Supplement are filed with the Bankruptcy Court prior to the Confirmation Hearing; and (d) the Plan Sponsor acquires a majority equity interest in, or otherwise obtains operational control of, the Reorganized Debtor.  When used with respect to a particular purchaser, "Purchase Price" shall mean such purchaser's pro rata share of the Purchase Price.

5.4 ***Section 1145 Exemption***.  Pursuant to section 1145 of the Bankruptcy Code, the issuance and allocation of shares of the New Membership Interests to the Plan Sponsor pursuant to the Plan shall be exempt from registration under the Securities Act of 1933 and any state or local law requiring registration for offer or sale of a security.

19147500.12

5.5     ***Company Action***.  Each of the matters provided for under this Plan or the Transaction Documents involving the company structure of the Debtor or Reorganized Debtor or any company action to be taken by, or required of, the Debtor or Reorganized Debtor shall be deemed to have occurred and be effective as provided herein, and shall be authorized, approved and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by members, creditors, directors, offices or managers of the Debtor or the Reorganized Debtor or the Chapter 11 Trustee.

5.6     ***Preservation of Causes of Action***.  In accordance with section 1123(b)(3) of the Bankruptcy Code, the Reorganized Debtor will retain and may (but is not required to) enforce all Retained Actions.  After the Effective Date, the Reorganized Debtor, in its sole and absolute discretion, shall have the right to bring, settle, release, compromise, or enforce such Retained Actions (or decline to do any of the foregoing), without further approval of the Bankruptcy Court.  The Reorganized Debtor or any successors, in the exercise of its sole discretion, may pursue such Retained Actions so long as it is in the best interests of the Reorganized Debtor or any successors holding such rights of action.  The failure of the Debtor to specifically list any claim, right of action, suit, proceeding, or other Retained Action in this Plan or the Disclosure Statement does not, and will not be deemed to, constitute a waiver or release by the Debtor or the Reorganized Debtor of such claim, right of action, suit, proceeding or other Retained Action, and the Reorganized Debtor will retain the right to pursue such claims, rights of action, suits, proceedings, and other Retained Actions in their sole discretion and, therefore, no preclusion doctrine, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches will apply to such claim, right of action, suit, proceeding, or other Retained Action upon or after the confirmation or consummation of this Plan.

5.7     ***Effectuating Documents; Further Transactions***.  Each of the Chapter 11 Trustee, the Liquidating Trust Trustee, the Debtor and Reorganized Debtor, and their respective officers and designees, is authorized to execute, deliver, file, or record the Transaction Documents and such other contracts, instruments, releases, indentures, and other agreements or documents, and take such actions, as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan, or to otherwise comply with applicable law.

5.8     ***Exemption From Certain Transfer Taxes and Recording Fees***.  Pursuant to section 1146(a) of the Bankruptcy Code, any transfers from the Debtor to the Reorganized Debtor or Trust to any other Person or entity pursuant to this Plan, or any agreement regarding the transfer of title to or ownership of any of the Debtor's real or personal property, will not be subject to any document recording tax, stamp tax, conveyance fee, sales tax, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

5.9     ***Further Authorization***.  The Reorganized Debtor shall be entitled to seek such orders, judgments, injunctions, and rulings as it deems necessary to carry out the intentions and purposes, and to give full effect to the provisions, of this Plan.

19

5.10     ***Dissolution of Creditors' Committee***.  The Creditors' Committee shall continue in existence until the Effective Date to exercise those powers and perform those duties specified in section 1103 of the Bankruptcy Code.  On the Effective Date, the Creditors' Committee, shall be dissolved and the Creditors' Committees members, in their capacity as such, shall be deemed released of all their duties, responsibilities, and obligations in connection with the Chapter 11 Case or this Plan and its implementation, and the retention or employment of the Creditors' Committee's attorneys, accountants, professionals, and other agents shall terminate, except with respect to (i) all Professional Fee Claims and (ii) any appeals of the Confirmation Order.

5.11     ***Chapter 11 Trustee***.  On the Effective Date, the Chapter 11 Trustee, in his capacity as such, shall be deemed released of all of his duties, responsibilities, and obligations in connection with the Chapter 11 Case or this Plan and its implementation, and the retention or employment of the Chapter 11 Trustee's attorneys, accountants, professionals, and other agents shall terminate, except with respect to (a) all Professional Fee Claims and (b) any appeals of the Confirmation Order.

5.12     ***Cancellation of Existing Securities and Agreements***.  Except as provided in this Plan or in the Confirmation Order or for the purpose of evidencing a right to distribution hereunder on the Effective Date, all notes, stock, instruments, certificates, agreements, side letters, fee letters and other documents evidencing or giving rise to Claims and Interests in the Debtor shall be canceled, and the obligations of the Debtor thereunder or in any way related thereto shall be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote, or other approval or authorization by any Person.  The Holders of or parties to such notes, stock, instruments, certificates, agreements, side letters, fee letters, and other documents shall have no rights arising from or relating to such notes, stock, instruments, certificates, agreements, side letters, fee letters, and other documents or the cancellation thereof, except the rights provided pursuant to this Plan and the Confirmation Order.

5.13     ***Officers and Directors of Reorganized Debtor***.  On the Effective Date, each of the members of the existing board of directors of the Debtor shall be deemed to have resigned in such capacity, and the members of the existing board of directors shall return all property of the Debtor in their possession to the Debtor or Reorganized Debtor on or before such date.  The Plan Supplement will designate the members of the board of directors of the Reorganized Debtor.  It is anticipated that the Debtor's businesses will continue to be managed, as of the Effective Date, by existing management, subject to replacement by the new board of directors after the Effective Date.  On the Effective Date, the officers and directors of the Reorganized Debtor will be appointed automatically without any requirement of further action by members, creditors, directors, or managers of the Debtor or the Reorganized Debtor or the Chapter 11 Trustee.

# ARTICLE VI

## ALLOWANCE AND RESOLUTION OF CLAIMS

6.1 ***Allowed Claims and Interests***.  Notwithstanding any provision herein to the contrary, the Reorganized Debtor or Trust, as applicable, shall make distributions only to Holders of Allowed Claims.  A Holder of a Disputed Claim shall only receive a distribution on account thereof when and to the extent that such Holder's Disputed Claim becomes an Allowed Claim.  The Reorganized Debtor or Liquidating Trust Trustee, as applicable, shall withhold distributions otherwise due hereunder to the holder of a Claim for a reasonable period of time to enable the Liquidating Trust Trustee or Reorganized Debtor, as applicable, to determine whether to object to the Claim.  The presence of a Disputed Claim in any class will not be a cause to delay distribution to Allowed Claims in that Class or in other Classes, as long as a reserve is created for the Disputed Claim in accordance herewith.  A holder of a General Unsecured Claim that becomes an Allowed Claim after the Distribution Date will receive its distribution on the next Periodic Distribution Date.

6.2 ***Full Satisfaction***.  The Reorganized Debtor or Liquidating Trust Trustee, as applicable, shall make, and each holder of an Allowed Claim shall receive, the distributions provided for in the Plan in full satisfaction and discharge of the Claim.

6.3 ***Interest and Penalties on Claims***.  Unless otherwise specifically provided for in this Plan or the Confirmation Order, required by applicable bankruptcy law, or necessary to render a Claim Unimpaired, postpetition interest and penalties shall not accrue or be paid on any Claims, including Priority Tax Claims, Non-Tax Priority Claims, WRC Secured Claims, and General Unsecured Claims, and no Holder of a Claim shall be entitled to interest and penalties accruing on or after the Petition Date through the date such Claim is satisfied in accordance with the terms of this Plan.

6.4 ***Post Confirmation Claim and Asset Resolution***.  After the Effective Date, the Reorganized Debtor may defend, pursue or settle, without Bankruptcy Court approval, any Disputed Claim or Claim or Cause of Action of the Estate other than with respect to General Unsecured Claims and Trust Property.  After the Effective Date, the Liquidating Trust Trustee may defend, pursue or settle, without Bankruptcy Court approval, any Disputed Claim or Claim or Cause of Action of the Estate constituting Trust Property or related to a General Unsecured Claim; provided, however, that the Liquidating Trust Trustee in its discretion may seek Bankruptcy Court approval of any such settlement.

6.5 ***Deadline to Object to Claims***.  No later than 90 days after the Effective Date (the "**Claims Objection Deadline**") (unless extended by an order of the Bankruptcy Court upon motion of the Reorganized Debtor or the Liquidating Trust Trustee), the Reorganized Debtor or the Liquidating Trust Trustee, as the case may be, shall file objections to Claims with the Bankruptcy Court and serve such objections upon the holders of each of the Claims to which objections are made.  Nothing contained herein, however, shall limit the Reorganized Debtor's or Liquidating Trust Trustee's right to object to Claims, if any, filed or amended after the Claims Objection Deadline and unless subsequently ordered for good cause the Reorganized Debtor or the Liquidating Trust Trustee shall continue to have the right to amend any objections and to file

and prosecute supplemental objections and counterclaims to a Disputed Claim until such Disputed Claim is Allowed.

## ARTICLE VII

## <u>TREATMENT OF EXECUTORY CONTRACTS<br>AND UNEXPIRED LEASES</u>

7.1 ***Assumption/Rejection of Executory Contracts and Unexpired Leases***. On the Effective Date, the Reorganized Debtor shall (a) assume the Executory Contracts and Leases on the Assumed Contract List and (b) reject the Executory Contracts and Leases on the Rejected Contract List. The Plan Sponsor reserves the right to amend the Assumed Contract List and Rejected Contract List at any time prior to the Confirmation Hearing. Each Executory Contract and Unexpired Lease not listed on either the Assumed Contract List or Rejected Contract List shall be deemed automatically rejected in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless such Executory Contract or Unexpired Lease:

(i) has been previously assumed by the Debtor by Final Order of the Bankruptcy Court;

(ii) has been assumed by the Debtor by order of the Bankruptcy Court in effect as of the Effective Date (which order may be the Confirmation Order); or

(iii) is the subject of a motion to assume filed by the Debtor under section 365 of the Bankruptcy Code pending as of the Effective Date.

An Executory Contract or Unexpired Lease that is assumed pursuant to the foregoing sentence shall be referred to as an "**Assumed Contract**." An Executory Contract or Unexpired Lease that is rejected as described above shall be referred to as a "**Rejected Contract**." Each non-debtor party to an Assumed Contract or Rejected Contract shall receive at least twenty–one days' notice of the deadline to object to assumption or rejection, as the case may be, of the identified Executory Contract or Unexpired Lease, which date will be the deadline set by the Bankruptcy Court to object to confirmation of the Plan (the "**Executory Contract Objection Deadline**"). If the Assumed Contract List or Rejected Contract List is modified less than twenty-one days prior to the Executory Contract Objection Deadline, the affected party will be provided at least twenty-one days' notice of the time to object to assumption or rejection of the identified Assumed Contract or Rejected Contract

Entry of the Confirmation Order by the Bankruptcy Court shall constitute findings by the Bankruptcy Court that (a) the Reorganized Debtor has properly provided for adequate assurance of payment of the cure of any defaults that might have existed consistent with the requirements of section 365(b)(1) of the Bankruptcy Code, (b) each assumption (or rejection, as the case may be) is in the best interest of the Debtor and its Estate and that each Assumed Contract is assumed as of the Effective Date and each Rejected Contract rejected as of the Effective Date or such other date identified in the Rejected Contract List, and (c) the requirements for assumption, or rejection, as the case may be, of any Executory Contract or

Unexpired Lease to be assumed or rejected, as the case may be, have been satisfied. No provision of any agreement or other document that permits a person to terminate or modify an agreement or to otherwise modify the rights of the Debtor based on the filing of the Chapter 11 Case or the financial condition of the Debtor or which would restrict the assumption of any Assumed Contract under a "change in control" prohibition or similar restriction shall be enforceable.

7.2     ***Rejection Damages Claim Deadline***.  Unless otherwise provided by an order of the Bankruptcy Court, any asserted Claims arising from the rejection of an Executory Contract or Unexpired Lease must be filed by Holders of such Claims with the Bankruptcy Court and served on the parties entitled to notice under this Plan no later than sixty (60) days after the later of (a) the Effective Date or (b) the effective date of such rejection, subject to the Liquidating Trust Trustee's and Reorganized Debtor's right to object thereto.  In the event of such objection, the Liquidating Trust Trustee shall not be obligated to make any distribution in respect of such Claim until such dispute is resolved by Final Order of the Bankruptcy Court or the agreement of the parties.

7.3     ***Cure Amounts***.  Any monetary amounts by which any Executory Contract and Unexpired Lease to be assumed under the Plan is in default shall be satisfied, under Section 365(b)(l) of the Bankruptcy Code, by Cure. If the Assumed Contract List indicates a specific Cure amount for a contract or lease, the payment of the amount so specified shall be conclusively deemed to constitute Cure with respect to that contract or lease, and no other payment or performance on account of a prepetition default thereunder shall be required. If the amount so specified is zero, no payment shall be required. Notwithstanding the foregoing, if the other party to a contract or lease on the Assumed Contract List files, no later than the Executory Contract Objection Deadline, an objection disputing the Cure amount so specified with respect to its contract or lease, or otherwise raising an objection as to the nature or amount of any Cure, (a) except as provided in Section 7.1, any other matter relating to assumption, Cure shall occur following the entry of a Final Order by the Bankruptcy Court resolving the dispute and approving the assumption; if an objection to Cure is sustained by the Bankruptcy Court, the Reorganized Debtor, in its sole option, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming it.

7.4     ***Compensation and Benefit Programs***.  All of the Debtor's existing programs, plans, agreements, and arrangements relating to employee compensation and benefits (other than as set forth in or related to any Rejected Contract), including, without limitation, all medical, dental, pharmacy, vision, dental, and disability plans entered into before the Petition Date, as amended from time to time and to the extent and as in effect immediately prior to the Effective Date ("**Benefit Plans**"), will be deemed to be, and will be treated as though they are, executory contracts that are assumed under Section 7.1 of this Plan, and the Debtor's and Reorganized Debtor's obligations and rights under such programs, plans, agreements, and arrangements will survive confirmation of this Plan, subject to the terms and conditions of such Benefit Plans.  The Debtor does not have any retiree plans (as defined in Section 1114 of the Bankruptcy Code).  Nothing contained herein shall be deemed to modify the existing terms of the Benefit Plans, including, without limitation, the Debtor's and the Reorganized Debtor's rights of termination and amendment thereunder.

7.5    ***Employment Contracts***.   To the extent not previously rejected by Final Order, the employment agreement of Brijinder Gupta  dated June 2, 2015 is hereby rejected as of the Effective Date.   The Debtor has not identified any other employment agreements.   To the extent any party asserts that it has an employment agreement with the Debtor, whether in writing or not, such employment agreement shall be deemed rejected as of the Effective Date.   For avoidance of doubt or not, the foregoing sentence does not apply to any collective bargaining agreement of the Debtor, which agreements are Assumed Contracts.

7.6    ***Indemnification***.   The Debtor's obligation to indemnify any former director, officer, or member under its operating agreement, employee indemnification policy, or any other agreement shall be deemed rejected as of the Effective Date.

## ARTICLE VIII

## PROVISIONS GOVERNING DISTRIBUTIONS

8.1    ***Disbursing Agent***.   Except with respect to distributions on account of the Trust, the Reorganized Debtor shall make all distributions under the Plan.   The Liquidating Trust Trustee shall make all distributions of Trust Property under the Trust Agreement.   Any entity other than the Liquidating Trust Trustee that acts as a disbursing agent for the Trust shall be an agent of the Liquidating Trust Trustee and not a separate taxable entity with respect to, for example, the assets held, income received or disbursements or distributions made for the Liquidating Trust Trustee. Neither the Liquidating Trust Trustee nor the Reorganized Debtor shall be required to provide a bond in connection with the making of any distributions pursuant to the Plan.

8.2    ***Delivery of Distributions***.   Distributions shall be made to each holder of an Allowed Claim (a) at the address shown on the list of creditors filed with the petitions commencing the Chapter 11 Case, (b) at the address listed in the Schedules if different from the address shown on the list creditors filed with the petitions commencing the Chapter 11 Case, or (c) if a proof of claim is filed, and the address is different from that listed in the Schedules, at the address set forth in the proof of claim.

8.3    ***Distribution Reserve***.

