UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION - DETROIT

In re:

OAKLAND PHYSICIANS MEDICAL                 Case No. 15-51011-wsd
CENTER, L.L.C. d/b/a DOCTORS'               Chapter 11
HOSPITAL OF MICHIGAN,                        Hon. Walter Shapero

     Debtor.

_____/

## OPINION GRANTING CONFIRMATION OF THE SANT PARTNERS, LLC PLAN AND DENYING CONFIRMATION OF THE SAVE THE HOSPITAL GROUP PLAN

Sant Partners, LLC ("Sant") and the Save the Hospital Group ("SHG") each filed separate competing Combined Plan and Disclosure Statements. A confirmation hearing was held relative to both plans. For the following reasons, the Court grants confirmation of the Sant plan and denies confirmation of the SHG plan.

A. Background

Oakland Physicians Medical Center, LLC d/b/a/ Doctors' Hospital of Michigan ("Debtor"), a Michigan limited liability company, is a physicians-owned hospital in Pontiac, Michigan. It was formed in November 2008, when a group of physicians purchased the assets of Pontiac General Hospital and Medical Center in a § 363 sale incident to that entity's Chapter 11 case in this Court (08-60731, Bankr. E.D. Mich.). Debtor currently has a three-member board of directors consisting of Dr. Yatinder Singhal, Dr. Anuj Mittal, and Dr. Michael Short. Over time and for various reasons, including claimed mismanagement, it came to pass that Debtor's

1

facilities and medical services became substantially underutilized and non-competitive, its finances became severely distressed, and its books and records in disorder. For example, for the calendar year 2013, Debtor had gross revenues of just over $29 million and a net loss of just under $9 million. These accumulated circumstances occasioned Debtor's filing this Chapter 11 petition on July 22, 2015. Early on, Sant became involved with the Debtor as a debtor-in-possession (DIP) lender and consultant, and upon Sant's motion, the Court approved the appointment of a Chapter 11 trustee. A Patient Care Ombudsman was also appointed and she, together with the Chapter 11 trustee and others, indicated concerns with the ongoing viability of the Debtor to the point that the Court approved somewhat accelerated deadlines, proceedings for the filing of plan and disclosure statements, appropriate preliminary hearings incident thereto, and confirmation hearings.

The sequence of events leading to the confirmation hearings, relevant to this opinion was as follows:

1. On November 17, 2015 Sant and SHG filed their respective Second Amended Plan and Disclosure Statements, and Allied Global Consulting filed its Corrected Amended Plan and Disclosure Statement. Global Health Organization Consulting, Inc. also filed a plan and disclosure statement, but thereafter withdrew it.

2. On November 18, 2015, the Court (as is provided for in applicable rules and procedures) granted preliminary approval of three noted disclosure statements, thus permitting the plans to be sent out to creditors for voting, subject to later resolution of any objections to the adequacy of the disclosure statements.

2

3. The Court's November 18, 2015 procedures order provided for (a) the solicitation of votes on the various plans; and (b) incident to confirmation, that plan proponents should file a designation of potential witnesses at the confirmation hearing by December 3, 2015 and make available potential witnesses for deposition prior to December 11, 2015. SHG timely filed its witness list and Sant filed its list on December 16, 2015. Sant's list did not include Dr. Jawad Shah, who later testified on behalf of Sant at the confirmation hearing. The solicitation packages were mailed out on or about November 21, 2015, with a ballot return deadline of December 11, 2015. A report of the results of the balloting was filed by the balloting agent on December 15, 2015.

4. The Court held a final hearing on the adequacy of the Sant and SHG disclosure statements on December 17, 2015, and shortly thereafter orally advised the parties of its denial of all objections to such and the granting of final approval of such (with a written opinion to follow, which is being issued contemporaneously);

5. Various objections to confirmation of the Sant and SGH plans were filed at various times. At some point the Allied Global Consulting plan had been withdrawn from confirmation consideration. During the period up to and including the end of the confirmation hearings, negotiations were going on relative to resolving or dealing with the various objections to both the Sant and SHG plans, most, but not all of which, were in fact resolved by way of various proposed plan amendments and/or proposed plan confirmation orders.