*(i)    Distribution Reserve; Estimation of Claims*

(1)    On the Effective Date, the Liquidating Trust Trustee shall establish a Distribution Reserve from the Trust Property on account of Disputed Claims.   The Distribution Reserve shall initially include Cash and other property to be distributed under the Plan in amounts sufficient to distribute to each holder of a Disputed Claim the full amount that it would receive hereunder if its Claim shall ultimately become an Allowed Claim in its full Face Amount.

(2)    Notwithstanding the foregoing, prior to making distributions to holders of Trust Beneficial Interests, the Liquidating Trust Trustee shall move on written notice to any affected party for a Bankruptcy Court order determining the maximum allowable amount of all unliquidated Class 7 General Unsecured Claims that are Disputed

24

Claims and shall adjust the amount held in the Distribution Reserve on account of such Disputed Claim, in accordance therewith. Additionally, the Liquidating Trust Trustee may move for a Bankruptcy Court order on written notice to any affected party determining, before allowance of the Claim, the maximum allowable amount of any specific Disputed Claim.

(3)     After any Disputed claim becomes an Allowed Claim, the Liquidating Trust Trustee shall, on the next Periodic Distribution Date, make the distributions that would have been made to such holder if the Disputed claim had been an Allowed Claim on or before the Effective Date.

(ii)     *Reserve Surplus*.

If a Disputed Claim becomes (i) a Disallowed Claim, (ii) an Allowed Claim in an amount less than the amount held as the Distribution Reserve on account thereof, or (iii) subordinated, the amount attributable to the Claim's disallowed or subordinated portion shall constitute reserve surplus ("**Reserve Surplus**"). Should the amount of an Allowed Claim exceed the amount held as the Distribution Reserve on account thereof, the Holder shall be entitled to receive any shortfall in the distribution that it would otherwise be entitled to receive solely from the Reserve Surplus, but in no event shall such Holder have recourse to any payments or distributions theretofore made to or for the benefit of any Holder from the Distribution Reserve or Reserve Surplus. If more than one Holder has a right to receive distributions from the Reserve Surplus, then they shall receive their *pro rata* share of the Reserve Surplus. After Final Orders have been entered, or other final resolutions have been reached, with respect to all Disputed Claims, any remaining cash or other property held in the Distribution Reserve or the Reserve surplus will be distributed in accordance with the Trust Agreement.

8.4     ***Distributions Relating to Allowed Insured Claims***. If any Claim otherwise payable under the Plan is covered by an insurance policy held by the Debtor or Reorganized Debtor, the Claim may be satisfied, in whole or in part, with the proceeds of the policy, if any.

8.5     ***No De Minimis Distributions***. Other than the final distribution made by the Trust in accordance with the Trust Agreement, no distribution in an amount of less than $50.00 shall be made on account of any Allowed General Unsecured Claim. Such undistributed amount will instead be retained by the Trust and added to subsequent distributions until such distribution equals or exceeds $50.00.

8.6     ***Unclaimed Trust Distributions***. If a Holder of an Allowed Claim fails to negotiate a check issued to such Holder within ninety (90) days of the date such check was forwarded to said Holder and such check was not returned due to an incorrect or incomplete address, the Liquidating Trust Trustee shall issue a "stop payment order" in connection with such non-negotiated check and the amount of cash attributable to such check will be deemed vested in the Trust and such cash shall constitute Trust Property to be distributed in accordance with this Plan and the payee of such check and holder of the concomitant Claim will be deemed to have no further Claim in respect of such check and will not participate in any further distributions under this Plan. If a distribution under this Plan to any Holder of an Allowed Claim is returned to the Liquidating Trust Trustee due to an incorrect or incomplete address for such Holder and such

25

Holder does not present itself within ninety (90) days of that such check was forwarded to said Holder, the amount of cash attributable to such check will be deemed vested in the Trust and such Cash shall constitute Trust Property to be distributed in accordance with this Plan and the payee of such check and holder of the concomitant Claim will be deemed to have no further claim in respect of such check and will not participate in any further distributions under this Plan.

8.7 ***Defenses; Setoff***. Any defenses, counterclaims, rights of set off or recoupment of the Debtor with respect to a claim (other than a General Unsecured Claim) shall vest in and inure to the benefit of the Reorganized Debtor. Any defenses, counterclaims, rights of set off or recoupment of the Debtor with respect to a General Unsecured Claim shall vest in and inure to the benefit of the Trust. To the extent permitted by law, the Reorganized Debtor or the Liquidating Trust Trustee, as applicable, may, but shall not be required to, set off against any claim, the payments or other distributions to be made in respect thereof, and claims of any nature whatsoever that the Debtor, Reorganized Debtor or the Trust may have against the Claim's holder, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release of a claim or Cause of Action of the Reorganized Debtor or the Liquidating Trust Trustee. This Plan does not affect any defenses or rights of set off or recoupment of the holder of a Claim against the Reorganized Debtor or the Trust or to the extent the Trust or Reorganized Debtor are successors to the Claims of the Debtor.

8.8 ***Distributions for Claims Allowed as of the Effective Date***. Except as otherwise provided herein or as ordered by the Bankruptcy Court, distributions to be made on account of Claims that are Allowed Claims as of the Effective Date shall be made on the Effective Date or as soon thereafter as is practicable. Any distribution to be made on the Effective Date pursuant to this Plan shall be deemed as having been made on the Effective Date if such distribution is made on the Effective Date or as soon thereafter as is practicable. Any payment or distribution required to be made under this Plan on a day other than a Business Day shall be made on the next succeeding Business Day. New Membership Interests shall not be certificated. Membership Interests shall be evidenced by the official registry maintained by the Reorganized Debtor under the Amended and Restated Operating Agreement.

8.9 ***Means of Cash Payment***. Payments of Cash made pursuant to this Plan shall be made, at the option and in the sole discretion of the applicable Reorganized Debtor or Liquidating Trust Trustee, as applicable, by checks drawn on, or wire transfer from, a domestic bank selected by the Reorganized Debtor or Liquidating Trust Trustee, as applicable, Cash payments to foreign creditors may be made, at the option of the applicable Reorganized Debtor or Liquidating Trust Trustee, as applicable, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

8.10 ***Withholding and Reporting Requirements***. In connection with this Plan and all distributions hereunder, the Reorganized Debtor and Liquidating Trust Trustee, as applicable, shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements. The Reorganized Debtor and Liquidating Trust Trustee, as applicable, shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.

# ARTICLE IX

## THE TRUST

9.1 ***Transfer of the Trust Property to the Trust***. On the Effective Date, title to and possession of the Trust Property shall be deemed transferred and delivered to the Trust without further act or action under any applicable agreement, law, regulation, order or rule of law.

9.2 ***Purposes of the Trust***. The purposes of the Trust are, among other things: (a) to liquidate, sell or dispose of the Trust Property; (b) to cause all net proceeds of the Trust Property, including proceeds of Trust Causes of Action on behalf of the Trust, to be deposited into the Trust; (c) to initiate actions to resolve any remaining issues regarding the allowance and payment of General Unsecured Claims including, as necessary, initiation and/or participation in proceedings before the Bankruptcy Court; (d) to take such steps as are necessary or useful to maximize the value of the Trust; (e) to make the payments and distributions to creditors and holders of Trust Beneficial Interests as required by the Plan; (f) to pursue Trust Causes of Action and (g) to enforce all rights with respect to the Trust Property. It is intended that the Trust (other than as relating to Trust Property allocable to Disputed Claims) will be classified for U.S. federal income tax purposes as a "liquidating trust," with the primary objective of liquidating the Trust Property and distributing the net proceeds thereof, with no objective to continue or engage in the conduct or a trade or business in accordance with Treasury Regulation 301.7701-4(d), except to the extent reasonably necessary to and consistent with the liquidating purposes of the Trust and the Plan, and, notwithstanding anything to the contrary in the Plan, all actions taken by the Trust or any person acting on behalf of the Trust shall be necessary to and consistent with accomplishing such primary objective.

9.3 ***Trust Agreement***. A copy of the Trust Agreement shall be contained in the Plan Supplement. The Trust Agreement shall be approved by the Bankruptcy Court, and the Liquidating Trust Trustee shall accept his or her duties thereunder on the Effective Date. The Trust Agreement shall, among other matters, create the Trust, identify the Liquidating Trust Trustee as the initial trustee of the Trust, identify the compensation of the Liquidating Trust Trustee, and specify the authorities and powers of the Liquidating Trust Trustee, consistent with this Plan. If there are any inconsistencies between the Plan and the Trust Agreement, the terms of the Trust Agreement shall govern.

9.4 ***Operations of the Trust***. From and after the Effective Date, the Trust may use, acquire and dispose of Trust Property, and take any of the actions set forth in this Plan or in the Trust Agreement without the approval of the Bankruptcy Court and free of the restrictions of the Bankruptcy Code, the Bankruptcy Rules or the prior orders of the Bankruptcy Court, other than restrictions expressly imposed by the Plan, the Confirmation Order or the Trust Agreement, provided that the Trust is administered so that it qualifies as a liquidating trust under Treasury Regulation § 301.7701-4(d) (other than as relating to the Trust Property allocable to Disputed Claims). The actions of the Trust and the Liquidating Trust Trustee shall be subject to the supervision and approval of the U.S. Trustee as provided in the Trust Agreement.

Under the Plan, and subject to the Trust Agreement, the Liquidating Trust Trustee shall have the power and authority to perform the following acts:

(1)      Perfect and secure his right, title and interest to the properties comprising the Trust Property;

(2)      Reduce the Trust Property to Cash and hold the same;

(3)      Determine when to sell Trust Property and on what terms, and sell and convert the Trust Property to cash and distribute the net proceeds in accordance with the Plan and the Trust Agreement;

(4)      Manage and protect the Trust Property;

(5)      Grant options to purchase, contract to sell and sell the Trust Property, or any part or parts thereof, for such purchase price and for cash or on such terms as the Liquidating Trust Trustee deems appropriate;

(6)      Exchange and re-exchange the Trust Property or any part or parts thereof for other personal property;

(7)      Release, convey or assign any right, title or interest in or about the Trust Property;

(8)      Pay and discharge any costs, expenses, collection fees or obligations deemed necessary to preserve the Trust Property, or any part thereof;

(9)      Purchase insurance to protect the Trust Property, as well as to protect the Liquidating Trust Trustee and its members, from liability for such risks and in such amounts as the Liquidating Trust Trustee shall determine is appropriate;

(10)      Deposit funds of the Trust and draw checks and make disbursements thereof;

(11)      Employ and have such professionals, including, without limitation, attorneys and accountants, and such other agents, consultants and employees on behalf of the Trust as the Liquidating Trust Trustee shall deem necessary; provided, however, that the Liquidating Trust Trustee's authority to pay, such professionals shall be governed by the provisions of the Trust Agreement.

(12)      Except as expressly required by the Plan, determine when distributions should be made to the Trust Beneficiaries;

(13)      Exercise any and all powers granted to the Liquidating Trust Trustee by any agreements or by common law or any statute which serve to increase the extent of the powers granted to the Liquidating Trust Trustee hereunder.

28

(14)  Take any action required or permitted by the Plan;

(15)  Negotiate, renegotiate and enter into contracts and execute obligations negotiable and non-negotiable;

(16)  Sue and be sued; provided, however that any suit commenced after the Effective Date against the Trust, or against the Liquidating Trust Trustee acting in his or her capacity as trustee of the Trust, must be commenced in the Bankruptcy Court; provided, further, however, that the Court may abstain from hearing any such suit;

(17)  With respect to Trust Property, institute, settle or compromise or abandon on behalf of the Trust all claims and Trust Causes of Actions which could be brought by a trustee, Debtor or the Creditors' Committee under the Bankruptcy Code, and prosecute or defend all appeals on behalf of the Debtor, as representative of the Estate within the meaning of section 1123(b)(3)(B) of the Bankruptcy Code;

(18)  Object to Claims of General Unsecured Creditors;

(19)  Settle, compromise or adjust, by arbitration or otherwise, any claims, disputes or controversies in favor of or against the Trust;

(20)  Waive or release rights of any kind;

(21)  Appoint, remove and act through agents, managers and employees and confer upon them such power and authority as may be necessary or advisable;

(22)  File all income and informational tax returns and forms of the Trust and the reserve for Disputed Claims as required by law, and pay all taxes required to be paid by the Trust or the reserve for Disputed Claims; and

(23)  In general, without in any manner limiting any of the foregoing, deal with the Trust Property, or any part or parts thereof, and the affairs of the Trust, in all other ways as would be lawful for any person owning the same to deal therewith, whether similar to or different from the ways above specified, at any time or times hereafter;

9.5  ***Supervision by U.S. Trustee***.  The Liquidating Trust Trustee, and the activities of the Trust, shall be subject to the review and supervision of the U.S. Trustee as set forth in the Trust Agreement.

9.6  ***Resignation or Replacement of Liquidating Trust Trustee***.  The Liquidating Trust Trustee may resign or be terminated at any time in accordance with the terms of

the Trust Agreement. Upon such resignation or termination, the Liquidating Trust Trustee shall be entitled to receive any unpaid compensation or expense reimbursement owing to the Liquidating Trust Trustee in accordance with the terms of the Trust Agreement.

In case of the resignation, termination, death or inability to act of the Liquidating Trust Trustee, a successor Liquidating Trust Trustee may be appointed by the U.S. Trustee without Bankruptcy Court approval in accordance with the terms of the Trust Agreement, whereupon such successor Liquidating Trust Trustee shall assume all duties and obligations from the resigned, terminated or incapacitated Liquidating Trust Trustee. The successor Liquidating Trust Trustee shall be vested with all the rights, privileges, powers and duties of the Liquidating Trust Trustee named herein. Each succeeding Liquidating Trust Trustee may in like manner resign and another may in like manner be appointed in his or her place.

9.7     ***Payment of Trust Expenses***.  Trust Expenses shall be paid, or adequate reserves created for Trust Expenses, prior to any distribution to the Trust Beneficiaries.

9.8     ***Distributions***.  The Liquidating Trust Trustee shall be responsible for making the distributions to Trust Beneficiaries in accordance with the terms of the Trust Agreement and the Plan.

9.9     ***No Payment of Transfer-Related Fees to the Trust***.  The Trust shall not be required to pay any fees to the United States Trustee based on any transfers of Trust Property to the Trust from the Estate.

9.10     ***Books and Records of Trust***.  The Liquidating Trust Trustee shall maintain an accounting of receipts and disbursements of the Trust. The Liquidating Trust Trustee shall maintain the books and records of the Trust, or provide storage for such book and records, for the longer of six (6) years, or while the Trust is in existence, provided that the Court may, upon application by the Liquidating Trust Trustee, authorize the Liquidating Trust Trustee to destroy all of the Trust's books and records at such time as the Trust has no further need for such books and records.  The Trust books and records shall be open to inspection by the U.S. Trustee at all reasonable times.

9.11     ***Limitations on Liability***.  The Liquidating Trust Trustee shall not be liable for any act he or she may do or fail to do as Liquidating Trust Trustee hereunder while acting in good faith and in the exercise of his or her best judgment, and the fact that such act or omission was advised or approved by counsel acting for the Trust, shall be conclusive evidence of such good faith and best judgment. The Liquidating Trust Trustee shall not be liable in any event for any claims, liabilities or damages based upon or arising out of any conduct of the Liquidating Trust Trustee in the course of his or her activities as trustee, unless such claims, liabilities or damages arise from his or her personal gross negligence or willful misconduct.

The Liquidating Trust Trustee shall not be liable for any indebtedness, liability or obligation incurred or entered into on behalf of the Trust, including, without limitation, indebtedness, liabilities or obligations under agreements, undertakings or commitments entered into or executed on behalf of the Trust by the Liquidating Trust Trustee or by any person employed by the Liquidating Trust Trustee or the Trust, it being expressly understood that all

19147500.12

such indebtedness, liabilities and obligations of and claims against the Trust, shall be the sole responsibility of the Trust and shall be satisfied only from the Trust Property, or such portion thereof as shall, under the terms of any agreement, be stated to be liable therefor. No claim or cause of action may be asserted against the Liquidating Trust Trustee on account of any indebtedness, liability or obligation entered into on behalf of the Trust, whether by legal or equitable proceedings, or by virtue of any bankruptcy or non-bankruptcy statute, rule or regulation.