6. Sant had circulated to creditors its Second Amended Combined Plan and Disclosure Statement, which had been filed on November 17, 2015. On December 15, 2015 Sant filed what it refers to as a "preliminary" Third Amended Combined Plan and Disclosure Statement and on

3

January 11, 2016, Sant filed a filed a "Third Amended Combined Plan and Disclosure Statement" that contained a change to a provision in the "preliminary" Third Amended version. It was essentially that plan Sant plan, together with the Second Amended Plan of SHG (both being thereafter amended from time to time deal with various objections) that were the subjects of the confirmation hearing.

7. The circulated Sant and SHG plans received the requisite votes to meet the confirmation threshold. As to the creditors' votes for plan preference, Sant received 55.6% of the number of votes, comprising 60.8% of the dollar amount, and SHG received 42.6% of the number of votes, comprising 39.1% of the dollar amount.[1] Sant's plan had both accepting and rejecting classes of creditors, including at least one impaired non-insider class (Class 3), and thus moved for confirmation pursuant to § 1129(b). SHG's plan had both accepting and rejecting classes of creditors, including at least one impaired non-insider class (Class 6), and thus also moved for confirmation pursuant to § 1129(b).

8. Confirmation hearings as to each plan were held on December 22-23, 2015 and a briefing schedule was established, following which final arguments on confirmation were heard on January 12, 2016.

## B. Relevant Legal Standards for Confirmation

Plan feasibility, required by § 1129(a)(11) was raised as an objection to both the Sant and the SHG plan. The feasibility requirements have been properly stated as follows:

---

[1] The remainder went to a plan filed by Allied Global Consulting, which was subsequently withdrawn.

4

As the bankruptcy court indicated, "[t]he purpose of the feasibility requirement of § 1129(a)(11) 'is to protect creditors against unrealistic plans that have little or no chance of success.' " *In re Shefa,* 524 B.R. at 741 (quoting *In re Adelphia Bus. Solutions, Inc.,* 341 B.R. 415, 421 (Bankr.S.D.N.Y.2003)). "[C]reditors should not be expected to be bound by the terms of plans entailing visionary schemes which promise creditors more than the debtor can possibly deliver." *In re Arts Dairy, LLC,* 432 B.R. 712, 716–17 (Bankr.N.D.Ohio 2010) (citing *In re Danny Thomas Props. II Ltd. P'ship,* 241 F.3d 959, 963 (8th Cir.2001)). Therefore, while "the proponent of a Chapter 11 plan need not show that success is guaranteed[,]" it must demonstrate that there is "a reasonable assurance of commercial viability," *id.* at 717, and "a 'reasonable probability' that the debtor will be able to make all of the payments to creditors according to the terms provided in the plan." *In re Waterford Hotel, Inc.* 497 B.R. 255, 263 (Bankr.E.D.Mich.2013) (quoting *Trenton Ridge Investors,* 461 B.R. at 478).

*In re Shefa, LLC*, 535 B.R. 165, 178 (E.D. Mich. 2015).

The requirement of § 1129(a)(3) that a plan be proposed in good faith and not by means forbidden by law has also been raised as an issue as to both plans. One Court has properly summarized these requirements as follows:

Neither the bankruptcy code nor the Sixth Circuit defines "good faith" for purposes of § 1129(a)(3). There are, however, guiding principles. Good faith under § 1129(a)(3) is "generally interpreted to mean that there exists a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *In re Waterford Hotel, Inc.,* 497 B.R. 255, 266 (Bankr.E.D.Mich.2013) (quoting *In re Trenton Ridge Investors, LLC,* 461 B.R. 440, 468 (Bankr.S.D.Ohio 2011)); *see also In re Dow Corning,* 244 B.R. 673, 675 (Bankr.E.D.Mich.1999).

***

Good faith also generally requires that the plan be proposed "with honesty and good intentions, and with a basis for expecting that a reorganization can be effected," and that the plan proponent deal with its creditors in a manner that is fundamentally fair. *In re Gregory Boat Co.,* 144 B.R. 361, 366 (Bankr.E.D.Mich.1992) (citations omitted).

In one sense, the inquiry under § 1129(a)(3) is limited; in another sense it is broad. The Court's focus must be on the plan itself. At the plan confirmation stage, "pre-petition behavior is largely irrelevant." *In re Dow Corning,* 244 B.R. at 675. However, when considering the plan, courts consider the "totality of the circumstances," and the court's own "common sense and judgment." *In re*

5

> *Okoreeh–Baah,* 836 F.2d 1030, 1033 (6th Cir.1988). It is thus an intensely fact-
> specific inquiry.