Any undertaking, contract or agreement entered into in writing by the Trust may, except as otherwise provided by the Plan or the Trust Agreement, expressly disclaim the personal liability of the Liquidating Trust Trustee.

9.12  ***No Credit Reporting***.  The Liquidating Trust Trustee shall have no duty or responsibility to provide any person with any credit or other information with respect to the Trust except as provided in the Plan or the Trust Agreement.

9.13  ***United States Federal Income Tax Treatment of the Holders of Trust Beneficial Interests***.  Except to the extent the Trust Property is allocable to Disputed Claims, for all United States federal income tax purposes, the transfers by the Debtor to the Trust shall be treated by the Debtor, the Trust and the Trust Beneficiaries as a transfer of the Trust Property by the Debtor to the Trust Beneficiaries followed by a transfer of the Trust Property by such Trust Beneficiaries to the Trust. The Trust Beneficiaries shall be treated as the grantors and deemed owners of the Trust for United States federal income tax purposes. The Liquidating Trust Trustee and the Trust Beneficiaries are required to value their interests in the Trust Property consistently with the values placed upon the Trust Property by the Trust, and to use such valuations for all purposes. The Trust Agreement shall provide for consistent valuations of the Trust Property by the Liquidating Trust Trustee and the Trust Beneficiaries, and shall provide that the Trust will determine the fair market value of the Trust Property within thirty (30) days after the Effective Date, and send such determination to each Trust Beneficiary. By its acceptance of a Trust Beneficial Interest, each recipient of such an interest will be conclusively deemed to agree to use such valuations for all purposes, including, without limitation, in computing any gain recognized upon the exchange of such holder's claim for purposes of determining any United States Federal income tax, and shall be required to include those items of income, deductions and tax credits that are attributable to its Trust Beneficial Interest in computing its taxable income.

9.14  ***Termination of the Trust***.  The Trust shall continue in effect until the earlier of: (a) the date that all Trust Property has been liquidated, all proceeds have been converted to cash or distributed in kind, all Trust Expenses have been paid, all claims to be paid under the Plan for which the Liquidating Trust Trustee is obligated to make distributions on have been paid, all distributions to be made with respect to the Trust Beneficial Interests have been made, all litigation to which the Trust is a party has been concluded by dismissal or an order issued by the court in which such litigation is pending and such order has become "final" (consistent with the definition of Final Order in this Plan for orders issued by the Bankruptcy Court), and the Chapter 11 Case has been closed; and (b) the expiration of five (5) years from the Effective Date; provided, however that the Liquidating Trust Trustee may request the Bankruptcy Court to extend the permitted life of the Trust for such additional period as is reasonably necessary to conclude the liquidation and distributions, not to exceed a total of ten (10) years from

31

the Effective Date, which request shall be filed so the Bankruptcy Court may consider and rule on the request within six (6) months prior to the expiration of the initial five-year term.

9.15 ***Trust Guaranteed Cash Payment***. The Reorganized Debtor will guaranty cash recoveries to the Trust in the amount of at least $1,600,000 (the "Trust Guaranteed Cash Payment") as follows:

(a) The Liquidating Trust Trustee and its counsel shall evaluate the Trust Causes of Action in good faith using reasonable commercial standards. If the Liquidating Trust Trustee concludes that any Trust Causes of Action have value, the Liquidating Trust Trustee will promptly and reasonably pursue such Trust Causes of Action. Otherwise, the Liquidating Trust Trustee would have discretion to abandon Trust Causes of Action deemed not to have value so as to maximize any return to General Unsecured Creditors.

(b) During the 12-month period after the Effective Date, the Reorganized Debtor shall pay the professional fees of the Trust and the Liquidating Trust Trustee incurred in administering the Trust and evaluating and pursuing the Trust Causes of Action, up to an aggregate amount of $160,000. At any time, funds held by the Trust may be reserved to pay subsequent fees or distributed to General Unsecured Creditors as determined by the Liquidating Trust Trustee in accordance with the Trust Agreement. The foregoing fees would be payable by the Reorganized Debtor monthly, within 45 days after the Reorganized Debtor's receipt of a detailed invoice therefor. Each such invoice may be redacted as necessary to preserve the attorney-client privilege.

(c) On the first anniversary of the Effective Date, the Reorganized Debtor would pay to the Trust an amount equal to $160,000 less amounts previously paid by Reorganized Debtor pursuant to the foregoing paragraph and less the net proceeds of the Trust Causes of Action actually received by the Trust as of such date.

(d) On each of the next three anniversaries of the Effective Date (e.g., a total 4-year payment period), the Reorganized Debtor would pay an amount to the Trust sufficient for the Trust to have received an aggregate of the following amounts inclusive of the net proceeds of the Trust Causes of Action:

| Anniversary of the Effective Date | Total Cash Guaranty to Trust |
| --- | --- |
| Year 2 | $640,000 |
| Year 3 | $1,120,000 |
| Year 4 | $1,600,000 |

(e) If, at any time after the Effective Date, the Trust has recovered more than $1,600,000 from the net proceeds of the Trust Causes of Action, the Trust will promptly refund to the Reorganized Debtor the net proceeds of the Trust Causes of Action in excess of $1,600,000, up to the aggregate amount funded to the Trust by the Reorganized Debtor.

# ARTICLE X

## INTENTIONALLY OMITTED

10.1    Section has been intentionally omitted.

## ARTICLE XI

## CONFIRMATION AND CONSUMMATION OF THIS PLAN

11.1    *Condition To Entry of the Confirmation Order*.  The following are conditions precedent to the entry of the Confirmation Order, each of which must be satisfied or waived by the Plan Sponsor in accordance with the terms hereof:

(a)    The Plan and all schedules, documents, supplements and exhibits relating to this Plan shall have been filed in form and substance acceptable to the Plan Sponsor; and

(b)    The proposed Confirmation Order shall be in form and substance acceptable to the Plan Sponsor.

11.2    *Conditions To Effective Date*.  The Plan Sponsor shall request that the Confirmation Order include a finding by the Bankruptcy Court that, notwithstanding Bankruptcy Rule 3020(e), the Confirmation Order shall take effect immediately upon its entry.  The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived by the Plan Sponsor in accordance with the terms hereof:

(a)    The Confirmation Order, in form and substance satisfactory to the Plan Sponsor  shall have been entered by the Bankruptcy Court and be in full force and effect and not subject to any stay and shall, among other things, provide that the Chapter 11 Trustee, Debtor and Reorganized Debtor are authorized without further board or member approval or consent to take all actions necessary to enter into the Transaction Documents and other agreements or documents created in connection with this Plan.  Without limiting the foregoing, the Chapter 11 Trustee, the board of directors, chief executive officer, or other appropriate officer of the Debtor shall be authorized to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents, and take such actions, as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan and the Transaction Documents;

(b)    Allowed Priority Tax Claims shall not exceed $2,000,000 in the aggregate.

(c)    All Transaction Documents shall have been executed and delivered, and all conditions precedent thereto shall have been satisfied (other than the occurrence of the Effective Date).

(d)    All authorizations, consents, and regulatory approvals required, if any, in connection with the consummation of this Plan shall have been obtained;

(e)　　All other actions, documents, and agreements necessary to implement this Plan shall have been effected or executed,

(f)　　The Debtor shall have sufficient Cash, whether on hand or from funds advanced under the New Credit Facility to make all required payments to be made on the Effective Date; and

(g)　　The Effective Date shall have occurred on or prior to January 1, 2016.

11.3　　*Waiver Of Conditions*.　　The Plan Sponsor may waive, in its sole discretion, in whole or in part, the conditions to the occurrence of the Effective Date, without any notice to parties in interest or the Bankruptcy Court and without a hearing.　The failure to satisfy or waive any condition to the Effective Date shall preclude the occurrence of the Effective Date, regardless of the circumstances giving rise to the failure of such condition to be satisfied.　The waiver of a condition to the occurrence of the Effective Date shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right that may be asserted at any time.

11.4　　*Notice of Effective Date.*　　The Reorganized Debtor will file with the Bankruptcy Court a notice of the occurrence of Effective Date on the date thereof or as soon thereafter or is practicable.

## ARTICLE XII

## EFFECT OF PLAN CONFIRMATION

12.1　　*Binding Effect*.　　This Plan shall be binding upon and inure to the benefit of the Debtor, its Estates, all current and former Holders of Claims and Interests, and their respective successors and assigns, including, but not limited to, the Reorganized Debtor and the Trust.

12.2　　*Revesting of Assets*.　　Except as otherwise explicitly provided in this Plan, on the Effective Date, all property comprising the Estates (including Retained Actions, but excluding Trust Property) shall revest in the Reorganized Debtor, free and clear of all Claims, Liens, charges, encumbrances, rights, and Interests of creditors and equity security holders.　As of the Effective Date, the Reorganized Debtor may operate its businesses and use, acquire, and dispose of property and settle and compromise Claims or Interests without supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by this Plan or the Confirmation Order.

12.3　　*Releases*.　　As of the Effective Date, for good and valuable consideration, including (without limitation) the service of the Released Parties in facilitating the expeditious implementation of the restructuring and reorganization contemplated by this Plan, the adequacy of which is hereby confirmed, the Debtor, its Estates, and the Reorganized Debtor shall be deemed forever to release, waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever (other than for fraud, willful misconduct, or gross negligence) against the Released Parties in connection with or related to the

Debtor or the Reorganized Debtor, the Chapter 11 Case, the Disclosure Statement or this Plan, and that could have been asserted by or on behalf of the Debtor, the Estate or the Reorganized Debtor against such Persons; provided, however, that there shall be no such release, waiver or discharge on account of claims or obligations in respect of the rights and obligations under this Plan, the Transaction Documents, and the contracts, instruments, releases, and other agreements or documents delivered hereunder or contemplated hereby and thereby. **For avoidance of doubt, this Section 12.3 is a limited release by the Debtor, the Estate and the Reorganized Debtor and does not constitute a release of any third party claims, obligations, suits, judgments, damages, demands, debts, rights causes of action, or liability.**

12.4    *Discharge of the Debtor*.

(a)    Other than Claims arising from or related to the Transaction Documents and except as otherwise provided herein or in the Confirmation Order, all consideration distributed under this Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims of any nature whatsoever against the Debtor or Estate and, regardless of whether any property shall have been abandoned by order of the Bankruptcy Court, retained, or distributed pursuant to this Plan on account of such Claims, upon the Effective Date, the Debtor, the Estate, and Reorganized Debtor shall be deemed discharged and released under section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims, including, but not limited to, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in section 502 of the Bankruptcy Code, whether or not (i) a proof of claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code, (ii) a Claim based upon such debt is Allowed under section 502 of the Bankruptcy Code, (iii) a Claim based upon such debt is or has been disallowed by order of the Bankruptcy Court, or (iv) the holder of a Claim based upon such debt accepted this Plan.

(b)    As of the Effective Date, other than Claims arising from or related to the Transaction Documents and except as provided in this Plan or the Confirmation Order, all Persons shall be precluded from asserting against the Debtor or the Reorganized Debtor, any other or further Claims, debts, rights, causes of action, claims for relief, or liabilities relating to the Debtor or any Interest in the Debtor based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date. In accordance with the foregoing, other than with respect to Claims arising from or related to the Transaction Documents and except as provided in this Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination of discharge of all such Claims and other debts and liabilities against the Debtor, and the termination of all such Interests, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment obtained against the Debtor at any time, to the extent that such judgment relates to a discharged Claim or a terminated Interest.

12.5    *Injunction*.

(a)    *General*.  Except as provided in this Plan or the Confirmation Order, from and after the Effective Date, all Persons that have held, currently hold, may hold, or allege that they hold, a Claim, Interest, obligation, suit, judgment, damage, demand, debt, right, cause of action, or liability that is released, terminated, exculpated, or discharged under this

Article XII, along with their respective current and former employees, agents, officers, directors, managers, principals, affiliates, shareholders, and members are permanently enjoined from taking any of the following actions against the Debtor, the Reorganized Debtor and the Exculpated Parties, and their respective agents, officers, directors, managers, employees, representatives, advisors, attorneys, affiliates, shareholders, or members, or any of their successors or assigns or any of their respective property on account of any such released, terminated or discharged Claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, liability or Interest: (a) commencing or continuing, in any manner or in any place, any action or other proceeding; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (b) creating, perfecting, or enforcing any Lien or encumbrance; (d) asserting a setoff, right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to any released Person; or (e) commencing or continuing any action, in each such case in any manner, in any place, or against any Person that does not comply with or is inconsistent with the provisions of this Plan or the Confirmation Order.

12.6    ***Exculpation and Limitation of Liability***.  None of the Exculpated Parties shall have or incur any liability to any Person for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, the Combined Disclosure Statement and Plan, the transactions contemplated by or described in the Transaction Documents, the formulation, negotiation, or implementation of this Plan or the Transaction Documents, the pursuit of Confirmation of this Plan, the operation of the Debtor during the Chapter 11 Case, the Confirmation of this Plan, the consummation of this Plan or the Transaction Documents, or the administration of Chapter 11 Case or this Plan or the property to be distributed under this Plan, except for acts or omissions that are the result of fraud, willful misconduct, or gross negligence; provided, however, that the foregoing exculpation and limitation of liability shall not apply to and shall not operate to waive, release, or exculpate any Claims or causes of action arising from or related to the rights and obligations under this Plan, the Transaction Documents, and the contracts, instruments, releases, and other agreements or documents delivered hereunder or contemplated hereby and thereby.  Without limiting the generality of the foregoing, Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under this Plan.

12.7    ***U.S. Government and Michigan***.  Notwithstanding anything contained in this Plan or the Confirmation Order to the contrary, as to the United States, its agencies, departments, or agents (collectively, the "**U.S. Government**"), and the State of Michigan, the Michigan Department of Treasury and Michigan Department of Health and Human Services, including its agencies, departments or agents (collectively, "**Michigan State Entities**"), nothing in this Plan or the Confirmation Order shall discharge, release, or otherwise preclude: (a) any liability of the Debtor or Reorganized Debtor arising on or after the Effective Date to the U.S. Government or Michigan State Entities; (b) any liability to the U.S. Government or Michigan State Entities that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code; (c) any valid right of setoff or recoupment of the U.S. Government or Michigan State Entities against the Debtor or Reorganized Debtor; or (d) any liability of the Debtor or Reorganized Debtor under environmental law to the U.S. Government or Michigan State Entities  as the owner or operator of property that such entity owns or operates after the Effective Date.  Moreover, nothing in this Plan or the Confirmation Order shall release or exculpate any non-debtor, including any Released Party or Exculpated Party, from any liability to the U.S. Government or

36

Michigan State Entities, including but not limited to any liabilities arising under the Internal Revenue Code, the environmental laws, or the criminal laws against the Released Parties or the Exculpated Parties, nor shall anything in this Plan or the Confirmation Order enjoin the U.S. Government or Michigan from bringing any claim, suit, action or other proceeding against the Released Parties or Exculpated Parties for any liability whatsoever; provided, however, that the foregoing sentence shall not limit the scope of discharge granted to the Debtor or Reorganized Debtor under sections 524 and 1141 of the Bankruptcy Code.

12.8    ***Term of Bankruptcy Injunction or Stays***.  Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Case under sections 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date (excluding any injunctions or stays contained in this Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.

12.9    ***Post-Effective Date Retention of Professionals***.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate and the Reorganized Debtor may employ and pay professionals in the ordinary course of business.