*In re City of Detroit*, 524 B.R. 147, 247-48 (Bankr. E.D. Mich. 2014).

## C.  The Sant Plan

As noted, on or around November 21, 2015, Sant circulated to creditors its Second Amended Combined Plan and Disclosure Statement (Dkt. 268). On December 15, 2015, Sant filed a "preliminary" Third Amended Combined Plan and Disclosure Statement (Dkt. 364) incorporating substantial changes. On January 11, 2016, Sant filed a "Third Amended Combined Plan and Disclosure Statement" (Dkt. 436) that changed a single immaterial provision from the "preliminary" Third Amended version. Neither of the latter two was formally circulated to creditors. The Sant plan involves using an affiliation with the Infrahealth Group of companies (which are associated with Sant's principals and others) to (a) identify cost-savings; (b) restructure administrative operations; (c) utilize the existing neurology practice of a Dr. Jawad Shah as a source of patients and medical services; and (d) in particular to synergize Sant's affiliation with St. Martinus University Faculty of Medicine. Sant also asserts that numerous physicians in various fields of practice have agreed to associate their practices with the Reorganized Debtor if Sant's plan is confirmed. The Sant plan generally provides for (1) the continuation of the Debtor as the Reorganized Debtor, being the existing ongoing operating limited liability company entity, but subject to an Amended and Restated Operating Agreement, resignation of the existing Board members and their replacement by specified others, and cancellation of existing membership interests; (2) issuance by Debtor of new membership interests in return for payments therefor, aggregating $1.5 million; (3) the cash necessary to

6

make initial and future payments required by the plan to be sourced from (a) the said issuance of new membership interests, (b) cash on hand, (c) Debtor's operations, and (d) borrowings by the Debtor pursuant to a new revolving credit facility for $8 million obtained by Dr. Shah for Sant's benefit; (4) dissolution of the Official Committee of Unsecured Creditors; (5) termination of the appointed Chapter 11 Trustee; (6) creation of a Liquidating Trust, to which will be transferred guaranteed cash payments to creditors plus any and all specified causes of action (including some against former directors or members, as well as others) to be pursued by the Trust for the benefit of the unsecured creditors – the initial trustee of the Trust being the individual who had been the appointed Chapter 11 Trustee, who would be subject to the supervision of the U.S. Trustee to the extent provided for in the Trust agreement. The proposed new four member Board of Directors consists of Sanyam Sharma, Priyam Sharma, and Sanjay Sharma (all of whose backgrounds are in the business and/or information technology aspects of healthcare), as well as the above referred-to Dr. Shah, who it is indicated will invest $375,000 in available personal funds on the effective date of the plan. As to Crittenton Hospital Medical Center ("Cittenton"), which has a secured claim and a graduate medical education affiliation agreement with Debtor, Sant proposes to (a) pay $100,000 on the effective date of the plan, and incident thereto, restate and reduce the outstanding balance of the secured loan to $650,000; and (b) as to the said affiliation agreement (which relates to resident physicians training with Debtor and Crittenton), to assume and modify such agreement. Sant also proposes to reinstate (i.e. assume) obligations to the Centers for Medicare & Medicaid Services relative to its approximately $6.7 million claim against the Debtor for overpayments and its right to recoup the same against the Debtor from future payments. The same is true with respect to the Michigan Department of Health and

7

Human Services for Medicaid overpayments and unpaid QAAP Taxes in the amounts of $325,000 and $1,584,000, respectively. As to general unsecured creditors, whose aggregate claims total approximately $13.2 million, what is contemplated is a *pro rata* recovery through the Liquidating Trust by applying the guaranteed amounts and/or the Trust's recovery on the indicated causes of action transferred to it. The causes of action are in the nature of avoidance of fraudulent transfers and preferences, and Sant estimates the likely range of net recoveries as between $500,000 and $1,600,000. The unsecured creditors will receive more than $1,600,000 to the extent net recoveries exceed the $1,600,000 guarantee.

Sant's proposed order confirming plan (Dkt. 437) effectuates its settlement of a number of objections to its plan, including those of the Oakland County Treasurer, the Michigan Department of Health and Human Services, and others. Except as to those dealt with in this opinion, the Court believes that all other objections to the confirmations of either or both of the Sant and SHG plans have previously been resolved by the parties in ways that have been indicated in filed pleadings or on the record.