## ARTICLE XIII

## RETENTION OF JURISDICTION

13.1    ***Retention of Jurisdiction***.  Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction (unless otherwise indicated) over all matters arising out of, and related to, the Chapter 11 Case and this Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

(a)    resolve any matters related to the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease with respect to which any Debtor or Reorganized Debtor may be liable, and to hear, determine, and, if necessary, liquidate any Claims arising therefrom;

(b)    decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications, involving the Debtor that may be pending on the Effective Date;

(c)    enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan and all contracts, instruments, releases, and other agreements or documents created in connection with this Plan, the Disclosure Statement, or the Confirmation Order;

(d)    resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation, or enforcement of this Plan or any contract, instrument, release, or other agreement or document that is executed or created pursuant to this Plan, or any entity's rights arising from, or obligations incurred in connection with, this Plan or such documents (other than a dispute arising after the Effective Date under, or directly with

37

respect to, the Transaction Documents, which such disputes shall be adjudicated in accordance with the terms of the Transaction Documents);

(e)     modify this Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code or modify the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with this Plan, the Disclosure Statement, or the Confirmation Order, or remedy any defect or omission, or reconcile any inconsistency, in any Bankruptcy Court order, this Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with this Plan, the Disclosure Statement, or the Confirmation Order, in such manner as may be necessary or appropriate to consummate this Plan;

(f)     hear and determine all applications for compensation and reimbursement of expenses of Professionals under this Plan or under sections 330, 331, 503(b) and 1129(a)(4) of the Bankruptcy Code; *provided, however*, that from and after the Effective Date the payment of fees and expenses of the Reorganized Debtor, including professional fees, shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

(g)     issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation, or enforcement of this Plan or the Confirmation Order;

(h)     adjudicate controversies arising out of the administration of the Estate or the implementation of this Plan;

(i)     recover all assets of the Debtor and property of the Estates, wherever located;

(j)     hear and determine causes of action by or on behalf of the Debtor, the Reorganized Debtor or Trust;

(k)     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason, or in any respect, modified, stayed, reversed, revoked, or vacated, or distributions pursuant to this Plan are enjoined or stayed;

(l)     hear and resolve all matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(m)     determine any other matters that may arise in connection with, or relate to, this Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with this Plan, the Disclosure Statement, or the Confirmation Order (other than a dispute arising after the Effective Date under, or directly with respect to, the Transaction Documents, which such disputes shall be adjudicated in accordance with the terms of the Transaction Documents);

(n)     enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Case;

(o)     hear and determine such other matters related hereto that are not inconsistent with the Bankruptcy Code or title 28 of the United States Code; and

(p)     enter an order closing the Chapter 11 Case.

13.2    ***Failure of Bankruptcy Court to Exercise Jurisdiction***.  If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter, including the matters set for in Section 13.1 of the Plan, the provisions of this Article XIII shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## ARTICLE XIV

## <u>MISCELLANEOUS PROVISIONS</u>

14.1    ***Effectuating Documents and Further Transactions***.  Each of the Chapter 11 Trustee, the Liquidating Trust Trustee, the Debtor and the Reorganized Debtor shall be authorized to execute, deliver, file, or record the Transaction Documents and such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of this Plan.

14.2    ***Company Action***.  Prior to, on, or after the Effective Date (as appropriate), all matters expressly provided for under this Plan or the Transaction Documents that would otherwise require approval of the members or directors of the Debtor or the Reorganized Debtor shall be deemed to have occurred and shall be in effect prior to, on, or after the Effective Date (as appropriate) without any requirement of further action by the members or directors of the Debtor or the Reorganized Debtor.

14.3    ***Payment Of Statutory Fees***.  All fees payable pursuant to section 1930 of title 28 of the United States Code ("**UST Fees**"), as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date.  The Reorganized Debtor shall pay any UST fees that become payable after the Effective Date for the quarter including the Effective Date.  The Trust shall satisfy any UST Fees for any period commencing on the first quarter after the Effective Date through the closing of the Chapter 11 Case.

14.4    ***Amendment Or Modification Of This Plan***.  Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, Plan Sponsor reserves the right to alter, amend, or modify this Plan at any time prior to or after the Confirmation Date.  A Holder of a Claim that has accepted this Plan shall be deemed to have accepted this Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

14.5 ***Severability of Plan Provisions***. If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power, upon the request of the Plan Sponsor to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

14.6 ***Successors and Assigns***. This Plan shall be binding upon and inure to the benefit of the Debtor, and its successors and assigns, including, without limitation, the Reorganized Debtor and Trust. The rights, benefits, and obligations of any entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such entity.

14.7 ***Revocation, Withdrawal, or Non-Consummation***.

The Plan Sponsor reserves the right to revoke or withdraw this Plan at any time prior to the Confirmation Date and to file a different plan of reorganization. If the Effective Date has not occurred within 45 days after the Confirmation Order has become a Final Order, the Plan shall be deemed withdrawn without liability to the Plan Sponsor, unless prior to that date the Plan Sponsor has filed a status report with the Clerk of the Bankruptcy Court setting forth the status of all regulatory approvals required to consummate the transactions contemplated by the Plan and indicating that additional time to obtain such approvals is necessary. If the Plan Sponsor revokes the Plan under this Section 14.7, the Plan Sponsor will provide that the Debtor has sufficient funds to provide for an orderly transfer of patients. If the Plan Sponsor revokes or withdraw this Plan, or if Confirmation or consummation of this Plan does not occur, then (a) this Plan shall be null and void in all respects, (b) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount any Claim or Class of Claims or any release contemplated hereby), assumption of executory contracts or leases effected by this Plan, and any document or agreement executed pursuant to this Plan shall be deemed null and void, and (c) nothing contained in this Plan, and no acts taken in preparation for consummation of this Plan, shall (A) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, the Debtor or any other Person, (B) prejudice in any manner the rights of the Debtor or any Person in any further proceedings involving the Debtor, or (C) constitute an admission of any sort by the Debtor or any other Person.

14.8 ***Notice***. All notices, requests, and demands to or upon the Reorganized Debtor or Chapter 11 Trustee to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

If to the Plan Sponsor, to:

E. Todd Sable, Esq.
Glenn S. Walter, Esq.
Honigman Miller Schwartz and Cohn LLP
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226

If to the Chapter 11 Trustee or Debtor:

Basil T. Simon
645 Griswold
Suite 3466
Detroit, MI 48226

14.9    *Governing Law*.  Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an exhibit or schedule to this Plan provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Michigan without giving effect to the principles of conflicts of law of such jurisdiction.

14.10    *Tax Reporting and Compliance*.  The Reorganized Debtor is hereby authorized, on behalf of each of the Debtor, to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtor for all taxable periods ending after the Petition Date through, and including, the Effective Date.

14.11    *Conflicts*.  In the event that provisions of the Disclosure Statement and provisions of this Plan conflict, the terms of this Plan shall govern.

## DISCLOSURE STATEMENT

This Disclosure Statement is part of the Combined Disclosure Statement and Plan of Reorganization of Oakland Physicians Medical Center, L.L.C. proposed by Sant Partners, LLC  (the "**Plan Sponsor**").

This Disclosure Statement has been prepared by the Plan Sponsor under section 1125(b) of the Bankruptcy Code and the Local Rules for use in the solicitation of votes on the Plan.  In preparing this Disclosure Statement, the Plan Sponsor has relied on public filings made by the Debtor in the Bankruptcy Case.  The Plan Sponsor does not have the ability to verify the accuracy of such filings.

The information contained in this Disclosure Statement is included solely for purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose. Capitalized terms used but not defined herein have the meanings set forth in the attached Plan.

All creditors are advised and encouraged to read the Combined Disclosure Statement and Plan in its entirety before voting to accept or reject the Plan. Plan summaries in this Disclosure Statement are qualified in their entirety by the Plan and the exhibits and schedules annexed to the Plan and the Disclosure Statement or filed in the Plan Supplement. The statements contained in this Disclosure Statement are made only as of the date hereof. There can be no assurance that the statements will be correct at any later time.

This Disclosure Statement has been provisionally approved by the Bankruptcy Court and distributed in accordance with Section 1125 of the Bankruptcy Code, Rule 3016(b) and the Local Rules and not necessarily in accordance with federal or state securities laws or other non-bankruptcy law. No other statements or information concerning the Debtor or its assets have been authorized. This Disclosure Statement has been neither approved nor disapproved by the Securities and Exchange Commission.

This Disclosure Statement is not and may not be construed as an admission of any fact or liability, stipulation or waiver in contested matters, adversary proceedings or other actions or threatened actions, but rather shall be treated as a statement made in settlement negotiations. This Disclosure Statement shall not be admissible in any non-bankruptcy proceeding nor shall it be construed to be conclusive advice on the tax, securities, or other legal effects of the Plan as to holders of claims against, or equity interests in, the Debtor.

## I. INTRODUCTION

### A. Executive Summary

On July 22, 2015, Oakland Physicians Medical Center, L.L.C. d/b/a Doctors' Hospital of Michigan (the "**Debtor**"), commenced its Chapter 11 Case by filing a voluntary petition under chapter 11 of the Bankruptcy Code with the Bankruptcy Court. Sant Partners, LLC ("**Sant**") agreed to provide debtor-in-possession financing to the Debtor to fund the Debtor's operations during the pendency of the Chapter 11 Case to facilitate confirmation and consummation of a plan of reorganization in which Sant would acquire an equity stake in the Debtor. Sant was an outsider and had no interest in the Debtor prior to the Chapter 11 Case.

The Debtor defaulted under the terms of the financing provided by Sant, and Sant and the Debtor's board of directors reached an impasse regarding negotiations with respect to the formulation of a plan of reorganization of the Debtor. Sant had concerns about the behavior of the board of directors, and was unwilling, and not obligated, to fund the Debtor's operations so long as the existing board remained in control of the Debtor. Therefore, Sant moved for the appointment of a chapter 11 trustee, the appointment of which was a condition precedent for Sant to continue to provide financing to the Debtor. Although the Debtor disagreed with certain statements made in Sant's motion, to avoid the potential immediate cessation of the Debtor's operations for lack of funding, the Debtor did not oppose the appointment of a trustee under section 1104(a)(2) of the Bankruptcy Code and the motion was granted by the Bankruptcy Court. Upon the appointment of the chapter 11 trustee, the exclusive period for the Debtor to propose a

plan of reorganization under section 1121 of the Bankruptcy Code terminated and any party in interest may file a plan. A competing plan has been filed by a group calling itself "Save the Hospital Group," which includes Dr. Yatinder Signhal, a member of the Debtor's existing board. The Plan Sponsor is also aware that there may be other potential plan proponents, but is unaware of any other firm credible proposal to acquire the Debtor, even though exclusivity has been lifted. Further, the definition of "adequate protection" under Section 1125(a)(1) expressly provides that adequate information "need not include such information about any other possible or proposed plan."

Sant is the proponent of the Plan. Under the Plan, existing equity in the Debtor will be cancelled and the Plan Sponsor will acquire 100% of the equity in the Reorganized Debtor for a purchase price of $1,500,000. The purchase price may be satisfied in cash or the conversion of amounts owed to the Plan Sponsor under the debtor-in-possession financing facility. The treatment of claims against the Debtor is summarized below.

**B.      Summary of Classification and Treatment of Claims and Interests**

The following table briefly summarizes the classification and treatment of claims and equity interests under the Plan.

| *Class* | *Description of Claims or Interests in Class* | *Treatment Under the Plan* |
|---|---|---|
| Priority Tax Claims<br><br>Estimated Allowed Amount: $2,000,000<br><br>Estimated Recovery: 100% | Federal, state and local governmental tax claims entitled to priority under Bankruptcy Code § 507(a)(8). | Paid in full in cash over a period ending not less than 5 years after the Petition Date in accordance with 11 U.S.C. § 1129(a)(9)(C). |
| Class 1 – Non-Tax Priority Claims<br><br>Estimated Allowed Amount: $0<br><br>Estimated Recovery: 100% | Unsecured claims, other than Administrative Claims and Priority Tax Claims, entitled to priority under Bankruptcy Code § 507(a). | Paid in full in cash. |

43

| Class | Description of Claims or Interests in Class | Treatment Under the Plan |
|---|---|---|
| Class 2 – Other Secured Claims<br><br>(Each Other Secured Claim shall constitute a separate Class numbered 2.1, 2.2, 2.3, etc.)<br><br>Estimated Recovery: 100% | Secured claims other than DIP Facility Claims, Crittenton Secured Claims, CMS Overpayment Claims, Michigan Overpayment Claims, and WRC Secured Claims. | At the Reorganized Debtor's option, (a) reinstated, (b) paid in full in cash, or (c) the collateral surrendered to the secured creditor. |
| Class 3 – Crittenton Secured Claims<br><br>Estimated Allowed Amount: $3,937,978.20 ($750,000 secured)<br><br>Estimated Recovery: 19% plus non-financial accommodation | Secured claims under the Crittenton Loan Documents. | $100,000 in Cash, and reduction of the secured loan to the principal amount of $650,000. In addition, the Reorganized Debtor will assume, as modified, the graduate medical affiliation agreement between the Debtor and Crittenton and enter into a new affiliation agreement for the 2016-2018 academic years. |
| Class 4 – CMS Overpayment Claims<br><br>Estimated Allowed Amount: $6,800,000<br><br>Estimated Recovery: 100% | Secured claims for CMS overpayments. | Reinstated. |
| Class 5 – Michigan Overpayment Claims<br><br>Estimated Allowed Amount:<br><br>$2,953,000<br><br>Estimated Recovery: 100% | Secured claims of the Michigan Department of Health and Human Services for Medicaid overpayments and unpaid QAAP taxes that are not Priority Tax Claims. | Reinstated. |

44

| Class | Description of Claims or Interests in Class | Treatment Under the Plan |
|---|---|---|
| Class 6 – WRC Secured Claim<br><br>Estimated Allowed Amount: $794,265.51<br><br>Estimated Recovery: 100% | Secured claim of the WRC as a water utility. | Paid in full by payment of sixty (60) equal monthly installments of $13,237.76 over a five year period. |
| Class 7 – General Unsecured Claims<br><br>Estimated Allowed Amount: $16,370,000<br><br>Estimated Recovery: 10% | Claims against the Debtor that are not Secured Claims or entitled to priority of payment under the Bankruptcy Code. | Right to pursue certain identified causes of action with guaranteed cash payments of up to $1,600,000 over a four year period. |
| Class 8 – Old Equity Interests<br><br>Estimate Allowed Amount: N/A<br><br>Estimated Recovery: 0% | All equity interests in the Debtor and Claims arising from or related thereto that are subject to subordination under Bankruptcy Code § 510(b). | Cancelled, and the holders will not receive or retain any property on account thereof. |

The foregoing is only a summary of the Plan's classification and treatment of Claims and Interests and is qualified in its entirety by the full text of the Plan. The Plan will control in the event of any discrepancy between the Plan and any summary or description herein.

## II.    DESCRIPTION OF THE DEBTOR

### A.    The Debtor

The Debtor is a Michigan limited liability company.  Under the Plan, the Debtor will be reorganized.  The Debtor's officers and directors are identified in Section II.B below.

### B.    The Principals

#### 1.    Board of Directors

The Debtor currently has a three-member board of directors consisting of Dr. Yatinder Singhal, Dr. Anuj Mittal, and Dr. Michael Short.  The three board members are also members of the Debtor and are, or have been, practicing physicians at the Debtor.  The Debtor's

Statement of Financial Affairs discloses that the directors received the following compensation in the one year prior to the Petition Date:

| Director | Compensation | Board Fees |
|----------|--------------|------------|
| Dr. Singhal | $112,690.44 | $20,001 |
| Dr. Mittal | $116,500.04 | $4,167 |
| Dr. Short | $40,761.02 | $12,501 |

The payment of board fees was discontinued in June, 2015. Upon the appointment of the Chapter 11 Trustee, the Debtor discontinued the payment of fees to the board members for serving as directors of their medical departments. The existing directors of the Debtor will not be affiliated with the Reorganized Debtor or receive any compensation from the Reorganized Debtor. Because the Plan Sponsor is not an insider of the Debtor, further information regarding the compensation or other remuneration, including fringe benefits, provided to the members of the board pre-Petition Date is not available.

### 2. Management

John Ponczocha is the Debtor's Chief Executive Officer. Mr. Ponczocha was appointed Chief Executive Officer in July, 2013. He receives an annual compensation of $220,000 and participates in the Debtor's Benefit Plan. The Plan Sponsor is unaware of any extraordinary fringe benefits offered to Mr. Ponczocha.

The Debtor's pre-petition Chief Financial Officer resigned during the pendency of the Bankruptcy Case. Mr. Brian Hardin was appointed interim Chief Financial Officer. He is paid on an hourly basis and receives $160 per hour for services rendered to the Debtor.

As set forth in more detail in Article II.B.5 below, after the Petition Date, Dr. Sanjay Sharma was appointed by the Debtor's board of directors as Chief Information Officer of the Debtor to make recommendations to the Chief Executive Officer respecting the Debtor's information systems. Dr. Sharma is not compensated for these services.

The Plan contemplates that existing management will continue on and after the Effective Date, subject to removal by the new board.