### D.  SHG Objections to the Sant Plan

SHG filed various objections to Sant's plan. First, SHG argues that Debtor has a backlog of *unbilled* receivables totaling $25 million and that Sant, in its capacity as Debtor's consultant, failed to take actions to collect on those receivables, characterizing such as "a windfall" to Sant. The Court finds this objection without merit because of the following: (a) any successful plan proponent, including SHG, would gain the right to invoice for, and thereafter pursue collection of, such, and it would be in their best financial interests to do so; (b) the apparent disarray of the Debtor's books and records; (c) the required focus on just surviving during the confirmation

8

process; (d) the more important and relatively achievable priorities involved in pursuing and obtaining confirmation; and (e) the lack of any direct responsibility and possibly an inability on the part of Sant, or indeed any relative outsider, to be able to properly invoice for, let alone thereafter actually collect on, such unbilled receivables (and to do so within the time frame this case has of necessity proceeded).

Second, SHG argues that Sant has manufactured a false sense of urgency and used its DIP loan to "stampede the parties and the Court," pointing particularly to Sant's then decision to extend the maturity date of the DIP lending only as far out as January 15, 2016 (Dkt. 415), thereby unduly expediting the confirmation process to SHG's detriment. While there may be some small truth to SHG's assertion that Sant's role in the DIP lending procedures increased its leverage over the Debtor and had the effect of strengthening the likelihood of having its own plan confirmed, it can also be said that such also enabled the Debtor to survive to this stage, thereby enabling to some extent this vigorously contested confirmation proceeding.

Third, SHG analyzes the ballot results and argues that SHG's plan is actually preferred by creditors over Sant's plan if one (a) discounts instances where a single creditor holding multiple claims voted multiple times; (b) discounts the votes of "insider medical staff" because of their status as such; and (c) discounts the large claim of Crittenton simply because that vote gives Sant a majority over SHG. These arguments are meritless, primarily because all such parties are entitled to vote pursuant to the Bankruptcy Code and the procedures set by this Court and, in any event, such would not change the Court's conclusions.

E.  Objections of Dr. Short and Dr. Singhal to the Sant Plan

9

Dr. Short and Dr. Singhal (who objected to Sant's plan and are currently on the Debtor's Board of Directors) are the subjects of some of the noted causes of action to be pursued, and are the holders of large unsecured claims against Debtor. They offered non-specific support for the SHG plan, but primarily articulate the following objections to the Sant plan. They first argue that the oral testimony presented by Dr. Jawad Shah in favor of Sant's plan at the confirmation hearing (primarily relating to feasibility) should be disallowed because he was not on Sant's ultimately filed witness list, and thus creditors were deprived of the opportunity for discovery or to depose him, and, because his purported rebuttal testimony at the confirmation hearing went well beyond the permitted scope of rebuttal.

Generally, Dr. Shah testified that he will provide an initial capital contribution to the reorganized Debtor of $375,000 and that he had personally obtained from a third party investor a credit line of up to $8 million, and he would serve as the reorganized Debtor's Chief Medical Officer and will be on the Board of Directors. Dr. Shah was in fact effectively cross examined by counsel for Dr. Short and Dr. Singhal, SHG, and Global Health Organization Consulting, Inc., who did make points in doing so. The nature and extent of Dr. Shah's personal involvement as a part owner and what he could bring to the operation and success of the Reorganized Debtor and thus enhance the likelihood of its success going forward, was fully articulated in the December 11, 2015 filing of the Plan Co-Sponsor Agreement between he and Sant. That document is legitimately part of the overall record before the Court. (Additionally, on January 7, 2016, Sant filed a Notice of Filing of Plan Co-Sponsor Agreement stating that Dr. Surindar Jolly will co-sponsor the Sant plan and be elected Chief Marketing Officer.) While Sant's witness list may have been filed after the deadlines set by the Court's procedures order for parties to take

10

discovery or depose Dr. Shah, as noted, parties were notified of Dr. Shah's involvement in the Sant plan in the referred-to plan co-sponsor agreement in advance of the confirmation hearing. In this situation, nothing precluded Dr. Short and Dr. Singhal from seeking further information or an extension of discovery incident to Dr. Shah's role.