### 3. Equity Ownership

The Debtor has reported that thirty-five percent of the equity in the Debtor is institutionally owned by S6 Holding, LLC, while the remaining sixty-five percent of the equity in the Debtor is owned by physicians individually, or in the case of Dr. Surindar Jolly, directly and indirectly through an investment vehicle. The specific holdings of the individual physicians, however, are uncertain. The board of directors has asserted that the membership registry filed with the Corporate Ownership Statement [DE 5] and Exhibit 21(b) to the Schedules [DE 93-2] is incorrect. However, the exact membership holdings are not relevant at this time as upon the appointment of the Chapter 11 Trustee the members were divested of any operational control of the Debtor. Further, under the Plan, existing membership interests in the Debtor will be

cancelled, and the holders of such equity interests will not receive or retain any equity on account thereof.

4.      The Plan Sponsor

a.      *Sant Partners, LLC*

Sant is a Delaware limited liability company that was formed for the purpose of providing debtor-in-possession financing to the Debtor during the pendency of the Chapter 11 Case to facilitate confirmation of a plan of reorganization in which Sant would acquire an equity stake in the Reorganized Debtor.  Sant's equity is held by Sanyam Sharma.  The two officers of Sant are Sanyam Sharma and Priyam Sharma.  Sanjay Sharma removed himself as an officer of Sant to serve as the Debtor's Chief Information Officer.

b.      *Infrahealth*

The Infrahealth® Group of companies ("**Infrahealth**") is one of the country's leading health care software and services providers.  Infrahealth creates value for physicians and hospitals through scalable solutions that help facilities improve patient care and maximize reimbursement.  The members of Sant are also principals in Infrahealth.  In connection with the potential investment by Sant, Infrahealth was contracted to provide consulting services at no cost to the Debtor's Estate so long as Sant was pursuing an equity investment in the Debtor.  Such consulting services were provided to the Debtor with the understanding that Infrahealth would be compensated at its standard rates for post-Effective Date services if a plan of reorganization sponsored by Sant was consummated.  Infrahealth's fees for such services provided to the Debtor would be approximately $400,000 per year.  Further, as part of the Debtor's operational restructuring during the pendency of the Chapter 11 Case, members of the Infrahealth Group of companies were contracted to perform the Debtor's billing function and to provide transcription services, each at a significant savings compared to the Debtor's prior providers.  Sant agreed to defer payment of such fees for the first three months of service and the contracts are terminable by the Debtor without cause.

Additionally, Dr. Sanjay Sharma, a principal in Infrahealth, was appointed by the board of directors as Chief Information Officer of the Debtor to make recommendations respecting the Debtor's information systems to the Chief Executive Officer.  Dr. Sharma has not been compensated for these services.  Dr. Sharma is not currently a member in Sant but he is the husband of Priyam Sharma and the father of Sanyam Sharma.

C.      **The Debtor's Business; Causes for the Chapter 11 Filing**

On November 7, 2008, the Debtor, which was formed by a group of physicians and McLaren Health, purchased the assets of Pontiac General Hospital and Medical Center d/b/a North Oakland Medical Center ("**NOMC**") in a §363 sale in the chapter 11 case of NOMC then pending before the Bankruptcy Court.  Upon the closing of the sale, the Debtor d/b/a Doctors' Hospital of Michigan, emerged as Michigan's first acute-care, for-profit hospital with physician ownership.

47

The Debtor's main facility is located in the city of Pontiac, Michigan. It is a licensed 304-bed hospital that provides, primarily, behavioral and family medicine, including 24-hour urgent care, to patients residing in the surrounding communities. The Debtor provides other medical care services, including radiology services, respiratory therapy, occupational medicine and physical medicine and rehabilitation. Until recently, the Debtor also provided general surgical services. The Debtor also has operated an ambulatory care center in Waterford, Michigan.

The Debtor faces the challenge of being located in a poor community where medical service for many patients is made by Medicare and Medicaid. There are other large, well-capitalized hospitals in the area which provide emergency, trauma, general surgical and other services. Specifically, the Debtor has struggled to attract or retain the kind of medical practices necessary to fill the hospital's bed count, facing neighboring competition from larger hospitals such as St. Joseph Mercy Hospital and McLaren Pontiac General Hospital. The Plan Sponsor also believes that the Debtor suffered from severe mismanagement.

The Debtor is in severe financial distress. For the year ending December 31, 2013, the Debtor had gross revenue of $29,268,000 and a net loss of $8,900,000. These losses continued through and after calendar year 2014. Because the Plan Sponsor is not an insider of the Debtor, more detailed financial information with the respect to the three year period prior to the Petition Date is not available to it.

Prior to commencing the Chapter 11 Case, the Debtor encountered a number of setbacks, including, among other things: (i) notice from the Joint Accreditation Commission of various violations which if not cured under a short timetable could lead to the loss of hospital accreditation and a closure of the hospital; (ii) on June 3, 2015, a current Debtor member and former director of Debtor, Dr. Surindar K. Jolly, and certain related persons or entities obtained a money judgment in the approximate amount of $2,700,000.00 million against the Debtor on account of unsecured loans previously advanced to the Debtor; and (iii) garnishment and collection actions by other creditors.

To stave off the imminent threat of a judgment foreclosure, avoid disruption of patient care, preserve the value of hospital assets and obtain vital breathing room to formulate and implement an orderly plan, the Debtor commenced the Chapter 11 Case.

### III.   POST-PETITION EVENTS OF SIGNIFICANCE

#### A.   Patient Care Ombudsman

Pursuant to a stipulation by and between the United States Trustee and the Debtor, the Bankruptcy Court entered an order on July 27, 2015, directing the United States Trustee to appoint a patient care ombudsman. On July 28, 2015, Deborah L. Fish was appointed as the patient care ombudsman (the "**Patient Care Ombudsman**").

#### B.   Use of Cash Collateral

1.   Pre-Petition Secured Debt

On April 14, 2011, the Debtor entered into a secured loan with Crittenton Hospital Medical Center in the original amount of $4,000,000, secured by, among other things, a security interest in Debtor's accounts, including health care insurance receivables, deposit accounts, cash and the proceeds of the foregoing. The Crittenton loan is also secured by a mortgage on the Debtor's Waterford Ambulatory Clinic property located at 1305 North Oakland Blvd. in Waterford, Michigan.

The Debtor is indebted to The Centers for Medicare & Medicaid Services in the approximate amount of $6,700,000 for Medicare overpayments. The Debtor is indebted to the Michigan Department of Health and Human Services for Medicaid overpayments and unpaid QAAP Taxes in the approximate amount of $1,909,000. The Debtor has not identified any other party asserting an interest in the Debtor's cash collateral.

2.   Cash Collateral Order

On July 27, 2015, the Debtor filed its *First Day Motion for Entry of Interim Order (I) Authoring Use of Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting of Superpriority Claims and Adequate Protection, and (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(C)* ("**Cash Collateral Motion**") [DE 19]. The Debtor sought the use of cash collateral to avoid a then imminent shutdown and maintain critical patient care functions and in-patient and out-patient services.

On September 17, 2015, the Bankruptcy Court entered its *Final Order (I) Authorizing (A) Use of Cash Collateral Pursuant to 11 U.S.C. 363, and (B) Granting of Security Interests, Superpriority Claims, and Adequate Protection, and (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(c)* (the "**Cash Collateral Order**") [DE 130]. Under the Cash Collateral Order: (i) the Debtor is authorized to use the cash collateral of Crittenton, CMS and Michigan (the "**Prepetition Cash Collateral Creditors**"); (ii) the Prepetition Cash Collateral Creditors received, as adequate protection for any diminution in the value of their collateral, perfected replacement liens in the same property of the Debtor's estate as held by the Prepetition Cash Collateral Creditors prior to the Petition Date; and (iii) as additional adequate protection the Prepetition Cash Collateral Creditors were granted superpriority administrative expenses status under Bankruptcy Code § 507(b). CMS and the State of Michigan reserved all rights under the Cash Collateral Order.

**C.    DIP Financing**

On August 18, 2015, the Debtor filed its *Emergency Motion for Entry of Interim Order (I) Authorizing (A) Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362 and 364(C), and (B) Granting Superpriority Claims and Adequate Protection, and (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(C)* ("**Motion for Postpetition Financing**") [DE 67] seeking postpetition financing pursuant to a debtor-in-possession credit facility (the "**DIP Facility**") provided by Sant to fund its operations, including payroll, taxes, and other administrative expenses.

After a hearing (the "**Final Hearing**") conducted on September 16, 2015, the Court entered its *Final Order (1) Authorizing the Debtor to Obtain Postpetition Financing on a*

*Senior Secured, Superpriority Basis, (ii) Authorizing the Use of Cash Collateral, and (iii) Granting Adequate Protection to Prepetition Secured Parties*(the "**Final DIP Order**") [DE 131]. The principal terms of the DIP Facility are as follows: (i) the maximum amount available and outstanding under the DIP Facility at one time was $1,500,000 to be funded only pursuant to a budget attached to the Motion for Postpetition Financing; (ii) the obligations provided by the DIP Facility are secured by the Debtor's property with the following priorities: (a) a first priority, perfected lien and security interest on the Debtor's property that is not otherwise subject to a valid and perfected security interest as of the Petition Date, and (b) best available junior, perfected liens and security interest on the Debtor's property that is subject to the security interests of the Prepetition Cash Collateral Creditors; and (iii) the obligations enjoy superpriority administrative expense status under 11 U.S.C. § 364(c)(1).

On October 19, 2015 the Chapter 11 Trustee filed the *Chapter 11 Trustee's Motion for Order Amending Final Order (I) Authorizing the Debtor to Obtain Postpetition Financing on a Senior Secured, Superpriority Basis, (II) Authorizing the Use of Cash Collateral, (III) Granting Adequate Protection to Prepetition Secured Parties and (IV) Scheduling of a Final Hearing* ("**DIP Amendment Motion**") to amend the terms of the DIP Facility to increase availability to $2,000,000 and modify certain terms of the DIP Facility to provide covenant relief to the Debtor.

### D.     Appointment of Chapter 11 Trustee

The Debtor defaulted under the terms of the DIP Facility.  Upon the occurrence of the subject events of default, Sant was relieved of any obligation to provide additional financing to the Debtor pursuant to the Final DIP Order or otherwise and had the ability to declare all outstanding obligations due and payable.  Sant and the Debtor's board of directors also reached an impasse in negotiations with respect to the formulation of a plan.  Sant had concerns about the behavior of the board of directors, and was unwilling, and not obligated, to fund the operations of the Debtor so long as the existing board remained in control of the Debtor.  On September 23, 2015, Sant filed the *Emergency Motion of Sant Partners, LLC for Appointment of a Chapter 11 Trustee Under 11 U.S.C. § 1104(a)* (the "**Trustee Motion**") [DE 144].  Although the Debtor disagreed with certain statements made in the Trustee Motion, to avoid the potential immediate cessation of operations of the Debtor for lack of funding, the Debtor did not oppose the appointment of a trustee under section 1104(a)(2) of the Bankruptcy Code.  On September 25, 2015, the Bankruptcy Court entered the *Order Granting Emergency Motion of Sant Partners, LLC for Appointment of a Chapter 11 Trustee Under 11 U.S.C. § 1104(a)* [DE 149].  On September 28, 2015, the Bankruptcy Court entered the *Order Approving Appointment of Trustee* [DE 154] whereby Basil T. Simon, Esq. was appointed as the chapter 11 trustee of the Debtor.

### E.     Post-Petition Transfers Outside the Ordinary Course of Business.

The Plan Sponsor is unaware of any post-petition transfers outside the ordinary course of business.

F.      **Litigation.**

Except as set forth herein, the Plan Sponsor is unaware of any litigation arising or continuing during the case, or which may be pending in any Court.

IV.     **SUMMARY OF THE CHAPTER 11 PLAN OF REORGANIZATION**

A.      **Treatment of Classes**

The Bankruptcy Code requires that a chapter 11 plan divide the different claims against, and equity interests in, the debtor into separate classes based upon their legal nature. Claims of a substantially similar legal nature are usually classified together, as are equity interests of a substantially similar legal nature. Administrative expenses and certain statutory priority claims are not classified.

A chapter 11 plan must designate each class as "impaired" (affected by the plan) or "unimpaired" (unaffected by the plan). If a class of claims is "impaired," the Bankruptcy Code affords certain rights to the holders of the claims, such as the right to vote on the plan (unless the plan provides for no distribution to the holders of claims in the class, in which case they are deemed to reject the plan), and the right to receive, under the plan, property with a value at least equal to the value that they would receive if the debtor were liquidated under chapter 7.

The definition of "impaired" in Section 1124 of the Bankruptcy Code is highly technical. In general, a class of claims is not impaired if the plan provides either that (i) the rights of the holders are unaltered or (ii) all defaults with respect to the claims will be cured (other than defaults arising from the debtor's insolvency, the commencement of the case or the nonperformance of a nonmonetary obligation), and the rights of the holders of the claims will be restored. The holder of a claim in an unimpaired class must be placed in the position it would have been in if the debtor had not commenced its case and the default had not occurred.

The Plan divides claims and equity interests into the following classes, which are described in more detail below.

1.      Unclassified Administrative Claims and Priority Tax Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified.

Administrative Claims are the actual costs and expenses of the Debtor's reorganization case. These claims include post-petition salaries and other benefits owed to employees, amounts owed to vendors for goods and services delivered after the Petition Date, taxes incurred after the Petition Date, certain statutory fees and charges, and post-petition financing obligations. Other Administrative Claims include the actual, reasonable fees and expenses of professionals retained by the debtor-in-possession, chapter 11 trustee, and the official committee of unsecured creditors. The Plan Sponsor expects that the Debtor will honor its post-petition obligations in the ordinary course of business and that Administrative Claims outstanding on the Effective Date will consist primarily of professional fees, obligations owed

51

under the DIP Facility, and post-petition obligations that have accrued but are not yet payable. The Plan provides for the payment in full of all Allowed Administrative Claims.

Section 2.3 of the Plan governs the payment of Professional Fee Claims. The Plan establishes a deadline of 45 days after the Effective Date for Professionals to file final fee applications with the Bankruptcy Court. Depending on how any objections to the Professional Fee Claims are resolved, the Plan Sponsor estimates that Allowed Professional Fee Claims will aggregate between $600,000 and $1,000,000. Allowed Professional Fee Claims will be paid in full upon their Allowance by the Bankruptcy Court.

Under Section 2.4 of the Plan, on the Effective Date, the Plan Sponsor shall satisfy its obligations to fund the Purchase Price to acquire the New Membership Interests through the conversion of DIP Facility Claims in an amount equal to the Purchase Price. To the extent that the Purchase Price is less than the amount of DIP Facility Claims, the unconverted DIP Facility Claims shall be paid in full in cash on the Effective Date. The Plan Sponsor estimate that the amount outstanding under the DIP Facility on the Effective Date will be between $1,500,000 and $2,000,000.

Section 507(a)(8) of the Bankruptcy Code gives priority to certain pre-petition tax claims. Under the Plan, Allowed Priority Tax Claims will be paid in full in cash. Under Section 1129(a)(9)(C) of the Bankruptcy Code, the Reorganized Debtor may elect to make such payments over a period not ending later than five years from the Petition Date. The Debtor's Schedules identify approximately $1,250,000 in Priority Tax Claims and additional tax claims have been filed. It is a condition precedent to the Effective Date of the Plan that Allowed Priority Tax Claims do not exceed $2,000,000 in the aggregate.