More importantly, in evaluating and disposing of this objection, the Court must take into account the situation and the record as a whole. The very fact that Debtor is an operating hospital in a deteriorating financial situation, with patients to care for and employees likely concerned about their futures, dictates the necessity for a deliberate and concentrated, if not accelerated, confirmation timetable and process encompassing few, if any, delays. It also involves consideration and postures of major creditors and the creditors' committee in this case. In light of those considerations, it would be entirely inappropriate to have confirmation (and possibly the future viability of Debtor's business) turn on or be threatened by a procedural or evidentiary issue relating to the admissibility of Dr. Shah's testimony, even if that ruling might have been technically in error (which the Court believes it was not). Given the entire record, including the testimony of Sant's other witnesses and other proffered evidence on feasibility in particular, the Court's ultimate conclusion to confirm the Sant plan would not have been different had Dr. Shah not himself personally testified. In that connection, though hardly decisive, the weigher of evidence in this and/or any other case cannot ignore a party's evident interest or motivation in the positions they take. As noted, a potential source of additional return to creditors, and a material source of contention throughout this proceeding, has been the contemplated prosecution of various alleged substantial claims by the Liquidating Trustee against these objectors and a number of others. It is quite apparent that the Sant plan, from its inception, provided that those

11

claims can and will be pursued with vigor, to the extent meritorious, whereas under the SHG plan (at least as initially proposed prior to the confirmation hearing), such is was clearly unlikely to be the case. It was therefore natural for those potential defendants, or some of them, to forcefully oppose the Sant plan, if for no other interest, out of self-interest.

Dr. Short and Dr. Singhal object to the conduct of the Official Committee of Unsecured Creditors alleging inadequate representation, allegedly conspiring with Sant to support only the Sant plan, and not giving competing plans a fair opportunity. SHG joins in this objection and U.S. Trustee does not. Contemporaneously, the Court is denying a motion by Dr. Short and Dr. Singhal to reconstitute the committee on this basis. It appears that the principal motivation of the Committee in favoring the Sant plan was its conclusion that, on balance, that plan was more favorable to its constituency, and, that is likely the fact notwithstanding that members of that constituency might end up being the subjects of actions by the Liquidating Trustee. No disqualifying conflict exists in such circumstances and arguably there is no real conflict at all given the natural inclination, to say nothing of the duty, of a creditors' committee in a competing plan situation, to favor a plan that most favors its constituency. That being said (and even if the arguments of Dr. Short and Dr. Singhal had some merit) while a committee's view is quite important, it is but one facet of the final determination.

Lastly, Dr. Short and Dr. Singhal object to the Sant plan's feasibility, arguing that the Sant Plan relies too heavily on Dr. Shah for financing, management, and business generation, and would subject the Debtor to unacceptable risks adversely affecting and precluding a finding of feasibility. Particularly, they note that when Dr. Shah left the class of physicians promoting the SHG plan in order to join forces with Sant, Sant then altered its financial projections by

12

significantly reducing projected revenues and increasing projected expenses. SHG joins these feasibility objections and had also originally argued that Sant's proposed 100% ownership of the reorganized Debtor and lack of physician ownership will prevent recruitment of physicians and patients. Sant contends that its plan is feasible, and that those noted objections have mostly been mooted by the fact that Dr. Shah is now a proposed investor and equity holder under the proposed Sant plan. On cross examination, Dr. Shah and Sant's other proffered witnesses were also challenged as to the accuracy and reliability of Sant's financial projections.

Overall, the Court finds that Sant by its plan has met the requisite burden of proving feasibility by a preponderance of the evidence, including testimony coming from witnesses other than Dr. Shah, though the Court indicates it found him to be a quite credible witness. Sant did so by demonstrating a sufficiently clear sense of business direction, new and effective and professional management, probable financial sustainability, maximized creditor recovery, substantial creditor preference, and preservation of the Debtor's operations.

It appears that the future success of a hospital debtor such as this may very well depend in no small part on its ability to receive referred patients. Historically, this Debtor apparently could not succeed even with its multiple doctor owners referring patients to it. Perhaps those were the wrong owners, or perhaps that business model was not the right one for a multitude of reasons. The Sant plan, with its indicated involvement of Dr. Shah, contemplates a different business model. By doing so it certainly cannot be concluded it is not feasible. Indeed, arguably such holds out the likely promise of enhancing the feasibility of the Sant plan and the likelihood of its success, particularly when combined with the actually demonstrated to date and the contemplated continued involvement of Sant itself. Thus, what the objectors point to as an

13

argument against confirming the Sant plan can be seen as an argument for confirming it, certainly more so than the SHG plan. Also asked were apropos questions as to whether consummation of Sant's plan would require obtaining further Certificates of Need. To be sure, final effectuation and realization of financing, obtaining the necessary governmental and other approvals, and the happening of other occurrences necessary for or important to the plan's ultimate success are subject to fulfillment of various requirements, terms, and conditions, to say nothing of the vagaries and pitfalls of the economy and the market in which the Debtor operates. That is almost always the case, and the very existence of such at this stage does not preclude confirmation or a finding of commercial viability and/or a reasonable probability of a plan's success.