2.      Classifications of Claims

a.      *Summary of Classes*

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim is also placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

| *Class* | *Impaired/Unimpaired; Entitlement To Vote* |
|---|---|
| Class 1 – Non-Tax Priority Claims | Unimpaired – Deemed to have accepted this Plan and not entitled to vote |
| Class 2 – Other Secured Claims | Unimpaired – Deemed to have accepted this Plan and not entitled to vote |
| Class 3 – Crittenton Secured Claims | Impaired – Entitled to vote |

52

| Class 4 – CMS Overpayment Claims | Impaired – Entitled to vote |
|---|---|
| Class 5 – Michigan Overpayment Claims | Impaired – Entitled to vote |
| Class 6 – WRC Secured Claims | Impaired – Entitled to vote |
| Class 7 – General Unsecured Claims | Impaired – Entitled to vote |
| Class 8 - Old Equity Interests | Impaired – Deemed to have rejected this Plan and not entitled to vote |

b.      *Class 1 – Non-Tax Priority Claims*

Section 507(a) of the Bankruptcy Code gives priority of payment to certain claims, including certain employee compensation and benefit claims incurred within 180 days before the petition date.  The Debtor scheduled one claim (other than payroll taxes which are treated as Priority Tax Claims) in the amount of $55,000 constituting a Non-Tax Priority Claim. The Debtor has indicated, however, that such claim has been paid, and no pre-petition Non-Tax Priority Claims are known to be outstanding.   Allowed Non-Tax Priority Claims will be paid in full in cash.

c.      *Class 2 – Other Secured Claims*

Other Secured Claims constitute all Secured Claims other than those separately classified or provided for under the Plan.  Other Secured Claims will be rendered unimpaired.  At the Reorganized Debtor's option, Other Secured Claims will be (a) reinstated, (b) paid in full in cash, or (c) the collateral surrendered to the secured creditor.  No Other Secured Claims were listed in the Debtor's Schedules.  However, this Class will include any secured claims, e.g., secured claims related to equipment financing, if any, that are subsequently identified.

d.      *Class 3 – Crittenton Secured Claims*

On April 14, 2011, the Debtor entered into a secured loan with Crittenton Hospital Medical Center in the original amount of $4,000,000 secured by, among other things, a security interest in Debtor's accounts, including health care insurance receivables, deposit accounts, cash, and the proceeds of the foregoing.  The Crittenton loan is also secured by a mortgage on the Debtor's Waterford Ambulatory Clinic property located at 1305 North Oakland Blvd. in Waterford, Michigan.

Under the Plan, Crittenton will receive $100,000 in Cash on the Effective Date and Crittenton's existing loan will be amended and restated to reduce the outstanding loan to $650,000 with the following terms:

| Issuer: | Reorganized Debtor |
|---|---|
| Principal: | $650,000.  Principal will be payable in full in cash at maturity.  There is no prepayment penalty. |

| Maturity: | 3 years from Effective Date |
|---|---|
| Interest: | 3% per annum. Interest will be paid quarterly in arrears beginning on April 1, 2016. Default rate equals 4% per annum over otherwise applicable rate. |
| Security: | Waterford Property |
| Form: | Amended and restated promissory note with no representations, warranties or covenants. |
| Governing Law: | State of Michigan |

The form of Amended Crittenton Note is attached as Exhibit F to the Plan.

Further, pursuant to the Medicare regulation at 42 C.F.R.§ 413.79(f) and as filed with and approved by the Medicare Administrative Contractor, the Debtor entered into a graduate medical education ("**GME**") affiliation with Crittenton, whereby the Debtor and Crittenton formed a GME affiliated group (the "**Crittenton GME Group**") for a residency training program under which 18 residents participated in training at Crittenton and/or the Debtor. Under the Plan, this agreement (the Crittenton 2011-2016 Prepetition Affiliation Agreement) is assumed, as modified in the form of the Crittenton Assumed Affiliation Agreement, a copy of which is attached as Exhibit H to the Plan. The Reorganized Debtor will also assume the 2015-2016 Prepetition Affiliation Agreement without modification. No Cure shall be payable and Crittenton will waive any pre-Effective Date defaults under these agreements. On the Effective Date, the Reorganized Debtor and Crittenton will also enter into a new affiliation agreement (the Crittenton 2016-2018 Affiliation Agreement) for the 2016-2017 and 2017-2018 academic years pursuant to Medicare regulation at  42 C.F.R.§ 413.79(f) which will be filed with and for which it is anticipated approval will be received from the Medicare Administrative Contractor. The form of this agreement is attached as Exhibit I to the Plan. The effect of the foregoing assumption and new affiliation agreement will be that residents participating in the Crittenton GME Group will continue to train, and a shared rotational arrangement for training consistent with pre-Petition practices will occur in both the 2016-2017 and 2017-2018 academic years. Under the Crittenton 2016-2018 Affiliation Agreement the Reorganized Debtor's Medicare certified hospital is sharing 18 Medicare FTE cap slots with Crittenton for the period July 1, 2016 through June 30, 2017 and sharing 18 Medicare FTE cap slots with Crittenton for the period July 1, 2017 through June 30, 2018. No subsequent FTE cap sharing under the Crittenton GME Group will occur unless the Reorganized Debtor enters into a subsequent agreement with Crittenton which it is not obligated to do. While this accommodation provides a material benefit to Crittenton, the net financial benefit to Crittenton is difficult for the Plan Sponsor to quantify. The Plan Sponsor believes, however, that Crittenton's treatment under the Plan provides Crittenton with value in excess of what Crittenton would receive in a chapter 7 liquidation.

e.        *Class 4 – CMS Overpayment Claims*

The Debtor is indebted to The Centers for Medicare & Medicaid Services (Debtor's Schedule D lists this creditor as "Wisconsin Physicians Service, Medicare Part A") in the approximate amount of $6,700,000 for Medicare overpayments. CMS has informally asserted a claim of approximately $6,800,000. CMS has asserted a right to recoup the full amount of its claim against future payments that the Debtor or Reorganized Debtor would otherwise be entitled to receive under the Medicare Act from CMS. Under the Plan, the obligations to CMS will be Reinstated (i.e., assumed)..

### f.    *Class 5 – Michigan Overpayment Claims*

The Debtor's Schedules list indebtedness to the Michigan Department of Health and Human Services for Medicaid overpayments and unpaid QAAP Taxes in the amounts of $325,000 and $1,584,000, respectively. The Michigan Department of Health and Human Services filed a proof of claim in the aggregate amount of $2,953,213.97, of which $1,067,738.97 is claimed as priority under § 507(a)(8)(E). Michigan Department of Health and Human Services has also asserted a right to recoup the full amount of its claim against future payments that the Debtor or Reorganized Debtor would otherwise be entitled to receive under the State of Michigan's Medicaid program. Under the Plan, the obligations to Michigan will be Reinstated (i.e., assumed).

### g.    *Class 6 – WRC Secured Claim*

The Debtor is indebted to the WRC in the amount of $794,265.51 for pre-petition water utility bills. This obligation is secured by a statutory lien. Under the Plan, the WRC will receive sixty (60) equal monthly payments of $13,237.76 over a 5-year period commencing on the first day of the month following the Effective Date. WPC will not receive interest on its Claim for the period after the Petition Date.

### h.    *Class 7 – General Unsecured Claims*

General Unsecured Claims are claims against the Debtor that are not Secured Claims or entitled to priority of payment under the Bankruptcy Code. The Debtor's Schedules identify $13,191,933.36 in General Unsecured Claims. General Unsecured Claims would also include any deficiency claims of under-secured creditors, and claims resulting from the rejection of executory contracts and unexpired leases. The unsecured deficiency claim of Crittenton under the Plan is Allowed in the amount of $3,187,978.29. Each Holder of an Allowed General Unsecured Claim will receive its pro rata share of beneficial interests in a liquidating trust to be established on the Effective Date.

The Trust will receive the ability to pursue any causes of action that the Debtor or its Estate has against Dr. Yatinder Singhal, Dr. Anuj Mittal, Dr. Michael Short, and Dr. Brijinder Gupta, including, without limitation any avoidance actions against such individuals. These potential causes of action are described more fully in Article IV.C below. Trust Property will also include causes of action against Butzel, Long, PC and the Law Offices of Melvin M. Raznick for potential preferential payments received within the 90 day period prior to the Petition Date as identified in the Debtor's Statement of Financial Affairs and any other causes of action of the Debtor of Debtor's estates against these entities. Additional Causes of Action,

55

including, without limitation, fraudulent transfer claims related to the sale of practice groups and assets of the Debtor prior to the Petition Date, may be identified for inclusion in the Trust at the Plan Sponsor's sole discretion. Any additional Trust Causes of Action will be identified on Exhibit G to the Plan to be filed as part of the Plan Supplement.

The Trust will be funded through the Trust Guaranteed Cash Payment. As set forth below, the Trust Guaranteed Cash Payment will provide an estimated recovery to General Unsecured Creditors of 10% of the Allowed amount of such claims over four years. If the Trust is successful in pursuing the Trust Causes of Action the ultimate recovery could be higher and payments made earlier. Conversely, if the Trust Causes of Action are not successful the recovery to General Unsecured Creditors could be reduced by the costs and expenses of administering the Trust and pursuing the Trust Causes of Action. Recoveries may also be higher or lower depending on the aggregate amount of Allowed General Unsecured Claims.

Under the Trust Guaranteed Cash Payment, the Reorganized Debtor will guaranty cash recoveries to the Trust in the amount of at least $1,600,000 as follows:

The Liquidating Trust Trustee, and its counsel, shall evaluate the Trust Causes of Action in good faith using reasonable commercial standards. If the Liquidating Trust Trustee concludes that any Trust Causes of Action have value, the Liquidating Trust Trustee will promptly and reasonably pursue such Trust Causes of Action. Otherwise, the Liquidating Trust Trustee would have discretion to abandon Trust Causes of Action deemed not to have value so as to maximize any return to General Unsecured Creditors.

During the 12-month period after the Effective Date, the Reorganized Debtor shall pay the professional fees of the Trust and the Liquidating Trust Trustee incurred in administering the Trust and evaluating and pursuing the Trust Causes of Action, up to an aggregate amount of $160,000. At any time, funds held by the Trust may be reserved to pay subsequent fees or distributed to General Unsecured Creditors as determined by the Liquidating Trust Trustee in accordance with the Trust Agreement. The foregoing fees would be payable by the Reorganized Debtor monthly, within 45 days after the Reorganized Debtor's receipt of a detailed invoice therefor. Each such invoice may be redacted as necessary to preserve the attorney-client privilege.

On the first anniversary of the Effective Date, the Reorganized Debtor would pay to the Trust an amount equal to $160,000 less amounts previously paid by Reorganized Debtor pursuant to the foregoing paragraph and less the net proceeds of the Trust Causes of Action actually received by the Trust as of such date.

On each of the next three anniversaries of the Effective Date (e.g., a total 4-year payment period), the Reorganized Debtor would pay an amount to the Trust sufficient for the Trust to have received an aggregate of the following amounts inclusive of the net proceeds of the Trust Causes of Action:

| Anniversary of the Effective Date | Total Cash Guaranty to Trust |
|---|---|

| Year 2 | $640,000 |
| Year 3 | $1,120,000 |
| Year 4 | $1,600,000 |

If, at any time after the Effective Date, the Trust has recovered more than $1,600,000 from the net proceeds of the Trust Causes of Action, the Trust will promptly refund to the Reorganized Debtor the net proceeds of the Trust Causes of Action in excess of $1,600,000 up to the aggregate amount funded to the Trust by the Reorganized Debtor.

### i.    *Class 8 – Old Equity Interests*

All the equity in the Debtor and all Claims arising from or related thereto will be cancelled and the Holders of such Claims and Interest will not receive or retain any property on account thereof.

### B.    Implementation Provisions of Plan

#### 1.    Continued Legal Existence and Revesting of Assets

On the Effective Date, the Reorganized Debtor shall be deemed to have adopted the Amended and Restated Operating Agreement attached as an Exhibit to the Plan and the Debtor will continue to exist after the Effective Date as a Michigan limited liability company. The Amended and Restated Operating Agreement shall include a provision to prohibit the Reorganized Debtor from issuing non-voting equity securities to the extent necessary to comply with section 1123(a) of the Bankruptcy Code.  In accordance with section 12.2 of the Plan, and except as otherwise explicitly provided in the Plan, on the Effective Date, all property comprising the Estate (including Retained Actions, but excluding Trust Property), shall revest in the Reorganized Debtor.

#### 2.    Sources of Cash for Distribution

All Cash necessary for the Reorganized Debtor to make payments required by the Plan shall be obtained from (i) existing Cash balances, (ii) the operations of the Debtor or Reorganized Debtor, (iii) the $1,500,000 equity investment being made by the Plan Sponsor, and (iv) proceeds from the New Credit Facility to be provided by the Plan Sponsor on the terms set on Exhibit A to the Plan.  The New Credit Facility will be a revolving facility that will provide up to $8,000,000 in financing to the Reorganized Debtor.

#### 3.    Issuance of New Membership Interest

On the Effective Date, upon the terms and subject to the conditions set forth in this Plan and the Amended and Restated Operating Agreement, the Reorganized Debtor shall issue, sell and deliver to the Plan Sponsor all of the New Membership Interests.  The aggregate Purchase Price is $1,500,000.  Notwithstanding the foregoing, the Plan Sponsor may, but is not required to, allow other Persons to acquire New Membership Interests, which may be separately classified, on the Effective Date under the Amended and Restated Operating Agreement and the Plan.  If the following conditions are met, the participation of additional new members shall not

constitute a material modification of the Plan that requires re-solicitation of the Plan, and a Holder of a Claim that has accepted this Plan shall be deemed to have accepted this Plan as modified: (i) the aggregate Purchase Price is not less than $1,500,000, (ii) the identify of any person to acquire New Membership Interests on the Effective Date is disclosed prior to the Confirmation Hearing, (iii) any amendments to the Amended and Restated Operating Agreement contained in the Plan Supplement are filed with the Bankruptcy Court prior to the Confirmation Hearing; and (iv) Sant acquires a majority equity interest in, or otherwise obtains operational control of, the Reorganized Debtor.

When used with respect to a particular purchaser, "Purchase Price" shall mean such purchaser's pro rata share of the Purchase Price.

4.      Section 1145 Exemption

Pursuant to section 1145 of the Bankruptcy Code, the issuance and allocation of shares of the New Membership Interests to the Plan Sponsor pursuant to the Plan shall be exempt from registration under the Securities Act of 1933 and any state or local law requiring registration for offer or sale of a security.

5.      Company Action; Effectuating Documents

The Plan provides that any company action required or contemplated by the Plan shall be deemed to have occurred and be effective without any requirement of further action by members, creditors, directors, offices or managers of the Debtor or the Reorganized Debtor or the Chapter 11 Trustee. The Chapter 11 Trustee, the Debtor and Reorganized Debtor, and their respective officers and designees, will be authorized to execute, deliver, file, or record any documents necessary to implement the Plan.

6.      Preservation of Causes of Action

The Plan provides that the Reorganized Debtor will retain and may (but is not required to) enforce, and take any other action with respect to, all Causes of Action of Debtor and the Estate other than with respect to the Trust Causes of Action that are being vested in the Trust for the benefit of General Unsecured Creditors.

7.      Exemption From Certain Transfer Taxes and Recording Fees

The Plan provides for an exemption for transfer taxes under section 1146(a) of the Bankruptcy Code with respect to any transfers from the Debtor to the Reorganized Debtor or Trust or to any other Person or entity pursuant to the Plan.

8.      Dissolution of Creditors' Committee

The Creditors' Committee shall continue in existence until the Effective Date to exercise those powers and perform those duties specified in section 1103 of the Bankruptcy Code. On the Effective Date, the Creditors' Committee, shall be dissolved and the Creditors' Committees members, in their capacity as such, shall be deemed released of all their duties, responsibilities, and obligations in connection with the Chapter 11 Case or the Plan and its

58

implementation, and the retention or employment of the Creditors' Committee's attorneys, accountants, professionals, and other agents shall terminate, except with respect to (i) all Professional Fee Claims and (ii) any appeals of the Confirmation Order.

9. <u>Chapter 11 Trustee</u>

On the Effective Date, the Chapter 11 Trustee, in his capacity as such, shall be deemed released of all of his duties, responsibilities, and obligations in connection with the Chapter 11 Case or the Plan and its implementation, and the retention or employment of the Chapter 11 Trustee's attorneys, accountants, professionals, and other agents shall terminate, except with respect to (i) all Professional Fee Claims and (ii) any appeals of the Confirmation Order.

10. <u>Cancellation of Existing Securities and Agreements</u>

Except as provided in the Plan or in the Confirmation Order, any securities or other documents evidencing or giving rise to Claims and Interests in the Debtor shall be canceled.