## F. The SHG Plan

On or around November 21, 2015, SHG's Second Amended Combined Plan and Disclosure Statement (Dkt. 266) was circulated to creditors. As part of its post-confirmation brief (Dkt. 422) filed on January 5, 2016, SHG filed a declaration of its counsel that he had in his possession signed financial commitments and proof of funds of nearly $6 million. These financial commitments differed substantially in amount and source from those contained in the circulated plan, but were not part of the record and were not circulated to creditors. At closing arguments, held on January 12, 2016, that counsel orally altered the plan's equity and funding structures, as will be later discussed in greater detail.

Briefly stated, the SHG plan, as thus amended, among other things, provides the following: (a) to market the Debtor's services to local physicians, thereby bringing both physicians and their

14

patients to the Debtor; and (b) an expansion of its services and of establishment of various specialty or sub-specialty clinics in the surrounding community. SHG argues that its plan is in the best public and community interests. SHG's plan funding was originally proposed includes, among other things, having a Dr. Shakib Halabu contribute $500,000 in exchange for a 5% Class B voting equity stake of his own, plus to also loan $500,000 to each of Dr. Greg Naman and Dr. Ted Naman, to enable each of them to acquire a 5% Class B voting equity stake. As to management, SHG proposes a new three member Board of Directors, consisting of Dr. Shakib Halabu, Dr. Greg Naman, and Dr. Ted Naman. As to claims by Crittenton, SHG proposes to pay the claim over ten years, provided that as a condition precedent to the effective date that SHG and Crittenton agree on the form and substance of a graduate medical education affiliation agreement. SHG also proposes to reinstate (i.e. assume) obligations to the Centers for Medicare & Medicaid Services relative to overpayments, provided that as a condition precedent to the effective date that there be a mutual agreement reached with respect thereto, the same being true with respect to the Michigan Department of Health and Human Services for Medicaid overpayments and unpaid QAAP Taxes. SHG originally proposed retaining but not pursuing the noted various causes of action (which, in large part, would be against members of SHG) for the benefit of general unsecured creditors. As noted, SHG's rationale for not pursuing those causes of action is that pursuing them would cause "ill will" within the medical community, producing a net negative for the success of their plan. SHG later adopted a substantially identical $1,600,000 minimum recovery provision from the Sant plan and, at closing arguments, its counsel indicated that SHG would adopt as part of its plan Sant's Liquidating Trust provision and with the appointed Chapter 11 Trustee as its trustee.

15

Like Sant, SHG eventually settled a number of objections to its plan, many of which were of a somewhat narrow scope. Various settlements are evidenced in SHG's Statement Regarding Objections (Dkt. 408) and Proposed Confirmation Order (Dkt. 435). The remaining objections follow.

### G.  Objections to the SHG Plan Relating to the Stark Law

Sant argues that SHG's proposed funding arrangement violates the Stark Law, C.F.R. § 411.362(b)(4)(ii) and (iii), because (a) such loans relative to the acquisition of the Class B equity interests are impermissible and (b) the proposed issuance of Class A non-voting equity interests for no consideration is similarly prohibited, thus rendering SHG's plan patently illegal and therefore unconfirmable. For those reasons alone, SHG later attempted to meet those arguments in part by amending its plan and now proposing (by way of the noted filed declaration of counsel and his statement at the later closing arguments) that Dr. Greg Naman and Dr. Ted Naman invest $100,000 from their personal funds. The disputed Class A equity interests will be stricken from SHG's plan. Various other aspects of funding have changed since the Second Amended Plan was filed, including the loss of some investors.