11. <u>Treatment of Executory Contracts and Unexpired Leases</u>

a. *Assumption/Rejection of Executory Contracts and Unexpired Leases*

The Exhibits to the Plan contain a list of Assumed Contracts and a list of Rejected Contracts. The Plan Sponsor reserves the right to amend the Assumed Contract List and Rejected Contract List at any time prior to the Confirmation Hearing. The Plan provides that all Executory Contracts and Leases will be assumed or rejected, as the case may be, as set forth on such lists. Unless dealt with by separate motion, any Executory Contract or Unexpired Lease not listed on either the Assumed Contract List or the Rejected Contract List will be deemed rejected. Each non-debtor party to an Assumed Contract or Rejected Contract shall receive at least twenty–one days' notice of the deadline to object to assumption or rejection, as the case may be, of the identified Executory Contract or Unexpired Lease, which date will be the deadline set by the Bankruptcy Court to object to confirmation of the Plan (the "**Executory Contract Objection Deadline**"). If the Assumed Contract List or Rejected Contract List is modified less than twenty-one days prior to the Executory Contract Objection Deadline, the affected party will be provided at least twenty-one days' notice of the time to object to assumption or rejection of the identified Assumed Contract or Rejected Contract.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute findings by the Bankruptcy Court that (i) the Reorganized Debtor has properly provided for adequate assurance of payment of the cure of any defaults that might have existed consistent with the requirements of section 365(b)(1) of the Bankruptcy Code, (ii) each assumption (or rejection, as the case may be) is in the best interest of the Debtor and its Estate and that each Assumed Contract is assumed as of the Effective Date and each Rejected Contract rejected as of the Effective Date or such other date identified in the Rejected Contract List, and (iii) the requirements for assumption, or rejection, as the case may be, of any Executory Contract or Unexpired Lease to be assumed or rejected, as the case may be, have been satisfied. No

provision of any agreement or other document that permits a person to terminate or modify an agreement or to otherwise modify the rights of the Debtor based on the filing of the Chapter 11 Case or the financial condition of the Debtor shall be enforceable.

b. *Rejection Damages Claim Deadline*

Unless otherwise provided by an order of the Bankruptcy Court, any asserted Claims arising from the rejection of an Executory Contract or Unexpired Lease must be filed by Holders of such Claims with the Bankruptcy Court and served on the parties entitled to notice under this Plan no later than sixty (60) days after the later of (1) the Effective Date or (2) the effective date of such rejection, subject to the Trustee's and Reorganized Debtor's right to object thereto. In the event of such objection, the Trustee shall not be obligated to make any distribution in respect of such Claim until such dispute is resolved by Final Order of the Bankruptcy Court or the agreement of the parties.

c. *Cure Amounts*

Any monetary amounts by which any Executory Contract and Unexpired Lease to be assumed under the Plan is in default shall be satisfied, under Section 365(b)(l) of the Bankruptcy Code, by Cure. If the Assumed Contract List indicates a specific Cure amount for a contract or lease, the payment of the amount so specified shall be conclusively deemed to constitute Cure with respect to that contract or lease, and no other payment or performance on account of a prepetition default thereunder shall be required. If the amount so specified is zero, no payment shall be required. Notwithstanding the foregoing, if the other party to a contract or lease on the Assumed Contract List files, no later than the Executory Contract Objection Deadline, an objection disputing the Cure amount so specified with respect to its contract or lease, or otherwise raising an objection as to (i) the nature or amount of any Cure, (ii) the ability of the Reorganized Debtor to provide "adequate assurance of future performance" (within the meaning of Section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (iii) any other matter relating to assumption, Cure shall occur following the entry of a Final Order by the Bankruptcy Court resolving the dispute and approving the assumption; if an objection to Cure is sustained by the Bankruptcy Court, the Reorganized Debtor, in its sole option, may elect to reject such executory contract or unexpired lease in lieu of assuming it.

d. *Compensation and Benefit Programs*

All of the Debtor's existing employee Benefit Plans (other than related to any rejected employment contracts) will be deemed to be assumed under the Plan, subject to the terms and conditions of such Benefit Plans, including without limitation, the Debtor's and the Reorganized Debtor's rights of termination and amendment thereunder.

e. *Employment Contracts*

To the extent not previously rejected by Final Order of the Bankruptcy Court, the employment agreement of Brijinder Gupta dated June 2, 2015 will be rejected as of the Effective Date. The Debtor has not identified any other employment agreements. To the extent any party asserts that it has an employment agreement with the Debtor, whether or not in writing, such employment agreement shall be deemed rejected as of the Effective Date. For avoidance of

doubt, the foregoing sentence does not apply to any collective bargaining agreement of the Debtor, which agreements are Assumed Contracts.

f. *Indemnification*

The Debtor's obligation to indemnify any former director, officer, or member under its operating agreement, employee indemnification policy, or any other agreement shall be deemed rejected as of the Effective Date.

12. Liquidation Trust

On the Effective Date, the Trust Agreement attached as Exhibit C to the Plan will become effective and the Trust Property will be transferred to the Trust. The Trust Property includes the proceeds of Trust Causes of Action against Dr. Yatinder Singhal, Dr. Anuj Mittal, Dr. Michael Short, Dr. Brijinder Gupta, The Law Offices of Melvin M. Raznick, and Butzel, Long PC described in Article V.C. and any other Trust Causes of Action set forth on Exhibit G of the Plan to be contained in the Plan Supplement. As set forth in more detail in Article IV.A.2.h, Trust Property also includes the Trust Guaranteed Cash Payment whereby the Reorganized Debtor will fund up to $1,600,000 into the Trust to the extent that litigation proceeds have not resulted in aggregate recoveries of $1,600,000 over a five year period. Basil T. Simon, if he accepts such position, will be appointed the initial Liquidating Trust Trustee of the Trust.

13. Distributions Relating to Allowed Insured Claims

If any Claim otherwise payable under the Plan is covered by an insurance policy held by the Debtor or Reorganized Debtor, the Claim may be satisfied, in whole or in part, with the proceeds of the policy, if any.

# V. LIQUIDATION ANALYSIS

A. **Best Interest Test/Liquidation Analysis**

Even if a plan is accepted by each Class of Holders of Claims and Interests, the Bankruptcy Code requires a bankruptcy court to determine that the plan is in the "best interest" of any holder of a Claim or Interests whose Class is impaired by the plan and who has not accepted the plan. The "best interest" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a bankruptcy court to find either that (i) all Holders of Claims or Interests in an impaired class have accepted the plan or (ii) the plan will provide a Holder who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to members of each impaired class of holders of unsecured claims and interests if the debtor were liquidated under chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from the debtor's unencumbered assets if its chapter 11 case were converted to a chapter 7 case under

61

the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtor's assets by a chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by the costs of liquidation under chapter 7 of the Bankruptcy Code, including the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, additional administrative claims and other wind-down expenses. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of equity interests. The liquidation also would prompt the rejection of most (if not all) of the Debtor's executory contracts and unexpired leases and thereby create a significantly higher number of unsecured claims.

Once the court ascertains the recoveries in liquidation of secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation. If such probable distribution has a value that is not greater than the distributions to be received by such creditors and equity security holders under the plan, then the plan meets the best interest test.

**B.    Preparation of Liquidation Analysis**

Attached as Schedule 1 hereto is a Liquidation Analysis of the Debtor. The Liquidation Analysis was prepared by the Debtor's financial advisor for use by any party-in-interest to develop and propose a plan of reorganization for the Debtor. The assumptions supporting the Liquidation Analysis are set forth in the notes included with the Liquidation Analysis.

The Plan Sponsor believes that any liquidation analysis is of necessity somewhat speculative. Notwithstanding the difficulties in quantifying recoveries to creditors with precision, the Plan Sponsor believes that the Liquidation Analysis prepared by the Debtor's financial advisor is reasonable and the Plan meets the "best interest" test of section 1129(a)(7) of the Bankruptcy Code. The Plan Sponsor believes that the members of each impaired class will receive at least as much under the Plan as they would in a liquidation in a hypothetical chapter 7 case. Creditors will receive a better recovery through the distributions contemplated by the Plan because the continued operation of the Reorganized Debtor as a going concern rather than a forced liquidation of the Debtor will allow the realization of more value for the Debtor's assets. Specifically, the Plan Sponsor believes a conversion to chapter 7 would cause the State of the Michigan to immediately implement an existing plan to relocate all in-patients to alternative hospital facilities, and could cause a precipitous decline in the value of the Debtor's assets because certain assets such as the Debtor's licenses, certificate of need and residency program could not be sold as part of the forced liquidation, and, therefore have no value in a liquidation. Additionally, conversion to a chapter 7 would create additional costs to the estate. Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, and potential litigation costs. The liquidation itself may trigger certain priority payments that otherwise would be due in the ordinary course of business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general

62

unsecured claims or to make any distribution in respect of equity interests. All of these factors lead to the conclusion that recoveries under the Plan would be at least as much, and in many cases significantly greater, than the recoveries available in a chapter 7 liquidation.

### C. Potential Causes of Action

The Debtor's SOFAs indicated that of the existing board members, Dr. Yatinder Singhal, Dr. Anuj Mittal, and Dr. Michael Short received the repayment of loans aggregating over $550,000 during the one year period prior to Petition Date that are potentially avoidable under section 547 of the Bankruptcy Code. The Creditors' Committee is also investigating claims of insider dealings and other alleged wrongdoings of the existing board members. The Creditors' Committee is further investigating whether the employment agreement between the Debtor and Dr. Brijinder Gupta provided any benefit to the Debtor. Under the Plan, all potential causes of action against Dr. Yatinder Singhal, Dr. Anuj Mittal, Dr. Michael Short and Dr. Brijinder Gupta shall constitute Trust Property and will be pursued at the discretion of the Liquidating Trust Trustee. Trust Property will also include Avoidance Actions against Butzel, Long and the Law Offices of Melvin M. Raznick for potential preferential payments received within the 90 day period prior to the Petition Date as identified in the Debtor's Statement of Financial Affairs and any other causes of action against these entities. The Creditors' Committee is also investigating other potential Estate Causes of Action, including, without limitation regarding payments of loans and interest to insiders during the preference period and potential fraudulent transfer actions related to the sale of practice groups and other assets of the Debtor prior to the Petition Date. Based on the results of this investigation, the Creditors' Committee may request that addition Causes of Action be deemed Trust Property. The Plan Sponsor will consider such requests, but is not obligated to expand the list of Trust Causes of Action. Any additional Trust Causes of Action will be identified in Exhibit G to the Plan contained in the Plan Supplement.

Dr. Yatinder Singhal, Dr. Anuj Mittal, Dr. Michael Short, Dr. Brijinder Gupta, the Law Offices of Melvin M. Raznick and Butzel, Long deny any wrongdoing or liability.

It is difficult to ascertain with certainty the ultimate cost of or the ultimate litigation recoveries to the Trust, if any. However, based on a preliminary analysis of Trust Causes of Action that the Plan Sponsor has been able to conduct to date, the Plan Sponsor estimates that the likely range of net recoveries will be between $500,000 and $1,600,000. Net recoveries could be higher, especially if additional Trust Causes of Action are identified and included. Litigation recoveries could also be lower, but cash recoveries to the Trust will not be less than $1,600,000 because the Plan is structured to include the Trust Guaranteed Cash Payment whereby the Reorganized Debtor will fund up to $1,600,000 into the Trust to the extent that litigation proceeds have not resulted in aggregate recoveries of $1,600,000 over a five year period.

All other causes of action shall be revested in the Reorganized Debtor.

### D. Codebtors

The Schedules do not identify any codebtors, and the Plan Sponsor is not aware of any.

## VI.    DETAILS REGARDING IMPLEMENTATION OF PLAN

### A.    Summaries of Financial Information

#### 1.    Prepetition

The Debtor stated that it is in severe financial distress, and that for the year ending December 31, 2013, the Debtor had gross revenue of $29,268,000.00 and a net loss of $8,900,000.00 and that these losses continued through and after calendar year 2014. The Plan Sponsor does not have additional detail regarding the Debtor's prepetition financial condition, but the Debtor has acknowledged that it has struggled from its formation to attract or retain the kind of medical practices necessary to fill the hospital's bed count.

#### 2.    Postpetition

The Debtor has not filed monthly operating reports, but on a cash flow basis the Debtor has continued to lose money. A summary of the Debtor's cash flow during the pendency of the Chapter 11 Case, which was prepared by the Debtor's financial advisor, is attached hereto as Schedule 2.

#### 3.    Financial Projections

To confirm the Plan, the Bankruptcy Court must find that confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtor. This requirement is imposed by section 1129(a)(1) of the Bankruptcy Code and is referred to as the "feasibility" requirement. The Plan Sponsor believes that the Reorganized Debtor will be able to timely perform all obligations described in the Plan, and, therefore, that the Plan is feasible.

To demonstrate the feasibility of the Plan, the Plan Sponsor has prepared financial Projections for the first five years after the Effective Date, which are set forth in Schedule 3. These Projections indicate that the Reorganized Debtor should have sufficient liquidity to pay and service its Plan obligations and to fund its operations. Initial liquidity will be provided by the equity investment and exit financing provided by the Plan Sponsor until the Reorganized Debtor's operational restructuring is completed. At the request of the Plan Sponsor, the Debtor's financial advisor reviewed the Projections, and believes that they are reasonable and consistent with the current financial performance of the Debtor and the plans for capital improvements, rebranding, marketing, and business operations. Accordingly, the Plan Sponsor believes that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code. The Plan Sponsor cautions that no representations can be made as to the accuracy of the Projections or as to the Reorganized Debtor's ability to achieve the projected results. Many of the assumptions upon which the Projections are based are subject to uncertainties outside the control of Reorganized Debtor. Some assumptions inevitably will not materialize, and events and circumstances occurring after the date on which the projections were prepared may be different from those assumed or may be unanticipated and may adversely affect the Reorganized Debtor's financial results. Therefore, the actual results may vary from the projected results, and the variations may be material and adverse.

The Projections were not prepared with a view toward compliance with the guidelines established by the American Institute of Certified Public Accountants, the practices recognized to be in accordance with generally accepted accounting principles, or the rules and regulations of the U.S. Securities and Exchange Commission regarding projections. Furthermore, the Projections have not been audited by the Debtor's or Plan Sponsor's independent accountants. Although presented with numerical specificity, the Projections are based upon a variety of assumptions, some of which in the past have not been achieved and which may not be realized in the future, and are subject to significant business, economic and competitive uncertainties and contingencies, many of which are beyond the control of the Plan Sponsor. Consequently, the Projections should not be regarded as a representation or warranty by the Plan Sponsor, or any other person, that the Projections will be realized. Actual results may vary materially and adversely from those presented in the Projections.

**B.      Principals and Management of Reorganized Debtor**

1.      **Board of Directors**

The Reorganized Debtor will have a three member board of directors. On the Effective Date, the initial directors will be Sanyam Sharma, Priyam Sharma, and Sanjay Sharma. Without prejudice to the ability of the Reorganized Debtor to establish board fees at a later date, the directors will initially serve without compensation or fringe benefits from the Reorganized Debtor. Any compensation or entitlement to fringe benefits to the new board will be set by the members of the Reorganized Debtor under the Amended and Restated Operating Agreement. It is not anticipated that any compensation will be paid to the new board in the foreseeable future.

Dr. Sanjay Sharma, PhD has more than 25 years of development experience in several technologies and platforms. He also holds extensive experience in designing and developing software products in various industries. He has conducted briefings, coordinated schedules, resources, and milestones to multiple clients and functional users in the healthcare space. Dr. Sharma serves as the Infrahealth's HIPAA compliance expert, and is the President of St. Martinus University, Faculty of Medicine. He holds a Ph.D. in Computer Science from the University of Illinois at Urbana-Champaign, IL.

With a Master's degree in Computer Science from Florida State University, Tallahassee, FL, Ms. Priyam Sharma has been involved in the medical information, administration, and technology field for most of her career. In the first decade of the 21st century, Ms. Sharma took a small basement-run operation and made it into a multinational corporation spanning over 3 continents with over 500 employees and various patents that are ubiquitous today. Employing the same approach, which incorporates emphases on quality service and innovation, Ms. Sharma continues to bring new advancements, now in the field of medical education.