### H.  Other Objections to the SHG Plan

Sant also objected on the basis that SHG's plan is not filed in good faith, with particular respect to the treatment of the potential causes of action. Sant argues that, even though SHG proposed to "retain" such causes of action (particularly those against SHG's insiders) in the event the Reorganized Debtor ends up in a Chapter 7 or another Chapter 11 bankruptcy, by that time, the applicable statutes of limitations may have run on those actions, thereby leaving them

16

worthless. The U.S. Trustee also objected, contending that SHG's plan secures an advantage for its insiders at the expense of creditors, notwithstanding SHG's plan's guarantees that match Sant's payout to those unsecured creditors. (The U.S. Trustee also continues to object to the specificity of SHG's disclosure of the identification of the causes of action, arguing that present identification may be insufficient to preserve the causes of action under governing law.) Maximizing returns to creditors is crucial to confirmability of Chapter 11 plans. In this case, while there has evolved a minimum guarantee that is virtually the same under both plans, there is credible potential for returns to creditors in excess of the guarantee in the form of the referred to causes of action to be pursued by the Liquidating Trust. Incapability of ascertaining the exact potential of such to determine whether or not it will result in additional distributions to creditors prior to confirmation should not stand in the way of confirmation. Preservation of the ability to pursue such, coupled with the unfettered obligation to do so, is what is important. Only after confirmation hearings did SHG come to the point of adopting the Sant plan proposal relating to the essentially unfettered pursuit by the Liquidating Trustee of those causes of action. At the very least, the real possibility that those principals might become involved in such actions and have to spend time defending them when that time might be better used in carrying out their responsibilities relating to the operations of the Debtor can be seen as adversely affecting the ongoing feasibility of the plan.

As to the feasibility of SHG's plan, the main objections are with respect to its funding. Sant argues that Dr. Greg Naman, who was SHG's only witness in support of its plan, testified that only $3.75 million of the $10 million in promised funding is actually committed, with the remainder being non-binding expressions of interest or letters of intent. Sant argues that (a) such

17

is too speculative and SHG has not even identified the contingencies that might cause the funding commitments to become firm; (b) that SHG's referred-to restructuring of the proposed funding structure after the confirmation hearings concluded (which was done to avoid possible Stark Law violations) would leave the reorganized Debtor undercapitalized by approximately $800,000, and that such modifications render the SHG plan unfeasible; and (c) that even if and when SHG invests roughly $3.75 million on or around the effective date of its plan, almost all of that money will have to be used to pay various immediate obligations, including repayment to Sant for its DIP lending, with the result that, the reorganized Debtor would be immediately then left with either a negligible surplus or a deficit. It is the Court's conclusion that (a) even if the latest version of SHG's plan is effectuated, it runs a significant risk of leaving Debtor undercapitalized on day one of the plan; (b) there is also a significant risk that SHG's plan will not be funded as envisioned, because it places its hopes on obtaining capital from uncommitted (and, in part, unidentified) investors who may or may not have the ability or funds to make the plan workable, and its proofs in that regard are materially less credible than the investor funding provided for in the Sant plan, as somewhat evidenced by SHG's attempts to alter its funding proposal and other provisions after the confirmation hearing; and (c) SHG thus has not met its burden of proving by a preponderance that its plan is feasible, and thus its confirmation must be denied for that reason.

## I.  "The Moving Target" Issue

As both Sant's and SHG's plans have evolved since their respective Second Amended plans were circulated to creditors. This has been referred to by various parties as a "moving target"

18

issue, and is the result of many factors, including the pace of this case, dictated in no small part by the needs of the case and the Debtor and the substantial agreement of the parties, the financial condition of the Debtor, the inherent complexity and multiplicity of the interests involved, and the existence of competing plans, to say nothing of the nature of the Chapter 11 process itself.

The "moving target" issue has not been without controversy. Dr. Short, Dr. Singhal, and Global Health Organization Consulting, Inc. argue that it is improper that Sant filed a Third Amended Plan, and that Sant should be required to formally re-circulate its most recent plan to creditors for re-voting. The same, of course, would be true of the SHG plan, which has evolved more radically, as noted, and in material respects after the confirmation hearing. Sant's position is that § 1127(d) provides that any holders of claims or interests that previously accepted the plan should also be deemed to accept the modified plan and that non-materially adverse changes to a plan are routinely allowed without a re-solicitation of votes, citing *In re Calpine Corp.*, No. 05-60200 BRL, 2007 WL 4565223, at *6 (Bankr. S.D.N.Y. Dec. 19, 2007) (permitting what were deemed non-material modifications that included a settlement of objections, changes to the plan, and a resolution of a valuation dispute) and *In re Dow Corning Corp.*, 237 B.R. 374, 379 (Bankr. E.D. Mich. 1999) (creditors who previously accepted a less favorable original plan are deemed to have accepted a more favorable modified plan). Plan modification is generally governed by Fed.R.Bankr.P. 3019(a), which states:

> In a chapter 9 or chapter 11 case, after a plan has been accepted and before its confirmation, the proponent may file a modification of the plan. If the court finds after hearing on notice to the trustee, any committee appointed under the Code, and any other entity designated by the court that the proposed modification does not adversely change the treatment of the claim of any creditor or the interest of any equity security holder who has not accepted in writing the modification, it

19

shall be deemed accepted by all creditors and equity security holders who have previously accepted the plan.

Thus, SHG's plan modifications after the confirmation hearings arguably should not even be considered, but even if they were to be, they appear to be less favorable to the various plan constituencies. Viewed from the status of the close of the confirmation hearing, as it should be, the SHG plan must be seen as either (a) unconfirmable; and (b) clearly inferior to the Sant plan. Viewed from its modified status as of the close of the closing arguments following the confirmation hearing, however, the SHG plan, while possibly more confirmable, remains inferior to the Sant plan, and that alone dictates the confirmation of the latter.

With respect to the Sant plan, its provisions did change between its Second Amended and Third Amended plans and included (a) narrowing the scope of exculpated parties and released parties, in response to various objections, including by the U.S. Trustee; (b) an increase in the credit facility from $3 million to $8 million; (c) incorporation of settlements of the various narrower confirmation objections, such as those of the Oakland County Treasurer; (d) an elimination of the Oversight Committee's purview over the Liquidation Trust and an addition of oversight by the U.S. Trustee; (e) an accelerated payment schedule of the reorganized Debtor's funding of $1.6 million to be paid into the Liquidation Trust; and (f) increased dividends to be paid to Crittenton on its secured claims. The Sant plan was also modified to include Dr. Shah and Dr. Jolly as co-sponsors (as stated in "plan co-sponsor agreements" filed as pleadings, on December 11, 2015 and January 7, 2016, respectively). Generally, such modifications are not materially adverse to creditors, in fact they appear to be quite the opposite. Specifically as to the Crittenton claim, it is in a separate impaired class and voted to accept the Sant plan, and after the

20

indicated modifications, it reiterated its support for that plan as modified. In general, it is the Court's opinion that, while the Sant plan did evolve and was modified after it was circulated to creditors, those modifications were for the better and in effect rendered that plan more feasible and provided better treatment to the various creditors. Sant timely set such forth, and by virtue of their indicated nature, under applicable law, should not be required to recirculate its modified plan to creditors for re-voting.

Finally, even if this were a situation where both plans met the requirements for confirmations, the result would not be different. Section 1129(c) provides that "the court may confirm only one plan" and "shall consider the preferences of creditors and equity security holders in determining which plan to confirm." Here, Sant's plan is superior to SHG's plan for a number of reasons, because it (a) has the support of a greater number of creditors; (b) has the support of a greater dollar amount of creditor claims; (c) has the support of Crittenton, a creditor that will continue to have long-term business relationship with the Reorganized Debtor; (d) has the support of the Official Committee of Unsecured Creditors; (e) as of the confirmation hearing was a better plan in terms of ultimate creditor recovery; and (f) importantly because of feasibility, for all the reasons discussed.

In sum, the following are the conclusions of the Court:

1. The Court has dealt with and overruled all of the remaining objections to the Sant plan.

2. The Court thus concludes the Sant plan is both (a) confirmable; and (b) as between the Sant plan and the SHG plan, the former is the more preferable of the two, even if one assumes the SHG plan is itself confirmable (which it is not, primarily on feasibility grounds). Therefore, the Sant plan  is the one that should be confirmed in any event.

21

J.   Conclusion

Therefore, for the foregoing reasons, Sant should prepare and present for entry under the

Local Rules a confirmation order effectuating this opinion. In connection therewith, the Court

suggests, in light of the complexity of the matter and the way in which it has proceeded, that

such order have attached to it the entire final confirmed plan (as opposed to a confirmation order

that adopts by reference a prior version of an amended plan) and specifies the amendments that

have since been made to it.

`Signed on February 02, 2016`

```
                                     /s/ Walter Shapero
                                Walter Shapero
                                United States Bankruptcy Judge
```