Sanyam Sharma is the Managing Director and primary principal of Sant Partners LLC. He also currently works with Infrahealth, Inc. and has operated in multiple functions since 2005 at the company. His experience includes product management, data analytics, and strategic planning for technological, healthcare administration, and financial services firms. At PwC, Mr. Sharma worked in the M&A Advisory group, an interdisciplinary team of deals professionals

who add value to clients by delivering process and subject-matter expertise to achieve tactical due diligence, integration, separation, and other deal consulting services across the full spectrum of buy-side and sell-side transactions. Prior to joining PwC, he implemented a dictation-to-EMR process that leverages human capabilities for seamless integration. He holds Bachelors of Business Administration, Science, and Arts from The University of Texas at Austin.

## 2. **Management**

The Plan provides that the existing management will continue on and after the Effective Date, subject to removal by the new board of directors. John Ponczocha will continue in his position of Chief Executive Officer but at a reduced salary of $175,000 per annum. Mr. Brian Hardin will be designated as Chief Financial Officer at his current compensation rate of $160 per hour for services rendered to the Reorganized Debtor. Dr. Sanjay Sharma will also continue to serve as the Reorganized Debtor's Chief Information Officer at no cost to the Reorganized Debtor. Officers of the Reorganized Debtor will also be able to participate in the Reorganized Debtor's Benefit Plans

John Ponczocha is a results-driven executive with over thirty years' experience directing positive organizational change. He has held his current position as President and Chief Executive Officer of the Debtor since July 8, 2015. Prior to holding his current position, he was Executive Director of Operations of the Debtor from October 1, 2012 to July 2015. Mr. Ponzocha spent most of his career at what is now Trinity Health Systems where he acquired a broad-based knowledge of hospital operations in clinical and support service departments, including a Supply Chain Professional (CSCP) certification. He has been a project manager for more than $20 million in renovation and construction projects and was featured twice in national industry magazines for his reengineering roles in "Great Comebacks" hospital awards. John has extensive knowledge and hand-on experience with Joint Commission Standards, CMS Conditions of Participation, and Regulatory requirements. Mr. Ponczocha holds a bachelor's degree from Central Michigan University.

Brian Hardin is a Certified Public Accountant based in Austin, TX. Mr. Hardin has over 30 years of accounting experience including income tax planning, preparation and compliance, for individuals, corporations, partnerships, trusts and non-profits 501(c)(3) and 501(c)(4), IRS and state audit representation, financial statement compilations, personal financial planning and general business consulting. He has a CTA from the University of Witwatersrand, Johannesburg, South Africa and BBA with Honors from the University of Texas at Austin.

## C. **Certain United States Federal Income Tax Consequences of the Plan**

Set forth below is a very general discussion of certain U.S. federal income tax consequences of the Plan to certain Holders of Claims and Interests that are Impaired under the Plan. Unless otherwise noted, the following summary does not discuss the U.S. federal income tax consequences to Holders whose Claims are entitled to payment in full in cash or are otherwise Unimpaired under the Plan, or with respect to Claims of nontaxable entities (such as a governmental entity, agency, instrumentality or authority).

66

This discussion is based on current provisions of the Internal Revenue Code of 1986, as amended (the "IRC"), final, temporary or proposed Treasury regulations promulgated thereunder, judicial opinions, published positions of the Internal Revenue Service (the "Service") and all other applicable authorities, all of which are subject to change (possibly with retroactive effect). There can be no assurance that the Service will not take a contrary view. No ruling from the Service has been or will be sought nor will any counsel provide a legal opinion as to any of the expected U.S. federal income tax consequences set forth below.

Legislative, judicial or administrative changes or interpretations may be forthcoming that could alter or modify the statements and conclusions set forth herein. Any such changes may or may not be retroactive and could affect the tax consequences to the Holders, the Debtor and the Reorganized Debtor. It cannot be predicted whether any tax legislation will be enacted or, if enacted, whether any tax law changes contained therein would affect the tax consequences to the Debtor, Reorganized Debtor, or Holders.

The following discussion assumes that a Holder of an Allowed Claim holds such Claim as a "capital asset" within the meaning of IRC section 1221 (generally, property held for investment). It also assumes that Debtors' debt obligations constitute indebtedness for U.S. federal income tax purposes.

This discussion is for general information only and addresses only certain U.S. federal income tax consequences and does not address all of the tax consequences that may be relevant to a Holder, such as the potential application of the alternative minimum tax or any state, local or foreign tax. This discussion does not purport to address all U.S. federal income tax consequences or any facts or limitations applicable to any particular Holder in light of that Holder's particular circumstances or to any Holder subject to special rules under the U.S. federal income tax laws, such as financial institutions, banks, thrifts, mutual funds, insurance companies, brokers, dealers or traders in securities, commodities or currencies, tax-qualified retirement plans, partnerships and other pass-through entities, investors in such pass-through entities, small business investment companies, regulated investment companies, real estate investment trusts, foreign corporations, foreign trusts, foreign estates, Holders who are not citizens or residents of the United States, Holders holding Claims as part of a hedge, straddle or other risk reduction strategy or as part of a conversion transaction or other integrated investment, Holders who are citizens or residents of the United States with a "functional currency" other than the U.S. dollar, Holders that acquired Interests in connection with the performance of services, or tax-exempt organizations. All Holders should consult their tax advisors regarding the tax consequences to them of the Plan.

The potential U.S. federal income tax consequences with respect to the Plan to a Holder of a Claim will depend, among other things, upon the origin of the Holder's Claim, whether or not the Holder holds the Claim as a capital asset, whether the Holder reports income using the accrual or cash method (or other method) of accounting, the manner in which the Holder acquired the Claim and its timing in acquiring the Claim, whether the Claim constitutes a "security" for U.S. federal income tax purposes, whether the Holder has taken a bad debt deduction or worthless security deduction, if applicable, with respect to such Claim (or portion of its Claim) in the current year or any prior year, the length of time the Claim has been held,

whether the Claim was acquired at a discount, whether the Holder has previously included in its taxable income accrued but unpaid interest with respect to the Claim, whether the Holder's Claim is modified such that it constitutes a "significant modification" or "retirement of debt" for U.S. federal income tax purposes, and whether the Claim is an installment obligation for U.S. federal income tax purposes.

**EACH HOLDER SHOULD CONSULT HIS, HER OR ITS OWN TAX ADVISER WITH RESPECT TO THE PARTICULAR TAX CONSEQUENCES TO IT UNDER THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF FEDERAL, STATE, LOCAL AND FOREIGN TAX LAWS.**

### U.S. Federal Income Tax Consequences to the Debtors

#### *Gain or Loss on Consummation of the Plan*

The Debtor is a limited liability company treated as a partnership for U.S. federal income tax purposes. The Debtor may recognize gain or loss on its assets under the Plan. If gain or loss is recognized, it would then flow up to the Debtor's members under the partnership tax rules. The U.S. federal income tax consequences of the Plan to the Debtor are uncertain.

#### *Cancellation of Indebtedness*

The Debtor generally will realize cancellation of debt income ("CODI") with respect to the exchange or satisfaction of certain Claims against the Debtor for Cash, other property (including, without limitation, the Crittenton Note), and Trust Beneficial Interests. The amount of such CODI will depend upon a number of factors. Under IRC section 108, CODI is not recognized if the CODI occurs in a case brought under the Bankruptcy Code, provided the taxpayer is under the jurisdiction of a court in such case and the cancellation of indebtedness is granted by the court or is pursuant to the plan approved by the court (the "Bankruptcy Exception"). Generally, under IRC section 108(b), any CODI excluded from gross income under the Bankruptcy Exception must be applied against and reduce certain tax attributes of the taxpayer. Unless the taxpayer elects to have such reduction apply first against the basis of its depreciable property, such reduction is first applied against net operating losses ("NOLs") of the taxpayer (including NOLS from the taxable year of discharge and any NOL carryover to such taxable year), and then to certain tax credits, capital loss and capital loss carryovers, and tax basis. Under IRC section 108(d)(6), when a partnership realizes CODI, the partners of such partnership are treated as receiving their allocable share of such CODI and the Bankruptcy Exception (and related attribute reduction) is applied at the partner level rather than the partnership level. Accordingly, the partners of the Debtor will be treated as receiving their allocable share of CODI realized by the Debtor. The Debtor's partners include another partnership, so the potential applicability of the Bankruptcy Exception would be tested under Section 108(d)(6) at the level of the partners of such partnership.

### U.S. Federal Income Tax Consequences to Holders

The following discussion applies to a Holder who (or that) is (i) an individual that is a citizen or resident of the United States, (ii) a corporation or other entity taxable as a corporation

created or organized under the laws of the United States or a political subdivision thereof, (iii) an estate, the income of which is subject to U.S. federal income tax regardless of its source, or (iv) a trust, if a U.S. court can exercise primary supervision over the administration of the trust and one or more U.S. persons can control all substantial trust decisions or, if the trust was in existence on August 20, 1996, and it has elected to continue to be treated as a U.S. person. As noted above, this discussion is further limited to Holders of Impaired Claims that are not subject to special U.S. federal income tax rules. Accordingly, the discussion below does not address any U.S. federal income tax consequences to certain Holders of Claims.

*Class 7—General Unsecured Claims.* Under the Plan, each Holder of an Allowed Claim in Class 7 (General Unsecured Claims) shall receive in full satisfaction of such Claim its pro rata share of the Trust Beneficial Interests. The U.S. federal income tax consequences of the Plan to a Holder of an Allowed Claim in Class 7 will depend upon the factors mentioned above, including in particular the nature of the Claim held by such Holder. Holders of such Claims should therefore consult their tax advisors as to the particular tax consequences resulting to them as a consequence of the Plan.

### Class 8 Claims—Old Equity Interests

Under the Plan, each Holder of Old Equity Interests in Class 8 shall not receive or retain any interest or property under the Plan and all such Old Equity Interests will be cancelled. The U.S. federal income tax consequences of the Plan to a Holder of an Equity Interest in Class 8 are uncertain. Holders of such Old Equity Interests should therefore consult their tax advisors as to the tax consequences resulting to them as a consequence of the Plan.

### Accrued but Unpaid Interest

A portion of the consideration received by a Holder of a Claim may be attributable to accrued but unpaid interest on such Claim. Such amount should be taxable to that Holder as interest income if such accrued but unpaid interest has not been previously included in the Holder's gross income for U.S. federal income tax purposes.

If the fair market value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued but unpaid interest is unclear. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a Chapter 11 plan of reorganization is binding for U.S. federal income tax purposes. The Service could take the position, however, that the consideration received by the Holder should be allocated in some way other than as provided in the Plan. **EACH HOLDER SHOULD CONSULT ITS OWN TAX ADVISOR REGARDING THE DETERMINATION OF THE AMOUNT OF CONSIDERATION RECEIVED UNDER THE PLAN THAT IS ATTRIBUTABLE TO INTEREST.**

### Information Reporting and Backup Withholding

In general, information reporting requirements may apply to distributions or payments under the Plan. Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding (currently at a rate of 28%) with respect to distributions or

payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; *provided*, *however*, that the required information is timely provided to the Service.

### *U.S. Holders of Equity of the Reorganized Debtor*

The U.S. federal income taxation of U.S. Holders of equity in the Reorganized Debtor will depend upon the entity classification of the Reorganized Debtor for U.S. federal income tax purposes.

**NO REPRESENTATIONS ARE MADE REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE PLAN TO ANY HOLDER OF A CLAIM OR INTEREST. EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT A TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE PLAN.**

## VII.   LEGAL REQUIREMENTS

### A.   Voting Procedures

Under the Bankruptcy Code, the only classes that are entitled to vote to accept or reject a Plan are classes of claims, or equity interest, that are impaired under the Plan. Accordingly, classes of claims or interests that are not impaired are <u>not</u> entitled to vote on the Plan.

Creditors that hold claims in more than one impaired class are entitled to vote separately in each class. Such a creditor will receive a separate ballot for all of its claims in each class (in accordance with the records of the Clerk of the Court) and should complete and sign each ballot separately. A creditor who asserts a claim in more than one class and who has not been provided with sufficient ballots may photocopy the ballot received and file multiple ballots.

Votes on the Plan will be counted only with respect to claims:

(1)     that are listed on the Debtor's Schedules of Assets and Liabilities <u>other</u> than as disputed, contingent or unliquidated; or

(2)     for which a proof of claim was filed on or before the bar date set by the Court for the filing of proofs of claim (except for certain claims expressly excluded from that bar date or which are allowed by Court order).

However, any vote by a holder of a claim will not be counted if such claim has been disallowed or is the subject of an unresolved objection, absent an order of the Court allowing such claim for voting purposes pursuant to 11 U.S.C. § 502 and Bankruptcy Rule 3018.

Voting on the Plan by each holder of a claim or interest in an impaired class is important. After carefully reviewing the Plan and disclosure statement, each holder of such a claim or interest should vote on the enclosed ballot either to accept or to reject the Plan, and then return the ballot by mail to the Debtor's attorney by the deadline previously established by the Court.

Any ballot that does not appropriately indicate acceptance or rejection of the Plan will not be counted.

A ballot that is not received by the deadline will not be counted.

If a ballot is damaged, lost, or missing, a replacement ballot may be obtained by sending a written request to the Debtor's attorney.

**B.      Acceptance**

The Bankruptcy Code defines acceptance of a Plan by an impaired class of claims as acceptance by the holders of at least two-thirds in dollar amount, and more than one-half in number, of the claims of that class which actually cast ballots.  The Bankruptcy Code defines acceptance of a Plan by an impaired class of equity interests as acceptance by holders of at least two-thirds in number of the equity interests of that class that actually cast ballots.  If no creditor or interest holder in an impaired class votes, then that class has not accepted the Plan.

**C.      Confirmation**

11 U.S.C. § 1129(a) establishes conditions for the confirmation of a Plan.  These conditions are too numerous and detailed to be fully explained here.  Parties are encouraged to seek independent legal counsel to answer any questions concerning the Chapter 11 process.

Among the several conditions for confirmation of a Plan under 11 U.S.C. § 1129(a) are these:

(1)      Each class of impaired creditors and interests must accept the Plan, as described in Section IV, above.

(2)      Either each holder of a claim or interest in a class must accept the Plan, or the Plan must provide at least as much value as would be received upon liquidation under Chapter 7 of the Bankruptcy Code.

**D.      Modification**

The Debtor reserves the right to modify or withdraw the Plan at any time before confirmation.

19147500.12

E.       **Effect of Modification**

If the Plan is confirmed by the Court:

(1)      Its terms are binding on the Debtor, all creditors, shareholders and other parties in interest, regardless of whether they have accepted the Plan;

(2)      Except as provided in the Plan:

(a)      In the case of a corporation that is <u>reorganizing and continuing business</u>:

(i)      All claims and interests will be discharged;

(ii)      Creditors and shareholders will be prohibited from asserting their claims against or interest in the Debtor or its assets.


SANT PARTNERS, LLC


By: /s/ Sanyam Sharma
Name:  Sanyam Sharma
Title:  Managing Director


HONIGMAN MILLER SCHWARTZ AND COHN LLP
Counsel for Sant Partners, LLC


By:   /s/ Todd Sable
         E. Todd Sable (P54956)
         Glenn S. Walter (P79853)
2290 First National Building
660 Woodward Avenue
Detroit, MI  48226
Telephone:  (313) 465-7548
Facsimile:  (313) 465-7549
Email:  tsable@honigman.com

Dated:  January 11, 2016

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

In Re:

OAKLAND PHYSICIANS MEDICAL            Case No. 15-51011-wsd
CENTER, L.L.C. d/b/a DOCTORS'          Chapter 11
HOSPITAL OF MICHIGAN, a Michigan
limited liability company,                   Hon. Walter Shapero

                   Debtor.
_____/

## CERTIFICATE OF SERVICE

       I hereby certify that on January 11, 2016, I caused the *Third Amended Combined*

*Disclosure Statement and Plan of Reorganization of Oakland Physicians Medical Center, L.L.C.*

*Proposed by Sant Partners, LLC* to be electronically filed with the Clerk of the Court using the

ECF system, which will send notification of such filing to all ECF participants registered in this

matter.

                       HONIGMAN MILLER SCHWARTZ AND COHN LLP
                       Counsel for Sant Partners, LLC

                       By:    /s/ E. Todd Sable
                            E. Todd Sable (P54956)
                            Glenn S. Walter (P79853)
                       2290 First National Building
                       660 Woodward Avenue
                       Detroit, MI 48226
                       Telephone: (313) 465-7548
                       Facsimile: (313) 465-7549
                       Email: tsable@honigman.com

Dated: January 11, 2016

19147500.12